Daniel Low (Bar #218387)
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

*Attorney for Plaintiff and Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Deborah Howington | Case No. 5:24-cv-5684 |
| Plaintiff, | **COMPLAINT** |
| v. | FOR EMPLOYMENT DISCRIMINATION |
| Taiwan Semiconductor Manufacturing Co., TSMC North America Co. Ltd., TSMC Technology, Inc., TSMC Arizona Corporation and TSMC Washington, LLC, | CLASS ACTION |
| | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Deborah Howington brings this action on behalf of herself and two classes of similarly situated individuals to remedy pervasive, ongoing race and citizenship discrimination by Taiwan Semiconductor Manufacturing Co., TSMC North America Co. Ltd. ("TSMC North America"), TSMC Technology, Inc. ("TSMC Technology"), TSMC Arizona Corporation ("TSMC Arizona"), and TSMC Washington, LLC ("TSMC Washington") (collectively, "TSMC") and alleges as follows:

36

1

2

## NATURE OF THE ACTION

3

1.   TSMC is the world's leading manufacturer of semiconductors, the chips that

4

5

power everything from smartphones to cars to satellites to weapons systems. TSMC

6

manufactures over 90% of the world's leading-edge logic chips, supplying well-known

7

customers such as Google, Nvidia, and Apple with the chips used in their technology.

8

TSMC is headquartered in Taiwan, but has subsidiaries in the United States, Canada,

9

Japan, China, South Korea, and Europe. TSMC employs over 76,000 employees

10

11

worldwide, including 2,668 workers in North America as of December 31, 2023,[1] the

12

vast majority of whom are Asian. As discussed below, this grossly disproportionate

13

workforce is the result of TSMC's intentional pattern and practice of employment

14

discrimination against individuals who are not Asian and not Taiwanese citizens,

15

16

including discrimination in hiring, staffing, and termination decisions.

17

2.   TSMC's employment practices violate the Civil Rights Act of 1866, as

18

19

amended, 42 U.S.C. § 1981 ("§ 1981"). Plaintiff seeks, on her own behalf, and on

20

behalf of two classes of similarly situated individuals, declaratory, injunctive, and other

21

equitable relief, compensatory and punitive damages, including pre- and post-

22

23

judgment interest, attorneys' fees, and costs to redress TSMC's pervasive pattern and

24

practice of discrimination.

25

26

27

28

[1] Form 20-F at 49 (Dec. 31, 2023), https://investor.tsmc.com/sites/ir/sec-filings/2023%2020F.pdf.

COMPLAINT

**PARTIES**

3.   Plaintiff Deborah Howington was born in the United States, is of American national origin and ancestry, and is Caucasian. She currently resides in California.

4.   Taiwan Semiconductor Manufacturing Co., Ltd. is a Taiwanese company, and is located at No. 8, Li Hsin Road VI, Hsinchu Science Park, Hsinchu 300-78, Taiwan, R.O.C. It is the parent corporation of Defendants TSMC North America, TSMC Technology, TSMC Arizona, and TSMC Washington.

5.   TSMC North America is a California corporation with its principal place of business at 2851 Junction Avenue, San Jose, California 95134. TSMC North America provides primarily sales, technical support, business operations, and customer service support in North America for its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

6.   TSMC Technology is a Delaware corporation, with its principal place of business at 2851 Junction Avenue, San Jose, California 95134. TSMC Technology provides primarily technology support at customer sites and research and development support in North America for its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

7.   TSMC Arizona is an Arizona corporation, with its principal place of business at 5088 W. Innovation Circle, Phoenix, AZ 85083. TSMC Arizona provides semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

COMPLAINT

8.  TSMC Washington is a Delaware corporation. Its principal place of business is at 5509 N.W. Parker Street, Camas, Washington 98607. TSMC Washington provides semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

## JURISDICTION

9.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1981(a).

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

12. This Court has personal jurisdiction over TSMC because each Defendant engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State. Further, Defendant TSMC North America and TSMC Technology Inc., subsidiaries of Taiwan Semiconductor Manufacturing Co., Ltd., maintain their headquarters in San Jose, California.

## VENUE

13. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §

1391 because TSMC resides in this District, conducts business in this District, engaged in discriminatory conduct in this District, and maintains and administers in this District employment records relevant to TSMC's pattern and practice of discrimination. Additionally, TSMC engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including TSMC North America and TSMC Technology Inc.'s operation of offices in San Jose, California (their U.S. headquarters).

## DIVISIONAL ASSIGNMENT

14. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) and (e) because a substantial part of the events giving rise to this matter's claims occurred in this Division given that Plaintiff is employed by TSMC North America, in San Jose, California.

## STATEMENT OF FACTS

*Overview of TSMC's Business Model*

15. TSMC is a manufacturer and supplier of semiconductors (or microchips), a key component of a vast array of electronic devices. Unlike other major microchip manufacturers, TSMC does not produce its own products—rather, it works with customers like Google and Apple to design and manufacture microchips for use in their products. This business has been enormously profitable for TSMC, generating a net revenue of over $66 billion in 2023. While TSMC is a Taiwanese company and its operations are centered in Taiwan, the majority (68%) of TSMC's customers are

COMPLAINT

headquartered in North America.[2] As such, TSMC has also established a strong presence in the United States, including the operation of its subsidiaries, TSMC North America and TSMC Technology Inc., both of which are headquartered in San Jose, California, proximate to many of TSMC's key Silicon Valley-based customers. Those two entities employ approximately 600 individuals in the United States—mostly in San Jose, CA, but also in Austin, TX, San Diego, CA, Boston, MA, and Washington, D.C.—and focus primarily on research and development ("R&D") and sales, which entail working closely with customers to create and innovate chips to be manufactured at TSMC's facilities. TSMC North America is also the employment entity for TSMC's Human Resource ("HR") function that supports both TSMC North America and TSMC Technology Inc in the U.S. and Canada.

16. TSMC also maintains a semiconductor manufacturing facility (or "fab") in Washington State (under the TSMC Washington employment entity) and has plans to build three fabs in Phoenix, AZ (under the TSMC Arizona employment entity). Construction on the first Arizona fab began in 2021 and commercial production is targeted in 2025. In December 2022, TSMC announced plans for the second fab, which is currently under construction. And TSMC just recently announced plans for its third fab in Phoenix, Arizona in April 2024.[3] TSMC's plans for the latter two fabs were announced after the Biden administration passed the CHIPS and Science Act (the

---

[2] Form 20-F at 15 (Dec. 31, 2023), https://investor.tsmc.com/sites/ir/sec-filings/2023%2020F.pdf.
[3] *Id.* at 22.

COMPLAINT

"CHIPS Act"), which designated $53 billion to boost semiconductor manufacturing in the U.S. Those applying for CHIPS Act funding committed to "guarantee[ing] all workers access to a safe environment that is free of harassment, discrimination, and retaliation,"[4] and were required to submit a plan "demonstrat[ing] appropriate investments and commitments to recruit, train, hire, retain, and upskill a skilled and diverse workforce."[5]

17. TSMC submitted a diversity plan in applying for CHIPS Act funding and, in return, was awarded $6.6 billion in direct funding under the Act to support TSMC's Arizona facilities.[6] TSMC's investment in Phoenix will create about 6,000 direct manufacturing jobs and more than 20,000 construction jobs.[7] As of December 31, 2023, TSMC employed 2,668 employees in North America, the vast majority of whom work in the U.S., with plans to drastically increase that number in the coming years as it completes construction on its Arizona fabs.

*TSMC's Discriminatory Scheme*

18. TSMC has willfully disregarded diversity commitments it made in its CHIPS

---

[4] CHIPS for America Fact Sheet, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Feb. 28, 2023), https://shorturl.at/30u0N

[5] Workforce Development Planning Guide, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Mar. 27, 2023), https://shorturl.at/nHfxo

[6] TSMC Arizona and U.S. Department of Commerce Announce up to US$6.6 Billion in Proposed CHIPS Act Direct Funding, the Company Plans Third Leading-Edge Fab in Phoenix, TSMC (Apr. 8, 2024), https://shorturl.at/INvtI.

[7] TSMC Will Receive $6.6 Billion to Bolster U.S. Chip Manufacturing, NEW YORK TIMES (Apr. 8, 2024), https://shorturl.at/dDJsR.

COMPLAINT

Act application for which it received $6.6 billion in government funding.  And while TSMC claims that it "believes strongly in the value of a diverse workforce,"[8] its leaders have made clear that the company has a cultural preference for Taiwanese employees. As Morris Chang (TSMC's former CEO who remains the company's public face) stated in a 2021 talk, "[c]omputers of different brands can often be hooked together, but not people of different culture." He also stated that, "[t]he fact that TSMC's top-flight executives can deliver top results in Taiwan is no guarantee of similar performance when they are posted overseas." Despite these reservations, TSMC was motivated to grow its U.S. presence due to its proximity to TSMC's customers and the U.S. government's willingness to provide billions in funding to TSMC. However, in growing its U.S. workforce, TSMC prefers to employ people of Asian race and Taiwanese national origin, including by bringing workers over from Taiwan on visas rather than hiring locally. This preference is reflected in every aspect of TSMC's U.S.-based business—in sales, R&D, engineering/manufacturing, and even in HR and administrative support roles. For instance, in 2023, 80% of employees hired to TSMC North America and TSMC Technology Inc. (which primarily do R&D and sales) in the U.S. self-identified as Asian. Similarly, approximately half of the hires to TSMC Arizona Corporation that are slated to work at the Phoenix fabs have been deployed on

---

[8] Diversity and Inclusion at TSMC, TSMC (Sept. 16, 2019), https://shorturl.at/Y05ub.

COMPLAINT

visas from Taiwan.[9] TSMC effectuates this preference in at least three ways.

19. First, Asians are preferred in hiring. In many instances, the HR team from TSMC in Taiwan sends HR in the U.S. the resumes of Asian/Taiwanese candidates in the United States that typically already have the ability to work in the U.S., who they have already vetted and found suitable for hire. The U.S. HR team then simply hires these Asian/Taiwanese candidates without question, even if no open roles have been posted in the U.S. In the rare instances when TSMC posts the job roles that these candidates ultimately fill, the jobs are posted for only a very short period of time, and candidates who apply are typically not reviewed or interviewed. The job postings are then summarily closed and the preferred Asian/Taiwanese candidates, who were referred by TSMC in Taiwan, are hired. Recruiters in the U.S. have also been explicitly instructed by the Taiwan Headquarters ("Taiwan HQ") Global Recruitment Program Leaders that the goal for recruiting new graduates from U.S. universities is to hire primarily Asian candidates. As a result of these practices, Global Recruitment interview and hiring reports document a clear preference for Asian U.S. new graduate candidates and hires.

20. When U.S. roles are posted as available, TSMC adds to the job posting that "Mandarin / Chinese" is either required, preferred, or "a plus" in the job posting. There

---

[9] Viola Zhou, *TSMC's debacle in the American desert*, REST OF WORLD (Apr. 23, 2024), https://restofworld.org/2024/tsmc-arizona-expansion/

COMPLAINT

is no legitimate business reason why such a requirement would be necessary—TSMC conducts business in English and requires proficiency in English not only for U.S. employees, but also for employees at TSMC headquarters in Taiwan and other countries in which TSMC operates. As such, a TSMC employee in the U.S. need not speak Mandarin / Chinese even if communicating with colleagues abroad. Rather, the requirement is used to attract TSMC's preferred candidates (Asians and Taiwanese citizens) and to dissuade non-Asian candidates from applying to the roles. When non-Asian candidates do secure an interview, the hiring managers, most of whom are Asian, often make excuses to reject them to effectuate TSMC's cultural preference for Asian employees. The above practices allow TSMC to effectuate its preference for candidates that are Asian and / or Taiwanese citizens without explicitly stating it and belie TSMC's claims that it hires Asians and Taiwanese citizens due to a lack of U.S. talent in the semiconductor industry.

21. Moreover, TSMC's bias towards Asians and Taiwanese citizens extends not only to engineering positions, but also to HR and administrative roles and to lower-end technician jobs, such as jobs inspecting and maintaining equipment. With respect to lower-end technician jobs, TSMC reportedly requires minimal experience or qualifications from applicants in Taiwan for jobs in the U.S.[10] Conversely, TSMC has

---

[10] Mark Tyson, TSMC's Arizona Fab Hiring Woes Prompt Calls for Willing Taiwanese Migrants, TOM'S HARDWARE (Apr. 21, 2022), https://www.tomshardware.com/news/tsmc-arizona-taiwanese-workers.

COMPLAINT

required U.S. hires to train in Taiwan for six months to a year (or longer) for these positions, a requirement that was designed to further TSMC's goal of culling the pool of non-Asian prospective employees.

22. TSMC's bias in favor of Asians and Taiwanese citizens was even apparent when it was hiring construction workers to build its first Arizona fab (via TSMC affiliates United Integrated Services (UIS) and Marketech International Corp.). TSMC chairman Mark Liu complained of "an insufficient amount of skilled workers" to build the facility and planned to fly workers in from Taiwan.[11] TSMC agreed to focus on local hiring for those positions only after massive and public outcry from Arizona labor unions.[12]

23. Second, non-Asian employees and non-Taiwanese citizens are frequently denied opportunities to advance and succeed at TSMC. Non-Asians and non-Taiwanese citizens are frequently excluded from business discussions, as conversations are often conducted in Mandarin, and business documents are routinely written in Mandarin. A related practice was acknowledged in the Q3 2023 U.S. HR Quarterly All-Hands meeting by Jen Kung, Head of Compensation, who casually commented on the use of "Chenglish" when Asians wanted to limit information being shared with non-Asians and/or to try to confuse them. Even though the entire US HR

---

[11] Taiwan Semiconductor Manufacturing (TSM) Q2 2023 Earnings Call Transcript, THE MOTLEY FOOL (July 20, 2023), https://shorturl.at/lHDzl.

[12] *See* n. 9, *supra.*

COMPLAINT

team was present (including the Head of HR, Judy Chiu), and there was widespread agreement that "Chenglish" was commonly used in the organization, TSMC took no action to correct the practice.

24. In engineering positions, non-Asians and non-Taiwanese citizens are denied training opportunities that would allow them to thrive. For instance, in the 2021 time frame, TSMC required U.S. hires to its Arizona fab to train in Taiwan, where they were, according to reports, excluded from "higher-level meetings conducted in Mandarin" and "rarely had a chance to handle problems themselves, and were mostly tasked with observing."[13] Back at the fab in Arizona, it was reported that "managers trusted Taiwanese workers with important tasks, starving the Americans of hands-on experience."[14] For instance, a Process Integration Engineer in Arizona stated that "an employee may be hired as an engineer [by TSMC,] but only taught technician-level jobs unless they are Taiwanese." An employee at TSMC's Washington fab complained that upper management "tends to play favorites with Taiwanese workers," "favoring and assisting Taiwanese engineers." Americans training for engineering positions in Taiwan reported of a meeting at which "a manager said Americans were less desirable than Taiwanese and Indian workers, according to people who saw leaked notes, which [were] circulated among trainees."[15]

---

[13] *See id.*

[14] *See id.*

[15] *See id.*

COMPLAINT

25. Employees have also complained that TSMC seems to encourage animosity between Taiwanese and U.S. employees, and have spoken of memorandums from higher management having surfaced that contained disparaging remarks about U.S. employees, who "are constantly seen as sub par." Employees assert that TSMC has fostered a culture in which "Senior American leaders within the company are apprehensive about voicing concerns due to potential job repercussions from executives based in Taiwan."

26. Non-Asian employees and non-Taiwanese citizens are reviewed more harshly than their Asian colleagues (including those who are Taiwanese citizens), which inhibits their advancement in the company. Employees at TSMC are evaluated by their managers, and the available rankings are: Outstanding (O), High Satisfactory (S+), Satisfactory (S), and Needs Improvement (I). Asian employees and Taiwanese citizens are consistently ranked higher than non-Asian employees and non-Taiwanese citizens. At TSMC North America, a rating of S or below has significant implications, as rating is a factor in calculating an employee's Annual Bonus payout (with higher bonuses being paid to those with ratings of S+ and O), and employees who receive ratings of S or below are less likely to be promoted (and receive lower bonuses) and more likely to be forced to leave the company (or are eventually terminated). For example, in 2023 Taiwanese "assignees"—visa workers from Taiwan—were particularly favored in ratings and did not receive ratings of less than S in the 2023 review cycle, even if they performed poorly. In addition, they received their expected bonuses regardless of their

COMPLAINT

performance ratings, and, if they were identified to be failing, were simply transferred to another role or another TSMC location. It is understood that Asian employees (particularly Taiwanese assignees/citizens) receive a +1 factor for every aspect of being at TSMC to include job assignments, performance ratings, and bonus payouts.

27. Third, non-Asian employees and non-Taiwanese citizens are either terminated or effectively forced to resign  at much higher rates than their Asian counterparts (including those of Taiwanese citizenship), and are frequently replaced with Asian employees, including assignees from Taiwan. For example, since 2022, TSMC Arizona and TSMC North America removed the majority of non-Asian managers and leaders and replaced them with Asian employees, maintaining non-Asians and non-Taiwanese citizens in management roles primarily, for a select number of customer- or public-facing positions.  TSMC's anti-American culture, practice of denying training and advancement opportunities to non-Asian employees and non-Taiwanese citizens, and practice of reviewing non-Asians and non-Taiwanese citizens more harshly contribute to the higher termination rates for non-Asian employees. TSMC also creates a hostile work environment for non-Asians employees and non-Taiwanese citizens that causes them to resign at higher rates (these resignations constitute acts of constructive discharge by TSMC). For instance, a Process Integration Engineer in Arizona stated that "the company has recently begun to bully some employees into resigning due to poor performance without proper training" and that "[t]hose who quit are often replaced by Taiwanese locals."

*Ms. Howington's Experience*

28. Ms. Howington began her employment with TSMC on February 13, 2023 as Deputy Director, Talent Acquisition. Ms. Howington is employed by TSMC North America (in San Jose, California) and supported hiring at three TSMC entities: TSMC North America, TSMC Technology Inc., and TSMC Canada.

29.  At the time of her hire in February 2023, Ms. Howington reported to the Head of Human Resources ("HR"), Teressa Harnois, who is Caucasian, but within a few months, Ms. Harnois told Ms. Howington that she was "squeezed out of her role" and soon replaced by Judy Chiu, who is Asian. Following Ms. Harnois' replacement in September 2023, Ms. Howington was the only non-Asian U.S. member of the HR Leadership Team. And only 4 of 17 employees on the U.S. HR team were non-Asian during Ms. Howington's employment with TSMC.

30. Ms. Howington's role involved developing and executing hiring programs, strategies, and processes for the 3 entities that she supported in the U.S. and Canada. Ms. Howington initially excelled at her position under the management of Ms. Harnois, working collaboratively with others in U.S. and Global Talent Acquisition.  She was requested to spearhead and participate in U.S. and global projects, aimed at, among other things, improving TSMC's employer reputation among prospective global candidates and increasing diversity hiring. Within the first 6 months of her tenure, Ms. Howington's performance was so strong that Ms. Harnois added Ms. Howington to the succession plan for the role of Head of HR. But afterwards, Ms. Harnois noted that she

had received a "strong negative reaction and pushback" from members of the (almost entirely Asian) local HR team, and that Ms. Harnois had been forced to "go around" local HR to add Ms. Howington's name to the succession list that was provided to Taiwan HQ. Ms. Howington also created and led an initiative to improve the company's employer brand which became a $250,000+ 10-person global project, and was nominated by Taiwan HQ for the role of TSMC North America Functional Expert and Employer Brand lead for the U.S.  In addition, while not directly responsible for the TSMC Arizona Manufacturing site, she created and presented to members of Taiwan HQ HR and local Arizona Head of HR, a U.S. Military Veteran hiring initiative to help them meet the Chips Act diversity hiring goals. She received glowing feedback, including in her 90-day probation period review, in the form of verbal and written accolades from Ms. Howington's previous manager (whom Ms. Chiu replaced), and in written feedback from co-workers, peers, and managers that Ms. Howington proactively requested in order to ensure continuous improvement. She was praised as "strategically minded" with "[e]xcellent communication and presentation skills."

31. Ms. Howington learned from Anne Hu, Head of Executive Recruitment that it is common practice at TSMC for HR manager and other high-level HR jobs/assignments not to be posted for internal or external job interest, and that selection for HR assignments and advancements are frequently determined by the HQ HR leadership team - behind closed doors.

32. Over time, Ms. Howington became very concerned about practices she

COMPLAINT

witnessed at TSMC that appeared heavily skewed in favor of Asians and Taiwanese citizens. For instance, when Ms. Harnois was removed from her role, Ms. Howington was assigned by the Hiring Manager, TSMC North America President, David Keller, to schedule interviews for the three finalists identified for the Head of HR replacement role. All three finalists were Asian and had been referred to TSMC by an Asian headhunter who was engaged to confidentially recruit for this role. Ms. Howington also routinely witnessed and raised concerns that well-qualified, non-Asian candidates (including non-Taiwanese citizens) were being routinely overlooked and/or ignored by hiring managers without proper justification. Often, global presentations and documents were provided by Taiwan HQ written in Mandarin, despite proficiency in English being a requirement to work at TSMC. On one occasion, in December 2023, Judy Chiu held a meeting which included Ms. Howington, and Asian members of the Business and HR team of which a significant portion was conducted in Mandarin, including the provision of important HR-related information, despite Ms. Chiu knowing that Ms. Howington was the only person at the meeting who could not understand and participate. Afterwards, Ms. Howington told Ms. Chiu that she felt uncomfortable and excluded, but Ms. Chiu dismissed her concerns, stating that she was just trying to make the other participants in the meeting feel comfortable.

33. In February 2024, Ms. Howington received an email from an HR Manager in Taiwan HQ stating that making offers to Asian candidates for U.S. positions should be done by "someone familiar with Asian culture in order to handle offer

communication." That guidance was similar to what Ms. Howington had been told on multiple occasions by the Jen Kung, who told Ms. Howington that she (Ms. Kung) "should make offers to U.S. candidates who are Asian so they can understand better in Chinese."

34. In addition to complaining to Ms. Chiu about the use of Mandarin during meetings where Ms. Howington was in attendance, Ms. Howington raised concerns about TSMC's preference for hiring Asians (including Taiwanese citizens) and rejection of non-Asian candidates on multiple occasions to both of her managers, initially Ms. Harnois, and later to Ms. Chiu.  Additionally, in December 2023, Ms. Howington raised concerns to Ms. Chiu about the circumstances under which TSMC hired an Asian candidate in the U.S.—specifically that the candidate had been hired despite failing the technical interview and was given a higher rate of pay than nearly all others in the same job grade. (The details related to this candidate's hire were discussed at the meeting conducted in Mandarin described above (*see* ¶ 32, *supra*) such that Ms. Howington had been unable to participate in the discussion.) Ms. Chiu shut down Ms. Howington's complaints, reminding Ms. Howington that TSMC leaders valued "execution" to remain working at TSMC and when considering promotions, which Ms. Howington perceived as a threat of retaliation for voicing a complaint.

35. In January 2024, Ms. Howington submitted a formal whistleblower complaint on TSMC's internal employee website, voicing concerns that the Asian hire

potentially violated discrimination laws (as well as provisions of the TSMC Employee Handbook) and that Ms. Chiu had seemingly threatened retaliation in her handling of Ms. Howington's initial complaint. Two weeks later, Ms. Howington had a brief meeting regarding the whistleblower complaint with the Director of Legal, Steven Schulman, but he refused to provide any information about whether there would be an investigation. Ms. Howington received no further written or verbal follow-up thereafter from anyone at TSMC, in violation of TSMC's internal policies and procedures for investigating whistleblower complaints.

36. TSMC's internal policies also prohibit "retaliat[ion] against any employee in the terms and conditions of ongoing employment" for complaining about potential legal violations. But shortly after complaining about discrimination against non-Asians (including non-Taiwanese citizens) in hiring and treatment, and submitting her whistleblower complaint, Ms. Howington began to experience just that. Specifically, despite having received no complaints from TSMC regarding her performance or otherwise, in February 2024, Ms. Howington received a lower-than-expected Performance Review Rating of "S" (Satisfactory) by Ms. Chiu, for work Ms. Howington performed during 2023.  Ms. Chiu refused to provide any details in writing for this lesser performance rating,  and when Ms. Howington requested examples and specific details substantiating the rating, Ms. Chiu not only refused to provide them but responded by telling Ms. Howington  that she  would now either be  placed on a Performance Improvement Plan ("PIP") or face other HR Intervention due to her (poor)

performance (even though the performance rating, while unjustly low, was still an "S" (Satisfactory), not an "I" rating which indicates "needs improvement").    Ms. Howington was shocked by this reaction from Ms. Chiu, as none of Ms. Chiu's prior communications had included any of her purported concerns about Ms. Howington's performance (verbally or in writing), and Ms. Chiu's new critiques of Ms. Howington's performance were mostly vague and generalized. Following this performance review discussion, Ms. Howington realized that at least 50%—2 of the 4—non-Asian members on the HR Leadership team in the U.S. received 'S' (Satisfactory) ratings in February 2024 for their performance in 2023.

37. After Ms. Chiu shared this unjustifiably low Performance Review Rating with Ms. Howington, Ms. Chiu began badmouthing Ms. Howington's performance to colleagues and peers publicly, insinuating that Ms. Howington appeared "confused," and making other disparaging comments during leadership meetings regarding Ms. Howington's capabilities when Ms. Howington asked for clarification or additional information. By comparison, when Asian HR team members asked for clarification or additional information during leadership meetings, Ms. Chiu answered them without hesitation or comment.

38. Shortly thereafter, Ms. Chiu and other team members began withholding resources and support from Ms. Howington. For instance, Ms. Chiu refused Ms. Howington's request to add temporary staff after Ms. Howington lost 50% of her team in January 2024 and experienced a significant and extended increase in workload,

while making baseless accusations that Ms. Howington was lying to Ms. Chiu about the need for support.

39. Ms. Howington complained about Ms. Chiu's treatment to Ms. Chiu's direct manager, TSMC North America President David Keller, and her dotted line manager, Lora Ho, the Global Head of HR in Taiwan HQ, but both individuals dismissed Ms. Howington's concerns and directed her back to Ms. Chiu. Ms. Howington later learned that it is common at TSMC to withhold resources and support from employees that the company wants to get rid of, with the goal of creating a workplace environment so severely burdened that the incumbent will decide to leave. Ms. Howington was made aware of multiple instances of this occurrence at TSMC North America and TSMC Arizona.

40. Ms. Chiu was similarly critical with other non-Asian HR employees, but was never critical about the Asian HR team members. For instance, Ms. Chiu told the HR Leadership Team ("HRLT") in a leadership meeting that the HR Program Manager, Kathryn Agarpao, who is not Asian, was "making mistakes, was not doing a good job, [and] needed help." Ms. Chiu said the same of a non-Asian recruiter Nick Barroga-Trumbo, who directly reported to Ms. Howington. Specifically, Ms. Chiu told Ms. Howington that in preparing Mr. Barroga-Trumbo's performance rating, Ms. Howington should weigh feedback from the HRLT that he was "making mistakes, not doing a good job, [and] needed help," but Ms. Chiu also refused to provide examples of the alleged mistakes complained of by the HRLT. These examples are characteristic

36

of the environment at TSMC, in which non-Asian employees and non-Taiwanese citizens are subjected to a stricter level of scrutiny than similarly situated Asian employees (including Taiwanese citizens).

41. In April 2024, Ms. Howington became so distressed by the openly hostile and discriminatory work environment at TSMC that her health began to suffer, and she requested FMLA leave. Upon her return from FMLA leave to the company in May 2024, she was told by Ms. Chiu that her responsibilities would be significantly curtailed and her role had seemingly been minimized. Ms. Chiu informed Ms. Howington that Ms. Howington's direct reports would no longer be reporting to her and repeatedly referred to Ms. Howington's role as the "TA Lead"—which would be a demotion from the title of Deputy Director—but refused to answer when Ms. Howington asked whether her role had changed. Ms. Chiu also provided a number of directives to Ms. Howington, such as a requirement that Ms. Howington copy Ms. Chiu on all communications she had with members of her team and provide Ms. Chiu written summaries of what Ms. Howington discussed during team meetings. Ms. Chiu read these directives from her computer screen, indicating that she was maintaining, in writing, a list of new expectations for Ms. Howington, but refused to provide Ms. Howington with the written list when Ms. Howington requested it.   During this discussion, Ms. Howington repeatedly asked if she was being put on a Performance Improvement Plan, but Ms. Chiu consistently ignored her questions and simply stated that, as the Head of HR, she was making the decision to implement these new

directives. Following this meeting, Ms. Howington did not feel capable of continuing to work in such a hostile environment and informed TSMC on June 5, 2024 that she had retained counsel and would no longer be coming into the office. Ms. Howington remains on leave to-date.

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TSMC's systematic pattern and practice of discrimination against non-Asian individuals in the United States and non-Taiwanese citizens in the United States. This action is brought on behalf of the following classes:

> All individuals who are not of Asian race who applied for positions with TSMC in the United States and were not hired, who were employed by TSMC in the United States and were not promoted, and/or who were employed by TSMC in the United States and were terminated between August 21, 2020 and the date of class certification.

> All individuals who are not Taiwanese citizens who applied for positions with TSMC in the United States and were not hired, who were employed by TSMC in the United States and were not promoted, and/or who were employed by TSMC in the United States and were terminated between August 21, 2020 and the date of class certification.

43. Members of the classes are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiff, it is believed to number in the thousands.

Furthermore, class members are readily identifiable from information and records in TSMC possession.

44. There are numerous questions of law and fact common to members of the classes. Among the common questions of law or fact are: (a) whether TSMC has intentionally discriminated against individuals who are not of Asian race and/or not Taiwanese citizens in making hiring, staffing, appraisal, and termination decisions; (b) whether TSMC has intentionally favored Asians and/or Taiwanese citizens in hiring, staffing, appraisal, and retention decisions and/or whether TSMC has intentionally disfavored non-Asians and/or non-Taiwanese citizens in hiring, staffing, appraisal, and termination decisions; (c) whether TSMC's policy and practice of relying on Asian local hires and Taiwan citizens is intentionally discriminatory; (d) whether TSMC has violated § 1981; (e) whether equitable and injunctive relief is warranted for the classes and (f) whether compensatory and/or punitive damages are warranted for the classes.

45. Plaintiff's claims are typical of the classes. Members of the classes were damaged by the same discriminatory policies and practices employed by TSMC in favor of Asians and Taiwanese citizens.

46. Plaintiff will fairly and adequately protect the interest of other class members because she has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent her and the classes.

COMPLAINT

47. Plaintiff and the classes she seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of TSMC's actions.

48. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TSMC has acted and/or refused to act on grounds generally applicable to the classes, making declaratory and injunctive relief appropriate with respect to Plaintiff and the classes as a whole. Members of the classes are entitled to declaratory and injunctive relief to end TSMC's systematic, common, uniform, unfair, and discriminatory policies and practices.

49. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether TSMC has discriminated on the basis of race and citizenship in its employment practices. This question is central to the case and predominates over individual issues among the members of the proposed class. TSMC has engaged in a common course of discriminatory conduct in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiff

36

knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

50. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TSMC's discrimination. Certification under this rule is also appropriate to decide whether TSMC has adopted a systemic pattern and practice of racial discrimination in hiring, staffing, appraisal, promotion, and termination decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## **COUNT I**
**(Disparate Treatment on the Basis of Race)**
**(Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of all Plaintiff and the Class)**

51. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

52. This claim is brought by Plaintiff on behalf of herself and the class.

53. Throughout the class liability period, TSMC has engaged in a pattern and practice of discriminating against individuals who are not of Asian race by: (a) knowingly and intentionally favoring individuals of Asian race in employment decisions (i.e., hiring/staffing, appraisal, and termination decisions) (b) knowingly and intentionally disfavoring individuals who are not of Asian race (including Plaintiff) in employment decisions (i.e., hiring/staffing, appraisal, and termination decisions), and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 90% or

36

1

more Asian employees.

2

3

54. As a direct and proximate result of TSMC's intentional discrimination, Plaintiff

4

and class members have been denied employment and continued employment with

5

TSMC.

6

7

55. TSMC's actions constitute unlawful discrimination on the basis of race in

8

violation of 42 U.S.C. § 1981.

9

**COUNT II**
**(Disparate Treatment on the Basis of Citizenship)**
**(Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of all Plaintiff and the Class)**

10

11

12

56. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

13

57. This claim is brought by Plaintiff on behalf of herself and the class.

14

58. Throughout the class liability period, TSMC has engaged in a pattern and

15

16

practice of discriminating against individuals who are not Taiwanese citizens by: (a)

17

knowingly and intentionally favoring Taiwanese citizens in employment decisions

18

(i.e., hiring/staffing, appraisal, and termination decisions) and (b) knowingly and

19

20

intentionally disfavoring individuals who are not Taiwanese citizens (including

21

Plaintiff) in employment decisions (i.e., hiring/staffing, appraisal, and termination

22

23

decisions).

24

59. As a direct and proximate result of TSMC's intentional discrimination, Plaintiff

25

and class members have been denied employment and continued employment with

26

27

TSMC.

28

60. TSMC's actions constitute unlawful discrimination on the basis of citizenship

in violation of 42 U.S.C. § 1981.

## COUNT III
### (Retaliation in Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)
### (On behalf of Plaintiff)

61. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

62. This claim is brought by Plaintiff on behalf of herself.

63. Ms. Howington engaged in a protected activity under Section 1981 by reporting to TSMC concerns about the corporation's discriminatory practices, including its preference for Asians and Taiwanese citizens in hiring and other employment decision.

64. Ms. Howington suffered harm as a result of engaging in this protected activity. She was given a negative performance review, threatened to be placed on a PIP, subjected to a hostile work environment, and had her responsibilities curtailed, requiring her to take a leave of absence.

65. A causal link exists between the harm Ms. Howington suffered and the protected activity. TSMC retaliated against Ms. Howington because she engaged in protected activity under Section 1981. Ms. Howington was given a negative performance review, threatened to be placed on a PIP, and subjected to hostile treatment shortly after complaining about TSMC's discriminatory employment practices, including the company's discriminatory preference for Asian and Taiwanese citizens and its practice of conducting meetings in Mandarin. But for TSMC's retaliation, Ms. Howington would not have been treated in such a hostile manner and subjected to changes in the terms and conditions of her employment.

66. TSMC's actions constitute unlawful retaliation in violation of 42 U.S.C. § 1981.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the class pray for relief as follows:

a.  Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiff as representative of the classes;

c.  Designation of Plaintiff's counsel as counsel for the classes;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e.  A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f.  Order Defendant to adopt a valid, non-discriminatory method for hiring, staffing, performance appraisals, termination, and other employment decisions;

g.  Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race and citizenship;

h.  Award Plaintiff and the Class compensatory damages for the harm they suffered as a result of Defendant's violations § 1981;

i.  Award Plaintiff and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of § 1981;

j.  Award Plaintiff and the Classes front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

k.  Award Plaintiff and the Class exemplary and punitive damages;

l.  Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m. Award Plaintiff and the Classes such other relief as this Court deems just and appropriate.

COMPLAINT

# JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff and the Classes respectfully demand a trial by jury on all issues properly triable by a jury in this action.


DATED:  August 22, 2024                    Respectfully submitted,

By: /s/Daniel Low
Daniel Low, SBN 218387
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com;

*Attorney for Plaintiff and the Classes*

COMPLAINT