# EXHIBIT C

# EXHIBIT C

Daniel Low (Bar #218387)
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

*Attorney for Plaintiffs and Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Deborah Howington, James Perry, Elena Huizar, Lacey Bostick, Modupe Adesemoye, Marc Popisteanu, Nicole Carrier, Michael Winn, Edward McKinley, Wendy Lara Prieto, Luis Zepeda, Phillip Sterbinsky, Samuel Langley, Kevin Driggs, Michelle Bernardo, Victoria Teixeria, Antonio Fisher, Jyni Wyse, Marcus Hernandez, Hunter Haley, Mark Lindley, Terrence Holmes, David Amiri, Alex Vonica, Kerrick Brookins, Ronald Bruner, Rosalie Kitagawa, and Cody Block. | Case No. 5:24-cv-5684-VKD **SECOND AMENDED COMPLAINT** FOR EMPLOYMENT DISCRIMINATION AND HOSTILE WORK ENVIRONMENT CLAIMS CLASS ACTION DEMAND FOR JURY TRIAL |
| Plaintiffs, v. Taiwan Semiconductor Manufacturing Co. Ltd., TSMC North America, TSMC Technology, Inc., TSMC Arizona Corporation and TSMC Washington, LLC, Defendants. | |

Plaintiffs Deborah Howington, James Perry, Elena Huizar, Lacey Bostick,

1

Modupe Adesemoye, Marc Popisteanu, Nicole Carrier, Michael Winn, Edward McKinley, Wendy Lara Prieto, Luis Zepeda, Phillip Sterbinsky, Samuel Langley, Kevin Driggs, Michelle Bernardo, Victoria Teixeria, Antonio Fisher, Jyni Wyse, Marcus Hernandez, Hunter Haley, Mark Lindley, Terrence Holmes, David Amiri, Alex Vonica, Kerrick Brookins, Ronald Bruner, Rosalie Kitagawa, and Cody Block bring this action on behalf of themselves and two classes of similarly situated individuals to remedy pervasive, ongoing race, national origin, and citizenship discrimination by Taiwan Semiconductor Manufacturing Co. ("TSMC Ltd."), TSMC North America ("TSMC North America"), TSMC Technology, Inc. ("TSMC Technology"), TSMC Arizona Corporation ("TSMC Arizona"), and TSMC Washington, LLC ("TSMC Washington") (collectively, "TSMC") and to redress the negative impact the company's hostile work environment has on employees who are not of East Asian race or Taiwanese or Chinese national origin. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.  TSMC is the world's leading manufacturer of semiconductors, the chips that power everything from smartphones to cars to satellites to weapons systems. TSMC manufactures over 90% of the world's leading-edge logic chips, supplying well-known customers such as Google, Nvidia, and Apple with the chips used in their technology. TSMC is headquartered in Taiwan, but has subsidiaries in the United States, Canada, Japan, China, South Korea, and Europe. TSMC employs over 76,000 employees

2

worldwide, including 2,668 workers in North America as of December 31, 2023,[1] the vast majority of whom are from Taiwan or China, and many of whom require visas in order to work in the U.S. As discussed below, this grossly disproportionate workforce is the result of TSMC's intentional pattern and practice of employment discrimination against individuals who are not of East Asian race, not of Taiwanese or Chinese national origin, and who are not citizens of Taiwan or China, including discrimination in hiring, staffing, promotion, and retention/termination decisions.

2.   In addition, TSMC routinely subjects non-East Asians (including those who are not of Taiwanese or Chinese descent) to a hostile work environment where verbal abuse, gaslighting, isolation, and humiliation is common, and oftentimes leads to the constructive discharge of these employees.

3.   TSMC's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs seek, on their own behalf, and on behalf of two classes of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress TSMC's pervasive pattern and practice of discrimination and hostile work environment.

---

[1] Form 20-F at 49 (Dec. 31, 2023), https://investor.tsmc.com/sites/ir/sec-filings/2023%2020F.pdf.

3

## **PARTIES**

4. Plaintiff Deborah Howington was born in the United States, is of American national origin and ancestry, and is Caucasian. She currently resides in California.

5. Plaintiff James Perry was born in the United States, is of American national origin and ancestry, and is Caucasian. He currently resides in Florida.

6. Plaintiff Elena Huizar was born in the United States, is of Mexican national origin, and is Caucasian. She currently resides in Arizona.

7. Plaintiff Lacey Bostick was born in the United States, is of American national origin and ancestry, and is Caucasian. He currently resides in Missouri.

8. Plaintiff Modupe Adesemoye was born in Nigeria, is of Nigerian national origin and citizenship, and is African American. She currently resides in California.

9. Plaintiff Marc Popisteanu is a naturalized U.S. citizen of European ancestry and is Caucasian. He currently resides in Arizona.

10. Plaintiff Nicole Carrier was born in the United States, is of American national origin and ancestry, and is Caucasian. She currently resides in Arizona.

11. Plaintiff Michael Winn was born in the United States, and is of Korean national origin and ancestry. He currently resides in California.

12. Plaintiff Edward McKinley was born in the United States, and is of African American race and American national origin. He currently resides in Texas.

13. Plaintiff Wendy Lara Prieto was born in the United States, is of Hispanic/Latino race and of American national origin. She currently resides in Arizona.

4

14. Plaintiff Luis Zepeda was born in Mexico and is of Hispanic race and Mexican national origin. He is a citizen of the United States and Mexico and currently resides in Arizona.

15. Plaintiff Phillip Sterbinsky was born in the United States, is of American national ancestry and origin, and is Caucasian. He currently resides in Arizona.

16. Plaintiff Samuel Langley was born in the United States, is of American national ancestry and origin, and is Caucasian. He currently resides in Texas.

17. Plaintiff Kevin Driggs was born in the United States, is of American national origin and ancestry, and is of Caucasian race. He currently resides in Arizona.

18. Plaintiff Michelle Bernardo was born in the Philippines, is a United States citizen, and is of Filipino American national origin and ancestry. She currently resides in Arizona.

19. Plaintiff Victoria Teixeria was born in the United States, is of American national origin and ancestry, and is of Caucasian race. She currently resides in Arizona.

20. Plaintiff Antonio Fisher was born in Panama City, Panama, is a United States citizen of American national origin and ancestry, and is mixed race (African American and Caucasian). He currently resides in Arizona.

21. Plaintiff Jyni Wyse was born in the United States, is of American national origin and ancestry, and is of African American race. She currently resides in Arizona.

22. Plaintiff Marcus Hernandez is a United States Citizen of Hispanic race and Mexican national origin. He currently resides in Arizona.

5

23. Plaintiff Hunter Haley was born in the United States, is of American national origin and ancestry, and is of Caucasian and Hispanic race. He currently resides in Texas.

24. Plaintiff Mark Lindley was born in the United States and is of Caucasian race and of American national origin. He currently resides in Texas.

25. Plaintiff Terrence Holmes was born in the United States, is of American national origin and ancestry, and is of African American race. He currently resides in Arizona.

26. Plaintiff David Amiri was born in the United States, is of Persian race and Iranian national origin, and is a U.S. citizen. He resides in Arizona.

27. Plaintiff Alex Vonica was born in the United States, is of Romanian national origin and ancestry, and is of Caucasian race. He currently resides in Arizona.

28. Plaintiff Kerrick Brookins was born in the United States, is of American national origin and ancestry, and is of African American race. He currently resides in Arizona.

29. Plaintiff Ronald Bruner was born in the United States, is of American national origin and ancestry, and is of Caucasian race. He currently resides in California.

30. Plaintiff Rosalie Kitagawa is a United States Citizen of Hispanic and Asian race and Japanese and Mexican national origin. She currently resides in California.

31. Plaintiff Cody Block was born in the United States, is of American national origin and ancestry, and is of Caucasian race. He currently resides in Arizona.

6

32. Plaintiffs Deborah Howington, Elena Huizar, Nicole Carrier, Michael Winn, Wendy Prieto, Luis Zepeda, Phillip Sterbinsky, Samuel Langley, and Mark Lindley have exhausted their Title VII administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against TSMC, and receiving a Notice of Right to Sue.

33. Taiwan Semiconductor Manufacturing Co., Ltd. is a Taiwanese company, and is located at No. 8, Li Hsin Road VI, Hsinchu Science Park, Hsinchu 300-78, Taiwan, R.O.C. It is the parent corporation of Defendants TSMC North America, TSMC Technology, TSMC Arizona, and TSMC Washington.

34. TSMC North America is a California corporation with its principal place of business at 2851 Junction Avenue, San Jose, California 95134. TSMC North America provides primarily sales, technical support, business operations, and customer service support in North America for its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

35. TSMC Technology is a Delaware corporation, with its principal place of business at 2851 Junction Avenue, San Jose, California 95134. TSMC Technology provides primarily technology support at customer sites and research and development support in North America for its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

36. TSMC Arizona is an Arizona corporation, with its principal place of business at 5088 W. Innovation Circle, Phoenix, AZ 85083. TSMC Arizona provides

7

semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

37. TSMC Washington is a Delaware corporation. Its principal place of business is at 5509 N.W. Parker Street, Camas, Washington 98607. TSMC Washington provides semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

**JURISDICTION**

38. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1981(a), and 42 U.S.C. § 2000e-5(f).

39. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

40. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

41. This Court has personal jurisdiction over TSMC because each Defendant engages in continuous and systematic business contacts within the State of California. Further, Defendants TSMC North America and TSMC Technology, subsidiaries of Taiwan Semiconductor Manufacturing Co., Ltd., maintain a substantial physical presence in the State, with their headquarters located in San Jose, California.

8

## VENUE

42. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because TSMC resides in this District, conducts business in this District, engaged in discriminatory conduct in this District, and maintains and administers in this District employment records relevant to TSMC's pattern and practice of discrimination. Additionally, TSMC engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including TSMC North America and TSMC Technology's operation of offices in San Jose, California (their U.S. headquarters).

## DIVISIONAL ASSIGNMENT

43. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) and (e) because a substantial part of the events giving rise to this matter's claims occurred in this Division given that Plaintiff Howington is employed by TSMC North America in San Jose, California. In addition, Plaintiff Winn worked for TSMC North America and TSMC Technology at its office in San Jose, California and applied to, but was denied, two roles with TSMC North America in San Jose.

## STATEMENT OF FACTS

*Overview of TSMC's Business Model*

44. Taiwan Semiconductor Manufacturing Co., Ltd. ("TSMC Ltd.") is a manufacturer and supplier of semiconductors (or microchips), a key component of a vast array of electronic devices. Unlike other major microchip manufacturers, TSMC

9

Ltd. does not produce its own products—rather, it works with customers like Google and Apple to design and manufacture microchips for use in their products. This business has been enormously profitable for TSMC Ltd., generating a net revenue of over $66 billion in 2023. While TSMC Ltd. is a Taiwanese company and its operations are centered in Taiwan, the majority (68%) of TSMC Ltd.'s customers are headquartered in North America.[2] As such, TSMC Ltd. has also established a strong presence in the United States, including through the operation of its subsidiaries, TSMC North America and TSMC Technology, both of which are headquartered in San Jose, California, proximate to many of TSMC's key Silicon Valley-based customers. Those two entities employ approximately 600 individuals in the United States—mostly in San Jose, CA, but also in Austin, TX, San Diego, CA, Boston, MA, and Washington, D.C.—and focus primarily on research and development ("R&D") and sales, which entail working closely with customers to create and innovate chips to be manufactured at TSMC's facilities. TSMC North America is also the employment entity for TSMC's Human Resource ("HR") function that supports both TSMC North America and TSMC Technology in the U.S. and Canada.

45. TSMC Ltd. also maintains a factory for semiconductor device fabrication (or "fab") in Washington State (under the TSMC Washington employment entity) and has plans to build three fabs in Phoenix, AZ (under the TSMC Arizona employment entity).

---

[2] Form 20-F at 15 (Dec. 31, 2023), https://investor.tsmc.com/sites/ir/sec-filings/2023%2020F.pdf.

SECOND AMENDED COMPLAINT

Construction on the first Arizona fab began in 2021 and commercial production is targeted in 2025. In December 2022, TSMC Ltd. announced plans for the second fab, which is currently under construction. And TSMC Ltd. just recently announced plans for its third fab in Phoenix, Arizona in April 2024.[3] TSMC's plans for the latter two fabs were announced after the Biden administration passed the CHIPS and Science Act (the "CHIPS Act"), which designated $53 billion to boost semiconductor manufacturing in the U.S. Those applying for CHIPS Act funding committed to "guarantee[ing] all workers access to a safe environment that is free of harassment, discrimination, and retaliation,"[4] and were required to submit a plan "demonstrat[ing] appropriate investments and commitments to recruit, train, hire, retain, and upskill a skilled and diverse workforce."[5]

46. TSMC submitted a diversity plan in applying for CHIPS Act funding and, in return, was awarded $6.6 billion in direct funding under the Act to support TSMC's Arizona facilities.[6] TSMC's investment in Phoenix will create about 6,000 direct manufacturing jobs and more than 20,000 construction jobs.[7] As of December 31,

---

[3] *Id.* at 22.

[4] CHIPS for America Fact Sheet, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Feb. 28, 2023), https://shorturl.at/30u0N

[5] Workforce Development Planning Guide, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Mar. 27, 2023), https://shorturl.at/nHfxo

[6] TSMC Arizona and U.S. Department of Commerce Announce up to US$6.6 Billion in Proposed CHIPS Act Direct Funding, the Company Plans Third Leading-Edge Fab in Phoenix, TSMC (Apr. 8, 2024), https://shorturl.at/INvtI.

[7] TSMC Will Receive $6.6 Billion to Bolster U.S. Chip Manufacturing, NEW YORK TIMES (Apr. 8, 2024), https://shorturl.at/dDJsR.

11

2023, TSMC employed 2,668 employees in North America, the vast majority of whom work in the U.S., with plans to drastically increase that number in the coming years as it completes construction on its Arizona fabs.

*TSMC's Discriminatory Scheme and Hostile Work Environment*

47. TSMC Ltd. and its subsidiaries have willfully disregarded diversity commitments TSMC made in the CHIPS Act application for which TSMC received $6.6 billion in government funding.  And while TSMC claims that it "believes strongly in the value of a diverse workforce,"[8] its leaders have made clear that the company has a cultural preference for Taiwanese (and Chinese) employees. As Morris Chang (TSMC's former CEO who remains the company's public face) stated in a 2021 talk, "[c]omputers of different brands can often be hooked together, but not people of different culture." He also stated that, "[t]he fact that TSMC's top-flight executives can deliver top results in Taiwan is no guarantee of similar performance when they are posted overseas." Despite these reservations, TSMC Ltd. was motivated to grow its U.S. presence due to its proximity to TSMC's customers and the U.S. government's willingness to provide billions in funding. However, in growing its U.S. workforce, TSMC prefers to employ people of East Asian race and Taiwanese or Chinese national origin, including by bringing workers over from Taiwan and China on visas rather than hiring locally. This preference is reflected in every aspect of TSMC's U.S.-based

---

[8] Diversity and Inclusion at TSMC, TSMC (Sept. 16, 2019), https://shorturl.at/Y05ub.

SECOND AMENDED COMPLAINT

business—in sales, R&D, engineering/manufacturing, and even in HR and administrative support roles. For instance, in 2023, 80% of employees hired to TSMC North America and TSMC Technology (which primarily do R&D and sales) in the U.S. self-identified as Asian. Similarly, approximately half of the hires to TSMC Arizona that are slated to work at the Phoenix fabs have been deployed on visas from Taiwan.[9]

48. TSMC's discriminatory scheme originates with the parent corporation, Taiwan Ltd., and permeates throughout TSMC Ltd.'s U.S. subsidiaries, TSMC North America, TSMC Technology, TSMC Arizona, and TSMC Washington. TSMC Ltd. is comprised almost exclusively of Taiwanese nationals who encourage—and expect—the U.S.-based subsidiaries to obey TSMC's discriminatory policies and practices without pushback, despite the fact that these policies and practices violate U.S. law. As a result, TSMC's U.S. subsidiaries have systematically engaged in a pattern or practice of discrimination in favor of East Asians, who trace their national origin to Taiwan and China, and citizens of those countries, and have created a hostile work environment for those who are not within those preferred groups. The U.S. subsidiaries also engage in uniform policies and practices, originating from TSMC Ltd., that result in a disparate impact on non-East Asians and non-Taiwanese and non-Chinese nationals.

---

[9] Viola Zhou, TSMC's debacle in the American desert, REST OF WORLD (Apr. 23, 2024), https://restofworld.org/2024/tsmc-arizona-expansion/.

SECOND AMENDED COMPLAINT

49. TSMC effectuates its preference for East Asians and Taiwanese and Chinese nationals (including citizens of those countries) in at least three ways.

50. First, East Asians and Taiwanese and Chinese nationals (including citizens of these countries) are preferred in hiring. In many instances, the HR team from TSMC Ltd. in Taiwan sends HR in the U.S. the resumes of Taiwanese/Chinese candidates in the United States that typically already have the ability to work in the U.S., who they have already vetted and found suitable for hire. The U.S. HR team then simply hires these Taiwanese/Chinese candidates without question, even if no open roles have been posted in the U.S. In the rare instances when TSMC posts the job roles that these candidates ultimately fill, the jobs are posted for only a very short period of time, and candidates who apply are typically not reviewed or interviewed. The job postings are then summarily closed and the preferred Taiwanese/Chinese candidates referred by TSMC Ltd. in Taiwan are hired. Hiring managers at TSMC America, TSMC Technology, TSMC Arizona, and TSMC Washington prefer to interview and hire Taiwanese and Chinese candidates, including those candidates who speak Mandarin, despite there being no foreign language requirement for the job openings in the U.S. Candidates are specifically asked to provide their national origin when applying to the company so that TSMC's recruiters and hiring managers can advance only members of its preferred groups in the hiring process.

51. Recruiters in the U.S. have also been explicitly instructed by the Taiwan Headquarters ("Taiwan HQ") Global Recruitment Program Leaders that the goal for

14

recruiting new graduates from U.S. universities is to hire primarily Taiwanese and Chinese candidates, and to target only universities known to have higher populations of Taiwanese and Chinese students. Invitations to TSMC job fairs, per the instruction of Taiwan HQ, are in Chinese so as to only attract students of TSMC's preferred race and national origin. As a result of these practices, interview and hiring reports document a clear preference for Taiwanese/Chinese U.S. new graduate candidates and hires.

52. When U.S. roles are posted as available, TSMC North America, TSMC Arizona, TSMC Technology, and/or TSMC Washington add to the job posting that "Mandarin / Chinese" is either required, preferred, or "a plus." There is no legitimate business reason why such a requirement would be necessary—TSMC conducts business in English and requires proficiency in English not only for U.S. employees, but also for employees at Taiwan HQ and other countries in which TSMC operates. As such, a TSMC employee in the U.S. do not need proficiency in Mandarin / Chinese, even if communicating with colleagues abroad. Rather, the language requirement is used to attract TSMC's preferred candidates (Taiwanese and Chinese citizens) and to dissuade non-East Asian, non-Taiwanese, and non-Chinese candidates from applying to roles. When non-East Asia, non-Taiwanese, and/or non-Chinese candidates do secure an interview, the hiring managers, most of whom are East Asian, often make excuses to reject them to effectuate TSMC's cultural preference for East Asian employees and employees of Taiwanese or Chinese national origin. The above

15

practices allow TSMC to effectuate its preference for candidates that are East Asian, Taiwanese, and/or Chinese (including those on visas) without explicitly stating it and belie TSMC's claims that it hires East Asians, Taiwanese citizens, and/or Chinese citizens due to a lack of U.S. talent in the semiconductor industry.

53. Moreover, TSMC's bias towards East Asians and Taiwanese and Chinese citizens extends beyond HR, recruitment, and hiring. The company similarly discriminates in engineering and lower-end technician jobs, such as jobs inspecting, maintaining, and cleaning equipment. With respect to engineering and technician jobs, TSMC reportedly requires minimal experience or qualifications from applicants in Taiwan for jobs in the U.S.[10] Conversely, TSMC requires many U.S. hires to train in Taiwan for six months to a year (or longer) for these positions, a requirement that was designed to further TSMC's goal of culling the pool of non-East Asian and non-Taiwanese/Chinese prospective employees. During the training period in Taiwan, U.S. employees are routinely excluded by their Taiwanese colleagues, who oftentimes speak exclusively in Mandarin in their presences, are denigrated by management, and are subjected to a hostile work environment.

54. TSMC's bias in favor of East Asians, Taiwanese, and Chinese citizens was even apparent when it was hiring construction workers to build its first Arizona fab (via

---

[10] Mark Tyson, TSMC's Arizona Fab Hiring Woes Prompt Calls for Willing Taiwanese Migrants, TOM'S HARDWARE (Apr. 21, 2022), https://www.tomshardware.com/news/tsmc-arizona-taiwanese-workers.

16

TSMC affiliates United Integrated Services ("UIS") and Marketech International Corp.). TSMC chairman Mark Liu complained of "an insufficient amount of skilled workers" to build the facility and planned to fly workers in from Taiwan.[11] TSMC agreed to focus on local hiring for those positions only after a massive and public outcry from Arizona labor unions.[12] While TSMC's affiliates hired some U.S. workers for those construction roles, TSMC has subjected those workers to horrifying work conditions at a work site plagued with safety and environmental concerns and a general disregard for human life and safety. This unsafe environment is partially a result of TSMC Arizona having systematically replaced U.S. hires with responsibilities related to U.S. regulations (including Occupational Safety and Health Administration ("OSHA") standards) with visa workers from China or Taiwan who have minimal work experience and no knowledge of those regulations. One construction worker reported anonymously that when he/she started working at the site, all workers went through a safety training program, but out in the field, that worker never saw the people who ran the program, or its safety protocols enforced.[13] Other complaints included too few and improperly cleaned or stocked portable toilets, likely resulting in workers falling ill, and the anonymous worker reported that instead of calling 911 for safety

---

[11] Taiwan Semiconductor Manufacturing (TSM) Q2 2023 Earnings Call Transcript, THE MOTLEY FOOL (July 20, 2023), https://shorturl.at/lHDzl.

[12] *See* n. 9, *supra*.

[13] Michael Sainato, 'They would not listen to us:' inside Arizona's troubled chip plant,' The Guardian (Aug. 28, 2023), https://shorturl.at/9YXkg

17

emergencies, workers were instructed to call TSMC Arizona's safety hotline, which took a long time to respond to requests for medical services. *Id.* Complaints by employees of TSMC Arizona to the company's internal legal department about safety violations (including violations that resulted in serious injury and death) have gone ignored. Taiwanese construction managers also subject non-East Asian and non-Taiwanese/Chinese workers to a hostile work environment in which they are constantly berated and expected to work long hours without pay, resulting in low morale for this classification of worker. When American construction workers—who are unionized—pushed back on the long, unpaid hours, the message from Taiwanese management was "Are all union workers this slow?"

55. Second, employees not in the preferred groups are frequently denied opportunities to advance and succeed at TSMC's U.S. subsidiaries. They are frequently excluded from business discussions, as conversations are often conducted in Mandarin, and business documents are routinely written in Chinese. A related practice was acknowledged in the Q3 2023 U.S. HR Quarterly All-Hands meeting by Jen Kung, Head of Compensation, who casually commented on the use of "Chenglish" when East Asians wanted to limit information being shared with non-East Asians and/or to try to confuse them. Even though the entire US HR team was present (including the Head of HR, Judy Chiu), and there was widespread agreement that "Chenglish" was commonly used in the organization, TSMC took no action to correct the practice.

56. In engineering positions, non-East Asians and non-Taiwanese/Chinese citizens

18

are denied training opportunities that would allow them to thrive. For instance, in the 2021 time frame forward, TSMC Arizona required U.S. hires to its fab to train in Taiwan for up to 18 months, where they were, according to reports, excluded from "higher-level meetings conducted in Mandarin" and "rarely had a chance to handle problems themselves, and were mostly tasked with observing."[14] Back at the fab in Arizona, it was reported that "managers trusted Taiwanese workers with important tasks, starving the Americans of hands-on experience."[15] For instance, a Process Integration Engineer in Arizona stated that "an employee may be hired as an engineer [by TSMC,] but only taught technician-level jobs unless they are Taiwanese." An employee at TSMC's Washington fab complained that upper management "tends to play favorites with Taiwanese workers," "favoring and assisting Taiwanese engineers." Americans training for engineering positions in Taiwan reported of a meeting at which "a manager said Americans were less desirable than Taiwanese and Indian workers, according to people who saw leaked notes, which [were] circulated among trainees."[16]

57. Employees have also complained that TSMC Ltd. and its U.S. subsidiaries seem to encourage animosity between Taiwanese and U.S. employees, and have spoken of memorandums from higher management having surfaced that contained disparaging

---

[14] *See id.*

[15] *See id.*

[16] *See id.*

SECOND AMENDED COMPLAINT

remarks about U.S. employees, who "are constantly seen as sub par." Employees assert that TSMC has fostered a culture in which "Senior American leaders within the company are apprehensive about voicing concerns due to potential job repercussions from executives based in Taiwan."

58. Non-East Asian employees and non-Taiwanese/Chinese citizens are also reviewed more harshly than their East Asian colleagues (including those who are Taiwanese and Chinese citizens), which inhibits their advancement in the company. Employees at TSMC North American, TSMC Technology, TSMC Arizona, and TSMC Washington are evaluated by their managers, and the available rankings are: Outstanding (O), High Satisfactory (S+), Satisfactory (S), and Needs Improvement (I). East Asian employees and Taiwanese and Chinese citizens are consistently ranked higher than those not in the preferred groups. At TSMC, a rating of S or below has significant implications, as rating is a factor in calculating an employee's Annual Bonus payout (with higher bonuses being paid to those with ratings of S+ and O), and employees who receive ratings of S or below are less likely to be promoted (and receive lower bonuses) and more likely to be forced to leave the company (or are eventually terminated). For example, in 2023, Taiwanese "assignees"—visa workers from Taiwan—were particularly favored in ratings at TSMC North American and did not receive ratings of less than S in the 2023 review cycle, even if they performed poorly. In addition, these workers received their expected bonuses regardless of their performance ratings, and, if they were identified to be failing, were simply transferred

20

Case 5:24-cv-05684-VKD    Document 33-9    Filed 02/13/25    Page 22 of 163

to another role or another TSMC location. It is understood that East Asian employees (particularly Taiwanese and Chinese assignees/citizens) receive an extra boost in every aspect of their employment at TSMC, including in job assignments, performance ratings, and bonus payouts.

59. Third, non-East Asian employees and non-Taiwanese/Chinese citizens are either terminated or constructively discharged at much higher rates than their East Asian counterparts (including those of Taiwanese and Chinese citizenship), and are frequently replaced with East Asian employees, including assignees from Taiwan and China. For example, since 2022, TSMC Arizona and TSMC North America have removed the majority of non-East Asian managers and leaders hired by the subsidiaries and replaced them with East Asian employees, maintaining non-East Asians in management roles primarily only in a select number of customer- or public-facing positions. In addition, despite its promise to focus on local, U.S. hiring, approximately half of TSMC Arizona's 2,200 U.S. workforce is comprised of assignees from Taiwan.[17] TSMC's anti-American culture, practice of denying training and advancement opportunities to non-East Asian employees and non-Taiwanese/Chinese citizens, and practice of reviewing non-East Asians more harshly contribute to the higher termination rates for non-East Asian employees. TSMC Ltd. and its subsidiaries also create a hostile work environment for non-South Asian, non-Taiwanese, and non-

---

[17] Jennifer Read. TSMC Arizona Struggles to Overcome Vast Differences Between Taiwanese and US Work Culture, EMS Now (Aug. 19, 2024), https://shorturl.at/tCHBq

21

SECOND AMENDED COMPLAINT

Chinese employees that causes them to resign at higher rates (these resignations constitute acts of constructive discharge by TSMC). For instance, a Process Integration Engineer in Arizona stated that "the company has recently begun to bully some employees into resigning due to poor performance without proper training" and that "[t]hose who quit are often replaced by Taiwanese locals."

60. TSMC also routinely subjects non-East Asian, non-Taiwanese, and non-Chinese employees to a hostile work environment where American workers are constantly yelled at and referred to as "stupid" or "lazy." Non-East Asian, non-Taiwanese, and non-Chinese workers are also excluded from meetings or business-related conversations (which are often conducted in Mandarin). They are similarly denied trainings, as training materials are in written in Chinese, and critical information needed for work is withheld by Taiwanese management, which stymies American employees' ability to advance within TSMC. At TSMC, it is common for American workers' strong performances to be downplayed or discredited, and Americans are reviewed more harshly by TSMC, resulting in lower appraisal scores, and fewer promotions or opportunities for advancement. It is also common for American workers to be talked to in a condescending manner by management, for their opinions to be discredited, and for them to be publicly humiliated in front of coworkers. Employees who are not East Asian, Taiwanese, or Chinese are micromanaged by Taiwanese management and many have their job responsibilities stripped away. As a result of TSMC's hostile work environment, many non-East Asian employees are forced to take

22

protected leave under the Family Medical Leave Act ("FMLA") due to the incredible stress and anxiety caused by TSMC's conduct, and oftentimes are forced to resign from the company (i.e., they are constructively discharged).

61. In addition, TSMC Ltd. and its subsidiaries engage in employment practices that result in a disparate impact on non-East Asian and non-Taiwanese/Chinese applicants and employees alike. Specifically, TSMC maintains a program whereby employees are able to refer their friends and family members for employment with the company, and those referrals are then preferred in hiring decisions. Because a large percentage of TSMC's workforce is Taiwanese and Chinese, a disproportionate number of referrals—and ultimately hires—are of East Asian race and Taiwanese or Chinese national origin.

62. In addition, TSMC maintains work assignment practices that favor visa employees (referred to as assignees) in U.S. roles. Visas are expensive, costing thousands of dollars for each work permit. Because TSMC wants to ensure that all visas it applies for and receives are used, visa employees are preferentially staffed into U.S. roles, so that TSMC obtains the maximum return on its investment. As a result, U.S. roles overwhelmingly are assigned to visa workers, and visa workers are often used to replace local hires (including local hires in management roles). While these assignment practices are race and national origin neutral, because the vast majority of employees for whom TSMC secures a visa are Taiwanese (as that is where the parent company, TSMC Ltd., and majority of TSMC's workforce is located), these practices

23

result in the disproportionate staffing of East Asians and Taiwanese citizens in U.S. roles, to the detriment of non-East Asians and non-Taiwanese workers.

63. Further, TSMC's U.S. subsidiaries often include Chinese / Mandarin language requirements in job postings, despite the fact that fluency in English is a requirement for employment at TSMC (including TSMC Inc.) and business is supposed to be conducted by the company in English. When recruiting college graduates for U.S. roles, sends invitations for career fairs in Chinese. These language "requirements," while not expressing any preference for a certain race or national origin, dissuade non-East Asians and non-Taiwanese/Chinese applicants and employees from applying to job roles, and result East Asian candidates being hired at disproportionate rates as they more often meet this language requirement.

64. Finally, TSMC maintains an appraisal process whereby visa workers (i.e., assignees) are given more favorable ratings than non-visa employees. This is done to ensure that visa employees remain in the U.S. and maximize their time on their visas, given that visas are a costly expenditure for TSMC. As a result, visa employees, who are predominantly Taiwanese nationals, ultimately receive higher appraisal scores than non-Taiwanese workers, and therefore are promoted at higher rates and receive higher annual bonuses.

*Ms. Howington's Experience*

65. Deborah Howington is a Talent Acquisition Leader who has spent her career working in Human Resources. She specializes in all aspects of recruitment and is

24

committed to diversity and inclusion. Prior to joining TSMC North America, Ms. Howington served as Global Talent Acquisition Leader at Western Union, a Director-level role. There, she was responsible for enterprise-wide design and execution of hiring for global Fintech skills, diversity, employer branding, university recruiting, and vendor management (among other job responsibilities).

66. Ms. Howington began her employment with TSMC on February 13, 2023 as Deputy Director, Talent Acquisition. Ms. Howington is employed by TSMC North America (in San Jose, California) and supported hiring at three TSMC entities: TSMC North America, TSMC Technology, and TSMC Canada.

67. At the time of her hire in February 2023, Ms. Howington reported to the Head of HR, Teressa Harnois, who is Caucasian, but within a few months, Ms. Harnois told Ms. Howington that she had been "squeezed out of her role" and was soon replaced by Judy Chiu, who was born in China and identifies as Taiwanese. Following Ms. Harnois' replacement in September 2023, Ms. Howington was the only non-East Asian U.S. member of the HR Leadership Team. And only 4 of 17 employees on the U.S. HR team were non-East Asian during Ms. Howington's employment with TSMC.

68. Ms. Howington's role involved developing and executing hiring programs, strategies, and processes for the 3 entities that she supported in the U.S. and Canada. Ms. Howington initially excelled at her position under the management of Ms. Harnois, working collaboratively with others in U.S. and Global Talent Acquisition. She was requested to spearhead and participate in U.S. and global projects, aimed at, among

25

other things, improving TSMC's employer reputation among prospective global candidates and increasing diversity hiring. Within the first 6 months of her tenure, Ms. Howington's performance was so strong that Ms. Harnois added Ms. Howington to the succession plan for the role of Head of HR. But afterwards, Ms. Harnois noted that she had received a "strong negative reaction and pushback" from members of the almost entirely East Asian local HR team, and that Ms. Harnois had been forced to "go around" local HR to add Ms. Howington's name to the succession list that was provided to Taiwan HQ. Ms. Howington also created and led an initiative to improve the company's employer brand which became a $250,000+ 10-person global project, and was nominated by Taiwan HQ for the role of TSMC North America Functional Expert and Employer Brand Lead for the U.S.  In addition, while not directly responsible for the TSMC Arizona manufacturing site, she created and presented to members of Taiwan HQ HR and the local Arizona Head of HR, a U.S. Military Veteran hiring initiative to help them meet the CHIPS Act diversity hiring goals. Ms. Howington received glowing feedback, including in her 90-day probation period review, in the form of verbal and written accolades from her previous manager (whom Ms. Chiu replaced), and in written feedback from co-workers, peers, and managers that Ms. Howington proactively requested in order to ensure continuous improvement. She was praised as "strategically minded" with "[e]xcellent communication and presentation skills."

69. Ms. Howington learned from Anne Hu, Head of Executive Recruitment, that it

26

is common practice at TSMC for HR manager and other high-level HR jobs/assignments not to be posted for internal or external job interest, and that selection for HR assignments and advancements are frequently determined by the Taiwan HQ HR leadership team behind closed doors.

70. Over time, Ms. Howington became very concerned about practices she witnessed at TSMC that appeared heavily skewed in favor of East Asians and Taiwanese citizens. For instance, when Ms. Harnois was removed from her role as Head of HR, Ms. Howington was assigned by the Hiring Manager, TSMC North America President David Keller, to schedule interviews for the three finalists to replace Ms. Harnois in the role. All three finalists were East Asian and had been referred to TSMC by an Asian headhunter who was engaged to confidentially recruit for this role. Ms. Howington also routinely witnessed and raised concerns that well-qualified, non-East Asian candidates (including non-Taiwanese citizens) were being routinely overlooked and/or ignored by hiring managers without proper justification. Often, global presentations and documents were provided by Taiwan HQ written in Chinese, despite proficiency in English being a requirement to work at TSMC. On one occasion, in December 2023, Judy Chiu held a meeting that included Ms. Howington, and East Asian members of the Business and HR team of which a significant portion was conducted in Mandarin, including the provision of important HR-related information, despite Ms. Chiu knowing that Ms. Howington was the only person at the meeting who could not understand and participate. Afterwards, Ms. Howington told Ms. Chiu that

27

she felt uncomfortable and excluded, but Ms. Chiu dismissed her concerns, stating that she was just trying to make the other participants in the meeting feel comfortable.

71. In addition, Ms. Howington witnessed discrimination at TSMC with respect to jobs that require Export Controls, for which additional steps are required for candidates who are considered "finalists" and who are from D1[18] or E1[19] countries. While TSMC's Export Control policy states that candidates can be asked to provide their nationality only once they are a "finalist" for an Export Control job, hiring managers at TSMC would often ask for nationality information in advance of determining the finalists for a role, and would historically reject or "ghost" candidates from a D1 or E1 countries, resulting in discrimination against employees from those countries (while the People's Republic of China is a D1 country, managers and leaders valued the candidate's ability speak Mandarin, typically resulting in positive hiring decisions for those candidates). When Ms. Howington reported this practice to TSMC North America's legal team, including to Senior Director Steven Schulman and Manager Chun-Lan Lim, Ms. Lim was dismissive of Ms. Howington's concerns and Ms. Howington's request that Export Control training be provided for the hiring managers. When Ms. Howington pressed further for the training, Ms. Lim agreed to "look into it" with Taiwan HQ. Ms. Howington ultimately learned that while the training was given, it was provided only

---

[18] This includes, among other countries, Albania, Armenia, Azerbaijan, Belarus, Cambodia, Cuba, Georgia, Iraq, Kazakhstan, Kyrgyzstan, Laos, Macau, Moldova, Mongolia, North Korea, Russia, Tajikstan, Turkmenistan, Ukraine, Uzbekistan, Vietnam, and the People's Republic of China.

[19] This includes, among other countries, Cuba, Iran, North Korea, Sudan, and Syria.

28

SECOND AMENDED COMPLAINT

to Mr. Shulman, and not to TSMC's hiring managers.

72. In August 2023, Ms. Howington and her three recruiters were approached by Nick Tsai, Director of Technology. Mr. Tsai requested that Ms. Howington and her team not interview any D1 candidates at the request of a major TSMC customer. Ms. Howington and her team were instructed to identify two finalists for each role servicing this customer, so that if one finalist was identified as being from a D1 country, they could simply drop him or her from consideration. When Ms. Howington expressed concern to Mr. Tsai and the Head of Human Resources, Teressa Harnois, regarding this instruction, Ms. Harnois shared that Mr. Schulman had approached her, and asked that all communications regarding export control be kept off email, as such communications could be discoverable. Mr. Schulman also instructed one of the recruiters, Jess Liu, to not provide D1 candidates updates with respect to their candidacy, in the hopes that they would look for other jobs instead of waiting for a response from TSMC. TSMC Ltd. is currently under investigation for concerns over U.S. export control violations.[20]

73. In February 2024, Ms. Howington received an email from an HR Manager in Taiwan HQ stating that making offers to East Asian candidates for U.S. positions should be done by "someone familiar with Asian culture in order to handle offer

[20] *See* Huawei's Latest AI Processors Allegedly Produced by TSMC, Raising Questions About U.S. Export Controls, IC & PCB UNION NEWS AND TECHNOLOGY (Oct. 24, 2024), https://shorturl.at/nK2vN.

29

SECOND AMENDED COMPLAINT

communication." That guidance was similar to what Ms. Howington had been told on multiple occasions by Jen Kung, who told Ms. Howington that she (Ms. Kung) "should make offers to U.S. candidates who are Asian so they can understand better in Chinese."

74. In addition to complaining to Ms. Chiu about the use of Mandarin during meetings where Ms. Howington was in attendance, Ms. Howington raised concerns about TSMC's preference for hiring East Asians (including Taiwanese citizens) and rejection of non-East Asian candidates on multiple occasions to both of her managers—initially to Ms. Harnois, and later to Ms. Chiu.  Additionally, in December 2023, Ms. Howington raised concerns to Ms. Chiu about the circumstances under which TSMC hired an East Asian candidate in the U.S.—specifically that the candidate had been hired despite failing the technical interview and was given a higher rate of pay than nearly all others in the same job grade. (The details related to this candidate's hire were discussed at the meeting conducted in Mandarin described above (*see* ¶ 54, *supra*) such that Ms. Howington had been unable to participate in the discussion.) Ms. Chiu shut down Ms. Howington's complaints, reminding Ms. Howington that TSMC leaders valued "execution" to remain at TSMC and when considering promotions, which Ms. Howington perceived as a threat of retaliation for voicing a complaint.

75. In January 2024, Ms. Howington submitted a formal whistleblower complaint on TSMC's internal employee website, voicing concerns that the East Asian hire

SECOND AMENDED COMPLAINT

potentially violated discrimination laws (as well as provisions of the TSMC Employee Handbook) and that Ms. Chiu had seemingly threatened retaliation in her handling of Ms. Howington's initial complaint. Two weeks later, Ms. Howington had a brief meeting regarding the whistleblower complaint with the Director of Legal, Steven Schulman, but he refused to provide any information about whether there would be an investigation. Ms. Howington received no further written or verbal follow-up thereafter from anyone at TSMC, in violation of TSMC's internal policies and procedures for investigating whistleblower complaints.

76. TSMC's internal policies also prohibit "retaliat[ion] against any employee in the terms and conditions of ongoing employment" for complaining about potential legal violations. But shortly after complaining about discrimination against non-East Asians (including non-Taiwanese citizens) in hiring and treatment, and submitting her whistleblower complaint, Ms. Howington began to experience just that. Specifically, despite having received no complaints from TSMC regarding her performance or otherwise, in February 2024, Ms. Howington received a lower-than-expected Performance Review Rating of "S" (Satisfactory) by Ms. Chiu, for work Ms. Howington performed during 2023.  Ms. Chiu refused to provide any details in writing for this lesser performance rating,  and when Ms. Howington requested examples and specific details substantiating the rating, Ms. Chiu not only refused to provide them but responded by telling Ms. Howington  that she  would now either be  placed on a Performance Improvement Plan ("PIP") or face other HR Intervention due to her

31

"poor" performance (even though the performance rating, while unjustly low, was still an "S" (Satisfactory), not an "I" rating which indicates "needs improvement"). Ms. Howington was shocked by this reaction from Ms. Chiu, as none of Ms. Chiu's prior communications had included any of her purported concerns about Ms. Howington's performance (verbally or in writing), and Ms. Chiu's new critiques of Ms. Howington's performance were mostly vague and generalized. Following this performance review discussion, Ms. Howington realized that at least 50%—2 of the 4—non-East Asian members on the HR Leadership team in the U.S. received 'S' (Satisfactory) ratings in February 2024 for their performance in 2023.

77. After Ms. Chiu shared this unjustifiably low Performance Review Rating with Ms. Howington, Ms. Chiu began badmouthing Ms. Howington's performance to colleagues and peers publicly, insinuating that Ms. Howington appeared "confused," and making other disparaging comments during leadership meetings regarding Ms. Howington's capabilities when Ms. Howington asked for clarification or additional information. By comparison, when East Asian HR team members asked for clarification or additional information during leadership meetings, Ms. Chiu answered them without hesitation or comment.

78. Shortly thereafter, Ms. Chiu and other team members began withholding resources and support from Ms. Howington. For instance, Ms. Chiu refused Ms. Howington's request to add temporary staff after Ms. Howington lost 50% of her team in January 2024 and experienced a significant and extended increase in workload,

32

while making baseless accusations that Ms. Howington was lying to Ms. Chiu about the need for support.

79. Ms. Howington complained about Ms. Chiu's treatment to Ms. Chiu's direct manager, TSMC North America President David Keller, and her dotted line manager, Lora Ho, the Global Head of HR in Taiwan HQ, but both individuals dismissed Ms. Howington's concerns and directed her back to Ms. Chiu. Ms. Howington later learned that it is common at TSMC to withhold resources and support from employees that the company wants to get rid of, with the goal of creating a workplace environment so severely burdened that the incumbent will decide to leave. Ms. Howington was made aware of multiple instances of this occurrence at TSMC North America and TSMC Arizona.

80. Ms. Chiu was similarly critical with other non-East Asian HR employees, but was never critical about the East Asian HR team members. For instance, Ms. Chiu told the HR Leadership Team ("HRLT") in a leadership meeting that the HR Program Manager, Kathryn Agarpao, who is not Asian, was "making mistakes, was not doing a good job, [and] needed help." Ms. Chiu said the same of a non-East Asian recruiter Nick Barroga-Trumbo, who directly reported to Ms. Howington. Specifically, Ms. Chiu told Ms. Howington that in preparing Mr. Barroga-Trumbo's performance rating, Ms. Howington should weigh feedback from the HRLT that he was "making mistakes, not doing a good job, [and] needed help," but Ms. Chiu also refused to provide examples of the alleged mistakes complained of by the HRLT.  These examples are

33

characteristic of the environment at TSMC, in which non-East Asian employees and non-Taiwanese/Chinese citizens are subjected to a stricter level of scrutiny than similarly situated East Asian employees (including Taiwanese citizens).

81. In April 2024, Ms. Howington became so distressed by the openly hostile and discriminatory work environment at TSMC that her health began to suffer, and she requested FMLA leave. Upon her return from FMLA leave to the company in May 2024, she was told by Ms. Chiu that her responsibilities would be significantly curtailed and her role had seemingly been minimized. Ms. Chiu informed Ms. Howington that Ms. Howington's direct reports would no longer be reporting to her and repeatedly referred to Ms. Howington's role as the "TA Lead"—which would be a demotion from the title of Deputy Director—but refused to answer when Ms. Howington asked whether her role had changed. Ms. Chiu also provided a number of directives to Ms. Howington, such as a requirement that Ms. Howington copy Ms. Chiu on all communications she had with members of her team and provide Ms. Chiu written summaries of what Ms. Howington discussed during team meetings. Ms. Chiu read these directives from her computer screen, indicating that she was maintaining, in writing, a list of new expectations for Ms. Howington, but refused to provide Ms. Howington with the written list when Ms. Howington requested it. During this discussion, Ms. Howington repeatedly asked if she was being put on a PIP, but Ms. Chiu consistently ignored her questions and simply stated that, as the Head of HR, she was making the decision to implement these new directives.  Following this meeting,

34

Ms. Howington did not feel capable of continuing to work in such a hostile environment and informed TSMC on June 5, 2024 that she had retained counsel and would no longer be coming into the office. Ms. Howington remains on leave to-date.

*Mr. Perry's Experience*

82. James Perry is a Chief Human Resources Business Partner who specializes in learning, organizational development and organizational design, talent management and change and transformation. He holds a Bachelor of Science in Business Administration and a Master of Science in Industrial and Organizational Psychology. Mr. Perry has over twenty years of HR experience in global high tech and oil and gas companies, has served as a subject matter expert at translating business needs into talent management and organizational performance solutions, and has extensive experience leading global organization and people transformations that drive revenue growth, employee satisfaction, and positively impact business results.

83. Mr. Perry worked as the Head of Learning and Organization Development and Culture for TSMC Arizona from July 2022 to August 2023. He was recruited to the company by Scott Holman, the Chief Human Resources Officer ("CHRO") for TSMC, who has since resigned from the company. Mr. Perry was hired by TSMC Arizona just as the company was starting to grow in the United States.

84. As part of his onboarding, Mr. Perry spent three months in Taiwan, undergoing mandatory training so that he understood TSMC's "business model." During that time, it became readily apparent that TSMC's "business model" was to work employees into

SECOND AMENDED COMPLAINT

the ground, to not respect employees' opinions or contributions, and for employees to follow any command issued by leadership, irrespective of whether it was safe or ethical.

85. When Mr. Perry returned to the United States, he began working at a temporary office in Phoenix, but later moved into TSMC's new office building in the same city. The new office building had all glass windows and overlooked the fab construction site. The construction site itself was plagued with safety and environmental concerns, and there was a general disregard by TSMC for construction workers' lives (who were predominantly non-East Asian, non-Taiwanese, and non-Chinese). Mr. Perry himself, who has a background in environmental health and safety and worked for Intel on construction-related jobs, had several conversations with Greg Jackson, the Construction Facilities Manager, concerning the dangerous fab construction site. During those conversations, Mr. Jackson informed Mr. Perry that the Taiwanese construction manager he reported to would constantly berate the non-Taiwanese construction workers, and that morale among this group was low as a result.

86. As the Head of Learning and Organization Development and Culture for TSMC Arizona, Mr. Perry was responsible for coaching the senior staff and leadership team to help integrate two diverse cultures—that of the Taiwanese staff who had traveled to the U.S. for work, and that of the American staff who had been hired locally in the U.S. However, Mr. Perry's role was quickly diminished by TSMC. He was expected not to voice his opinion or challenge members of Taiwanese leadership, and any attempts to

36

SECOND AMENDED COMPLAINT

train Taiwanese U.S.-based leaders on U.S. culture were futile.

87. Mr. Perry would conduct workshops with the Taiwanese managers as part of his role. The subject of one such workshop was the current culture at TSMC and the culture the company wanted in the future, which was attended by approximately 150 employees. At that workshop, Taiwanese leadership expressed a desire for a militant and authoritative culture where employees obey commands without question and offer no pushback. One female, a frontline manager at the meeting who is Taiwanese, began crying and stated: "I'm so embarrassed; Americans are lazy, they don't work hard enough, they don't know enough, and they don't know commitment."

88. These discriminatory comments towards Americans were common at TSMC Arizona. During Mr. Perry's employment, he heard Americans being called "lazy" and "not hard working" by members of management (who were predominantly Taiwanese and Chinese). And employees who refused to consistently work twelve-hour days were considered poor performers.

89. While TSMC Arizona hired a number of non-Taiwanese and non-Chinese workers while Mr. Perry was employed by the company as part of its efforts to expand TSCM's presence in the U.S., the company quickly replaced all U.S. managers with individuals of Taiwanese descent. In fact, during Mr. Perry's tenure, approximately 10-15 Americans who had been hired to work in Human Resources for TSMC Arizona left the company due to discrimination and TSMC's hostile work environment. Mr. Perry personally witnessed a number of these female employees leaving meetings in

37

tears, having been berated and denigrated by Taiwanese management. TSMC's preference for East Asians and those of Taiwanese or Chinese national origin is reflected in the demographics of the company's managers and executive leadership. In one of the offsite meetings led by Mr. Perry, all 160 front-line managers in attendance were of Taiwanese national origin, and TSMC's executive leadership team is exclusively made up of those of Taiwanese or Chinese descent.

90. Mr. Perry resigned from TSMC Arizona in August 2023, unable to further tolerate the hostile work environment and TSMC's refusal to accept American culture and legal norms. Mr. Perry filed a written complaint with TSMC's HR department during his exit interview, specifically noting that his resignation was being compelled by the discriminatory and hostile treatment from manufacturing leaders, and specifically naming Ted Chiang, Senior Director of HR (who is Chinese) as an individual who had expressed negative and hostile behavior towards Mr. Perry and other non-Taiwanese and non-Chinese members of HR.

91. On information and belief, TSMC Arizona has since retaliated against Mr. Perry following his constructive discharge. Mr. Perry joined Oracle after leaving TSMC, and within the first six months of his employment, he was notified by Oracle's legal department that it had received an anonymous complaint about him from someone at TSMC. The complaint was ultimately investigated and unsubstantiated by Oracle, but it put Mr. Perry's employment with the company at risk.

*Ms. Huizar's Experience*

38

SECOND AMENDED COMPLAINT

92. Elena Huizar is a Human Resources Business Partner with over fifteen years of relevant experience. She holds a Bachelor's Degree in Communications from Arizona State University. Ms. Huizar has spent her career in HR, and is skilled in recruitment, hiring, and onboarding, talent management, diversity and inclusion, and project management. Before joining TSMC Arizona, Ms. Huizar spent three years as an Executive Assistant and HR Business Partner for Onsemi, a semiconductor manufacturing company in Phoenix, Arizona.

93. Ms. Huizar joined TSMC Arizona in November 2021 where she worked as an HR Project Manager for approximately 2.5 years. Ms. Huizar was responsible for overseeing two employee experience programs, TSMC Arizona's canteen (cafeteria project) and its wellness center (medical clinic), and ensuring that employees were taken care of with respect to their meals and offering medical care in the Wellness Center. She reported to Naiyu "Clair" Hsu, who is Taiwanese. Ms. Hsu had no prior HR experience and was assigned to Ms. Huizar's team only because the Arizona fab was not yet up and running, and she had no actual work to do in the fab.

94. When Ms. Huizar joined TSMC Arizona, her HR team was comprised of about 10 members (three of whom were from Taiwan), and TSMC Arizona was approximately 80% American and 20% Taiwanese. It was understood that the company was going to integrate with U.S. culture and strive to become a diverse, U.S. company, aligning to operate separately from TSMC's corporate headquarters in

39

Taiwan. However, after Ms. Huizar had been with TSMC Arizona for approximately 1.5 years, there was a complete switch in the company's business model and attempts to localize. TSMC sent a number of employees from Taiwan to the U.S. and every time a non-Taiwanese worker left the company (either on their own volition or via constructive discharge by TSMC Arizona), a Taiwanese national replaced them. Many of these Taiwanese nationals were on visas. TSMC Arizona also leaned heavily on hiring employees' family members, resulting in a spike in the percentage of East Asian, Mandarin speaking employees in the United States. As TSMC Arizona increased its Taiwanese, Mandarin speaking workforce, it abandoned its efforts to integrate with U.S. culture and began operating in close alignment to TSMC's corporate headquarters in Taiwan—which was known for being oppressive and dictatorial. TSMC Arizona was approximately 80% Taiwanese when Ms. Huizar left the company in March 2024.

95. While at TSMC, Ms. Huizar witnessed first-hand the discrimination faced by non-Taiwanese employees. The Wellness Center, for instance, was designed by Banner Health, which provided concierge-like medical information and services for assignees from Taiwan—e.g., immunizations, children's school physicals, information on where to deliver a baby, etc. U.S. employees, many of whom had moved to Arizona from other states for work, were not provided with the same medical assistance, and mobile healthcare checkups—where Banner Health medical vans traveled to apartment complexes where Taiwanese TSMC employees lived to provide services—were offered only to Taiwanese employees. When Ms. Huizar asked why American workers

40

were being excluded from these medical services, she was specifically told by Victor Yang (who is Taiwanese and at the time worked in HR) that such services were "just for the Taiwanese."

96. When Ms. Hsu and Ted Chiang sought to hire a manager for the Wellness Center and posted a job opening, Yiting Hsieh, a Taiwanese doctor from Los Angeles was hired for the role, rather than a local Arizona candidate. This individual was trained in Taiwan, and was not licensed to practice medicine in the United States. Ms. Huizar was told that Ms. Hsieh was hired because the Taiwanese employees at TSMC could understand her. Ms. Huizar was excluded from the interview panel, which was comprised of Ms. Hsu and Chia "Carrie" Yin Tao (who had been at TSMC Arizona for just two months at the time of the interview).

97. In addition to seeing members of the Human Resources team replaced by Taiwanese workers, Ms. Huizar also saw this same practice followed with information technology ("IT") workers. At TSMC, it was understood that in order to advance in IT, employees needed to speak and understand Mandarin, despite the fact that there is no Mandarin language requirement at TSMC and business was supposed to be conducted in English.

98. Discriminatory comments were also the norm at TSMC Arizona. Americans were called "babies" because, unlike Taiwanese workers, they objected to being yelled at and did not simply acquiesce to management's verbal abuse.

99. Ms. Huizar was also personally impacted by TSMC's discrimination. She was

41

SECOND AMENDED COMPLAINT

publicly chastised for minor mistakes by her Taiwanese manager, while her East Asian colleagues' errors went unmentioned. If Ms. Huizar voiced an opinion different than that of her manager in a meeting, Ms. Hsu would immediately start speaking in Mandarin to exclude Ms. Huizar from the business conversation. Ms. Huizar was also excluded from meetings simply because she was not Taiwanese. Her manager, Ms. Hsu, would hold meetings with vendors and not include Ms. Huizar, and then would task Ms. Tao (a Taiwanese colleague who sat in the cubicle in front of Ms. Huizar) with relaying information from the meeting to Ms. Huizar. On one occasion, Ms. Huizar tripped on some flooring at work and fractured her ankle. She immediately sought medical attention and notified her then-manager Sean Lai. Mr. Lai dismissed the incident, and berated Mr. Huizar for missing a conference call with Taiwan HQ during the time she was receiving medical treatment. And each time Ms. Huizar voiced concerns regarding the disparate treatment of non-Taiwanese employees, her complaints were ignored.

100.    Taiwan HQ was aware of the harsh treatment to which American employees were subjected, and in mid to-late 2023, Lynette Ng, Senior Director of Global Human Resources, traveled to Arizona from Taiwan HQ to meet with the HR team. At that meeting, she apologized for the treatment that the HR team had received from TSMC's Taiwanese management. While the HR team hoped that there would be a change in TSMC's culture and management's behavior following that meeting, no such changes took place. And in the months following that meeting, the number of

42

SECOND AMENDED COMPLAINT

Taiwanese employees hired to replace American workers increased.

101.    By 2024, Ms. Huizar was working 60 hours per week for TSMC Arizona. Yet no matter how hard she worked and how much she contributed to the company, she was still not accepted, and was still treated with hostility by her manager.

102.    Ultimately, Ms. Huizar was forced to resign from TSMC Arizona on March 3, 2024 due to the company's discriminatory treatment. Prior to her departure, Ms. Huizar had a conversation with Ted Chiang, Senior Director of Human Resources (who is from Taiwan), in which she complained of unfair treatment and asked why every time an American left the company, a Taiwanese national was put in the employee's place. Mr. Chiang responded that it was because TSMC "is an Asian company." At the time Ms. Huizar left TSMC Arizona, there were only two non-Taiwanese employees on her HR team, Ashlee Ramage and Nate Burt, and approximately 75% of the HR department was comprised of Taiwanese nationals. As of November 4, 2024, only Ashlee Ramage remains from Ms. Huizar's original team.

*Mr. Bostick's Experience*

103.    Lacey Bostick is a Global Security, Compliance, and Firewall Service Delivery Manager with a long career working in governance, risk, compliance, and audit positions.  He holds a Master's Degree in Telecommunications Engineering from the University of Colorado at Boulder, and spent 43 years of his career working at IBM with many different cultures and companies. For instance, Mr. Bostick worked in the United Kingdom for 3 years, in Australia for 9 months, and in Holland for 2 years. He

43

also worked with employees across Europe, Asia, Africa, and North and South America (both face-to-face and remotely), and managed employees across the globe.

104. TSMC Arizona recruited Mr. Bostick to work for the company on two occasions given his strong background in risk, compliance, and security. Mr. Bostick at first declined the job offer from TSMC, but ultimately accepted a role with TSMC Arizona in November 2022, based upon TSMC's promise that Mr. Bostick's hours would remain reasonable (no more than 55 hours per week) and that, when Mr. Bostick needed, he could take time off and start working remotely to care for his elderly mother.

105. Mr. Bostick served as TSMC Arizona's Enterprise Governance, Risk, and Compliance Manager from November 2022 to June 2023. This was a high-level job role, just two levels below the Global CFO who worked for Taiwan HQ. Mr. Bostick reported to Tricia Chu, Treasurer of TSMC Arizona who is Chinese. Ms. Chu reported directly to the Global CFO in Taiwan.

106. When Mr. Bostick joined the company in November, his manager, Ms. Chu, refused to meet with him, stating she was "too busy," and telling Mr. Bostick to simply "figure it out" when he asked what was required of his job role. After Mr. Bostick returned from three weeks of training in Taiwan in January 2023, Ms. Chu informed Mr. Bostick that she had hired a TSMC employee from Taiwan to work as a contractor with Mr. Bostick to create the Arizona Compliance Plan for TSMC Arizona. Ms. Chu never gave Mr. Bostick any directive or instruction as to what was expected of him, yet often berated him for not meeting her unarticulated expectations. Ms. Chu's

44

lack of support continued throughout Mr. Bostick's short tenure with TSMC Arizona.

107.    Mr. Bostick was tasked with implementing a compliance plan that included physical security, IT security, meeting environmental safety and health guidelines, and construction. However, TSMC Arizona's IT security was moved to Taiwan HQ in the first quarter of fiscal year 2023, and Taiwan HQ refused to provide Mr. Bostick with necessary information to develop and implement an Arizona Compliance Plan. Taiwan HQ refused to share business information with anyone outside of HQ, and Mr. Bostick was kept in the dark, despite leading this endeavor. In TSMC's eyes, Mr. Bostick was of no consequence because he was not Taiwanese or Chinese. Upon Mr. Bostick's resignation in June 2023, Ms. Chu had C.W. "Kris" Hsu, a Taiwanese employee from Operations (on assignment in Arizona) who spoke Mandarin, replace Mr. Bostick in his role.

108.    While with the company, Mr. Bostick was constantly subjected to a hostile work environment by Ms. Chu. Ms. Chu would berate Mr. Bostick in their daily meeting, telling him he was "stupid," and that his "plans [we]re wrong," and "not the TSMC way." Every afternoon, Ms. Chu would yell and scream at Mr. Bostick at their daily meeting, verbal abuse that was audible to the entire office, given the open floor plan. When Mr. Bostick refused to respond to Ms. Chu's hostility, remaining calm during the meetings, Ms. Chu would escalate her beratement, telling Mr. Bostick "I just hate you. You sit there and you never fight back."

109.    In addition, Ms. Chu constantly insulted Mr. Bostick in front of his

45

colleagues and peers, telling them not to be like Mr. Bostick. At the department Christmas luncheon in 2022, which Mr. Bostick attended with about twenty of his peers, Ms. Chu publicly humiliated him, telling the group "Don't be like Lacey." Ms. Chiu made similar, public comments at the monthly department meetings, informing TSMC employees "Don't be like Lacey or I'll micromanage you."

110.    Scott Holman, TSMC's CHRO in the U.S., was well aware of Mr. Bostick's poor treatment and daily beratement by Ms. Chu. Not only did he overhear Ms. Chu screaming at Mr. Bostick during their daily meetings (as his office was located next to Ms. Chu's), Mr. Bostick would also keep Mr. Holman apprised of Ms. Chu's treatment of him when they grabbed coffee in the morning. No action, however, was taken to redress Ms. Chu's hostile treatment.

111.    When Mr. Bostick joined TSMC Arizona, he understood that TSMC was endeavoring to be a global company, and to grow its local footprint. But TSMC reneged on its commitment to diversity, sending approximately 2,000 assignees from Taiwan during Mr. Bostick's tenure to work in the U.S. While TSMC informed the State of Arizona that the assignees (who were on visas) were being brought over to train local, U.S. hires, and would return home after training, additional assignees were brought to the U.S. to replace American workers who resigned and/or were constructively discharged at high rates due to TSMC's hostile work environment. Late in the second quarter of 2023, TSMC also began shipping mid-level managers and junior directors to the United States, who were also used to displace local managers

46

and directors.

112.    Prior to resigning from the company, Mr. Bostick was forced to work fifteen hours (or more) each day, Monday through Friday, and when he sought to take time off to care for his mother, he was told "TSMC pays you enough to pay someone else to take care of her."

113.    Mr. Bostick resigned from TSMC Arizona in June 2023 due to the company's hostile work environment, Ms. Chu's constant beratement, and the fact that he was discriminated against simply because he was not a member of TSMC's favored groups. Mr. Bostick's resignation constitutes a constructive discharge.

### *Ms. Adesemoye's Experience*

114.    Modupe Adesemoye is a Touch/Display Quality Engineer who specializes in semiconductor fabrication processes and application and properties of materials used in the semiconductor industry. She holds a Bachelor of Science degree in Electrical and Computer Engineering and a Master's of Science degree in Electrical Engineering from Texas A&M University. Ms. Adesemoye has held a number of engineering positions since graduating college in 2017 and is highly skilled in data analytics, research, and development.

115.    Ms. Adesemoye worked for TSMC Arizona from March 2021 to June 2022 as a Process Integration Engineer, and was a member of the company's integration team. Shortly after joining TSMC, Ms. Adesemoye traveled to Taiwan in April 2021 for compulsory training.  She was one of the first batches of new hires in

47

the U.S. to travel to Taiwan, and the training was scheduled to last 1.5 years (until October 2022).

116.    In Taiwan, Ms. Adesemoye served as the lead engineer for her group, given her educational background and prior engineering experience. There were five members in Ms. Adesemoye's immediate group, of whom three were Taiwanese and one was American (of Caucasian race). Ms. Adesemoye was tasked in Taiwan with solving issues that arose with the fab (of which there were many).

117.    While at training, Ms. Adesemoye heard a number of discriminatory comments made regarding Americans, including that TSMC will not do well in America because Americans are lazy. Ms. Adesemoye sought to disprove this stereotype, and worked hard while in Taiwan, oftentimes staying at the office until 9:00 p.m., and, in line with the company's directive, took very few breaks, and did not take any time off or travel back to the U.S. during her training. While TSMC guaranteed Ms. Adesemoye an additional $5,000 to $6,000 for every six months she remained continuously in Taiwan for training, TSMC never paid her any of this money. Ms. Adesemoye was also asked by TSMC to train one of her Taiwanese colleagues, an engineer who had been working for the company for years but lacked Ms. Adesemoye's engineering skill-set. Ms. Adesemoye took pride in her work ethic, and was always the first to complete her trainings and the work assigned to her.

118.    While in Taiwan, Ms. Adesemoye was excluded by her Taiwanese colleagues, who did not invite her to social events. As a result, Ms. Adesemoye mostly

48

kept to herself and focused on working hard for the company. On the rare occasions that Ms. Adesemoye spoke up or shared her opinion, it was met with hostility by TSMC's Taiwanese management: "Why are you talking a lot? Why do you have an opinion about things? Just do your job."

119.     In March or April 2022, after Ms. Adesemoye had been with TSMC Arizona for about a year, she received her first performance review. The performance review was completed by a Director, SK Tien, who is Taiwanese. To Ms. Adesemoye's surprise (and dismay), Mr. Tien ranked her the lowest among the integration department, which was comprised of approximately 20 individuals (both Taiwanese employees and local hires from the U.S.), the vast majority of whom were recent college graduates. Of the U.S. hires, Ms. Adesemoye was the only African American, and the only employee with engineering experience. The other members of the team was East Asian, with the exception of one Caucasian individual. When Ms. Adesemoye met with Mr. Tien to discuss her low performance review score, which impacted her bonus, Mr. Tien offered no justification for the score, stating vaguely that Ms. Adesemoye's presentation slides could be improved (a criticism Ms. Adesemoye had never before received). The next day, Ms. Adesemoye approached Mr. Tien with a list of her accomplishments over the past year to better understand why she was ranked lowest of her group, despite the fact that no group member had completed even half of her achievements, and the fact that Ms. Adesemoye had been tasked with training another engineer given her skill set. Mr. Tien still had no explanation for Ms.

49

Adesemoye's unjustifiably low performance review score. He then referred her to another Director, Charles Chu, who is Taiwanese. Mr. Chu tried to gaslight Ms. Adesemoye, asking how she knew that she was ranked the lowest, but still refused to change her score.

120. Ms. Adesemoye was so impacted by her low performance review score after having worked so hard for TSMC, that she informed the company that she planned to resign, and provided notice of her impending resignation. However, TSMC informed Ms. Adesemoye that she was required to immediately return to the U.S that same day, and forced her to move out of the TSMC dormitory where she had been staying for the past year. Ms. Adesemoye was not given sufficient time to pack, and was forced to leave behind half of her belongings, and to pay for her own return flight home. She was so traumatized by the hostile work environment at TSMC that she took medical leave from her new employer after returning to the U.S. to focus on her mental health.

*Mr. Popisteanu's Experience*

121. Marc Popisteanu is an IT Infrastructure Manager who specializes in storage virtualization, VMware infrastructure, and incident management. He holds an MBA and a Bachelor of Science degree in Business/Information Systems, along with several relevant certifications (CSM Certified Scrum Master, PSM Professional Scrum Master, and an ITIL Foundation Certificate in IT Service Management). Mr. Popisteanu has extensive experience in service management, project management, process improvement, and cost optimization, and is skilled in leveraging new and

50

emerging technologies to transform IT infrastructure and align with strategic business initiatives.

122.    Mr. Popisteanu worked for TSMC Arizona for approximately 1.5 years, from March 2022 to July 2023, as an IT Infrastructure Manager. He was hired by Jason Liu, a Taiwanese Director, to build the company's infrastructure, which included building and running the Arizona fab from an IT perspective with local talent so as to enable TSMC Arizona to establish a local presence in the U.S.

123.    Mr. Popisteanu's initial experience with TSMC Arizona was positive. When he joined the company, a transition team was brought over from Taiwan, and he hired the equivalent of that team in the United States. Mr. Popisteanu's U.S. team was to learn from the Taiwanese transition team who would then return to Taiwan following the knowledge transfer. While Mr. Popisteanu's U.S. team was comprised mostly of employees of Indian national origin as that was the nationality of the majority of candidates who applied for the open roles, he was forced by his offshore counterpart H.F. Wang (who is Taiwanese) to hire an employee of East Asian descent simply because that individual spoke Mandarin.

124.    In or around November 2022, there was a significant shift within the company, and TSMC Arizona abandoned its localization efforts. TSMC replaced its then-CEO with C.C. Wei (who is Chinese), and Mr. Liu was transferred back to Taiwan. A new IT Director, Peter Cheng, who is from Taiwan, began working in the U.S., and under his management, the IT Department at TSMC Arizona assumed the

51

militant operations of its headquarters in Taiwan. While American employees were not fired, so that TSMC Arizona could maintain its façade of being a local, U.S. company, Mr. Cheng began removing responsibility from U.S. workers, meetings shifted from being conducted in English to being conducted in Mandarin, and employee feedback in the U.S. was met with hostility by leadership.

125.    Following the shift, Mr. Popisteanu would attend hour-long meetings that were conducted in Mandarin, to his exclusion, only to receive a task in English at the end of the meeting with no additional follow-up. He was given no opportunity to contribute or participate in the meetings, and was expected just to sit there quietly. On one occasion, Mr. Popisteanu was yelled at and belittled by Mr. Cheng in a meeting with one of TSMC Arizona's vendors, when the vendor Mr. Popisteanu had hired failed to follow a certain 6S methodology (a workplace organization and management methodology) when it operated in the building. Mr. Cheng made a sarcastic comment to the effect of "dumb Americans, they can't even follow 6S."

126.    The transition team, which was designed to perform a knowledge transfer to Mr. Popisteanu's U.S. hires before returning to Taiwan, remained in the United States, and all operations and responsibilities shifted to that team. The knowledge transfer to Mr. Popisteanu's U.S. team came to a halt, and assignees from Taiwan were tasked with finishing the IT implementation. Remote control tools were also put in place so that the Taiwanese team could maintain control of IT operations when returning to their home country.

127.    Mr. Popisteanu also witnessed during his tenure with TSMC Arizona the company's preference for East Asian, Taiwanese, and Chinese workers. Mr. Popisteanu observed other departments within IT that affirmatively sought out and hired Taiwanese or Chinese nationals who spoke Mandarin. TSMC job descriptions oftentimes listed a preference or requirement that the individual be a native Mandarin speaker, despite the fact that the company conducted—or held itself out to conduct— business in English.

128.    Mr. Popisteanu was constructively discharged by TSMC Arizona in July 2023. Mr. Popisteanu was forced to resign as TSMC had a clear preference for Taiwanese and Chinese workers, resulting in Mr. Popisteanu's role being diminished, responsibilities removed from his U.S. team, and being excluded from meetings and the overall decision-making process.

*Ms. Carrier's Experience*

129.    Nicole Carrier has worked professionally as a volunteer firefighter, corrections officer, and emergency medical technician, and holds a Bachelor's Degree in Criminal Justice and Corrections. Ms. Carrier is skilled in incident management, SAP Environment, health, and safety management, and emergency response.

130.    Ms. Carrier worked for TSMC Arizona from February 2022 to May 2024 as an Emergency Response Coordinator. In this role, Ms. Carrier was responsible for supervising security for the grounds, monitoring systems, and handling employee medical issues. Once hired, Ms. Carrier was told that she would receive further training

53

on chemistry and chemicals, and was asked whether she would be willing to travel to Taiwan for eight months of training. Ms. Carrier agreed, as the role sounded like a promising opportunity, and she was excited to be part of TSMC Arizona's growth in the United States.

131.    When Ms. Carrier arrived in Taiwan, however, her optimism was quickly quashed. All of the company trainings were conducted in Mandarin, and the materials she was provided were written in Chinese, despite the fact that Ms. Carrier did not speak the language, forcing her to use Google Translate to learn TSMC's policies and procedures, and about chemicals and gasses. The living conditions in Taiwan were unsafe, with black mold covering the walls. While Ms. Carrier and other U.S. hires were placed in small, cramped dormitories in Taiwan, TSMC's Taiwanese hires were given beautiful homes and cars once they traveled to the U.S. for work.

132.    Shortly before moving to Taiwan, Ms. Carrier had her gallbladder removed, and suffered a number of medical complications in Taiwan. On a number of occasions, Ms. Carrier would need to use the bathroom immediately after eating, and when unable to locate a bathroom and discard her protective gear in time, she had accidents. Ms. Carrier was humiliated by her health complications, but her manager, Joy Jones (who is Chinese) showed Ms. Carrier no compassion, and was rude, abrasive, and condescending. On one occasion, when Ms. Carrier had an accident and asked Ms. Jones to call her a cab so that she could return to her dormitory to shower and change, Ms. Jones begrudgingly acquiesced, but then made a strange, offhanded comment that

54

she thought Ms. Jones was going through menopause.

133. Ms. Carrier returned to Arizona in September 2022 where she worked as part of TSMC Arizona's Emergency Response Center. TSMC staffed only two employees per shift at this center, which was insufficient, resulting in two non-Taiwanese employees being forced to resign due to the harsh working conditions.

134. Ms. Carrier's manager, Ms. Jones, reported to Rong-tai Wu in the U.S. who is Taiwanese. Mr. Ru constantly berated and yelled at the American workers, calling them "stupid Americans" and throwing things when he became incensed. While Ms. Carrier reported this hostile treatment to Human Resources, no steps were taken to correct this behavior

135. When Ms. Carrier sought medical care in the United States to address her ongoing health issues, her manager, Ms. Joy would belittle and degrade her, making comments like "Oh another doctor's appointment." On one occasion, when Ms. Carrier had an accident while performing a safety audit of the construction site and was unable to make it to a toilet, her manager asked why she couldn't just go back to her car, clean up, and return to work (rather than heading home to shower and change). When Ms. Carrier pushed back on this instruction, Ms. Jones responded that she should "just quit" if she can't do the work.

136. Ms. Jones also routinely micromanaged Ms. Carrier's work and humiliated her in front of coworkers, calling her a "stupid American." During Ms. Carrier's one-on-one meetings with Ms. Joy and Ms. Carrier's immediate supervisor

55

Darrell Johnson, Ms. Joy would constantly criticize and belittle Ms. Carrier. Presentations created by Ms. Carrier or the team were met with criticism. On one occasion, Ms. Carrier and her partner were working on a writeup after an electrical cable running through the construction site disconnected from the grounding prong and was dangerously exposed. While Ms. Carrier had two hours to prepare the report, Ms. Jones demanded it immediately, wrongly accused Ms. Carrier of wasting time (when she was, in fact, in the process of preparing the report), and then gave her just fifteen minutes to complete it, loudly counting down in the open office environment each minute remaining: "You now have 14 minutes, now 13 minutes, now 12…" Ms. Jones' conduct was designed to humiliate and embarrass Ms. Carrier in front of her coworkers. This hostile conduct led Ms. Carrier to question her own abilities and self-worth as she was constantly berated and put down by Ms. Joy, and never received any praise or accolades despite her hard work and accomplishments.

137.    Ms. Carrier complained of Ms. Jones' harassment to HR, citing the hostile work environment at TSMC, lack of leadership and mentoring, and overall disrespect by the Taiwanese and Chinese staff. To Ms. Carrier's knowledge, no actions were taken to improve the work environment at TSMC Arizona.

138.    When Ms. Carrier was no longer able to manage the ongoing stress and anxiety caused by the hostile work environment at TSMC Arizona, she went out on medical leave in late February or early March 2023. When Ms. Carrier sought to return to work, she asked TSMC Arizona for an accommodation limiting her shifts to 8-10

56

hours (she was working four, 12 hour shifts previously) and allowing her full accessibility to a restroom. While TSMC acknowledged Ms. Carrier's need for an accommodation, it refused to provide her with one so that she could return to work, nor did it offer any alternate work for Ms. Carrier while she managed her medical condition. Ms. Carrier attempted to work with HR for a number of months, locating open positions with TSMC that she could fill, but was told that the company could not provide her with an accommodation for those roles. HR then went silent on Ms. Carrier, and refused to respond to her outreach. Ms. Carrier ultimately resigned from TSMC Arizona, having been constructively discharged by the company.

*Mr. Winn's Experience*

139.    Mr. Winn is a Recruiting Coordinator who is skilled at building relationships, customer and candidate interactions, managing projects, and multi-tasking. He graduated from San Jose State University in May 2020 with a Bachelor of Science in Business Administration Management. Prior to joining TSMC, Mr. Winn served as a recruiting coordinator at NVIDIA.

140.    Mr. Winn worked as a Recruiting Coordinator for TSMC North America and TSMC Technology from August 2022 to January 2024. He learned of the Recruiting Coordinator position through an online job posting, and applied directly to TSMC for the role. Mr. Winn was interviewed by a recruiter, who was an employee of TSMC, and Teressa Harnois, then the Head of HR for TSMC. These individuals made the ultimate hiring decision for the role, and selected Mr. Winn for employment. While

57

Mr. Winn was contracted by AppleOne Employment Services ("AppleOne") for the position, which provides staff to both TSMC North America and TSMC Technology, he was, in fact, a contractual employee of TSMC. While Mr. Winn received payment through AppleOne Employment Services, TSMC maintained complete control and supervision over Mr. Winn's day-to-day work and decided if and when to extend Mr. Winn's employment contracts (this responsibility first belonged to Ms. Harnois, but was later transferred to Judy Chiu, who replaced Ms. Harnois). And AppleOne only hired Mr. Winn after he had been selected for the Recruiting Coordinator role by TSMC. When the TSMC role ended with Mr. Winn's constructive discharge, so did Mr. Winn's position with AppleOne.

141.    Mr. Winn had a hybrid work schedule with TSMC, working three days per week at TSMC North America and TSMC Technology's office in San Jose, California, and two days per week remotely from his home. He reported to Deb Howington, Deputy Director, Talent Acquisition for TSMC, who oversaw Mr. Winn's work. Mr. Winn had little to no contact with AppleOne during his time at TSMC, as TSMC assigned and oversaw his day-to-day tasks, and only interacted with AppleOne when submitting his time cards and reporting sick time. TSMC provided Mr. Winn's work laptop, IT support, and training, and he had access to the TSMC portals and systems necessary to complete his work.

142.    As a Recruiting Coordinator, Mr. Winn was primarily responsible for scheduling interviews for job requisitions across TSMC North America and TSMC

58

Technology, helped launch a preboarding program with another recruiter, assisted with university recruiting tasks, and maintained and organized various recruiting and Human Resources documents. With respect to interview scheduling, Mr. Winn would be provided with resumes that had advanced through the initial screening process by TSMC's recruiters. The vast majority of candidates for whom he was tasked with scheduling interviews, and who were ultimately hired by TSMC Arizona or TSMC Technology, were East Asian and spoke Mandarin. Similarly, all of the student interns hired by TSMC who worked in the office with Mr. Winn were East Asian.

143.    When Mr. Winn first joined TSMC, he participated in a meeting with the recruitment team, which included TSMC recruiters and Teressa Harnois (HR Head). During that meeting, the topic of discrimination in favor of Taiwanese candidates was raised. Specifically, an individual on the hiring team complained that one of TSMC's hiring managers was discriminating against Indian candidates and anyone who didn't speak Mandarin.[21] Qualified candidates who did not meet TSMC's preferred race or national origin criteria were being rejected by this hiring manager while less qualified Taiwanese candidates were being moved forward in the hiring process. While Ms. Harnois stated that she would address the issue at a later time, given the time constraints of the meeting, Mr. Winn is not aware of what steps were taken (if any) to address the

---

[21] Mr. Winn is also aware of a hiring manager who requested to only interview candidates from certain universities where the Taiwanese student population was large (e.g., USC where Chinese students make up the school's largest international school population and UC Berkeley where Chinese students made up around 18% of the new undergraduate class in 2022).

SECOND AMENDED COMPLAINT

issue, and Ms. Harnois was ultimately replaced by Judy Chiu (a Chinese/Taiwanese employee) towards the end of 2023. Ms. Chiu was aggressive, and constantly yelled at and demeaned a White employee, Kathryn Agarpao, who was a Human Resources Program Manager.

144.    It is Mr. Winn's understanding that he was just one of two contractor employees at TSMC. However, despite his strong performance, TSMC never converted Mr. Winn to a full-time TSMC employee (despite his multiple requests).

145.    After working for TSMC for approximately fifteen months, Mr. Winn applied for an Organizational Development Specialist role with TSMC North America, a role which would have reported to Annie Hu, a member of the HR leadership team who is Chinese. During an HR leadership meeting, Ms. Hu had proposed Mr. Winn to Ms. Harnois for the role, with 70% of his workload being dedicated to the Organizational Development specialist role and 30% of his workload dedicated to recruiting until he fully transitioned into the Organizational Development Specialist role. Mr. Winn was a good fit for the role, as it would have required him to implement, lead, and support future HR projects (a task he was already assisting with). But after the job posting was made public and Mr. Winn formally applied to the role, Judy Chiu became involved in the hiring process, and Ms. Hu began considering additional candidates beyond Mr. Winn (despite having previously found him to be a fit for the role and encouraging him to apply). Ms. Hu interviewed ten candidates, 90% of whom were East Asian, and ended up selecting two Taiwanese candidates as finalists for the

60

role, one of whom was ultimately hired for the position.

146.    Mr. Winn then applied for a Business Operations role for TSMC North America that was located in San Jose. The job posting for the role stated that the ability to speak Mandarin was preferred, but not required for the position. Ms. Howington encouraged Mr. Winn to apply for the role, and spoke with the Director of the group, Robin Wang, who is East Asian, to put in a good word for Mr. Winn. However, during that conversation, Mr. Wang expressed discomfort in hiring Mr. Winn, who is not Chinese or Taiwanese, but reluctantly agreed to speak with him to see if he was a "fit."

147.    Mr. Winn was then scheduled to interview with the hiring team. However, in advance of his interview date, the hiring manager dropped by his cubicle unannounced with another team member (both of whom were East Asian females) and asked to conduct the interview immediately. Mr. Winn acquiesced and interviewed for the role without being afforded time to prepare. During the interview, Mr. Winn performed well, and was advanced to the next round in the interview process.

148.    Mr. Winn then participated in the second interview a week later, which was designed to assess his skills in Excel. The interview was attended by the same two mangers as his first interview, along with two new interviewers. After a brief conversation regarding Mr. Winn's background and interests, he was assigned a simple task in Excel, which took him one minute to successfully complete. Mr. Winn was then asked whether he spoke other languages, knew Chinese, or had any issues not speaking Mandarin in recruiting. Mr. Winn responded that he did not speak Mandarin, and that

61

it had never posed an issue when working for TSMC. Mr. Winn was then asked what he would do if he had someone on the phone who spoke only Mandarin (the ability to speak Mandarin was not a requirement for the Business Operations role). Mr. Winn responded that he would be willing to learn Mandarin, but that in the interim, he would ask a coworker who spoke the language to assist with the call.

149.    Mr. Winn was ultimately rejected by TSMC North America for the Business Operations role. A few weeks later, Mr. Winn was at lunch with his teammates, which included Wendy Sun, a Taiwanese recruiter who had been with TSMC North America for six years. During that lunch, he asked his colleagues why he was not selected for the Business Operations role, and the group's consensus was that it was because he was not a woman and did not speak Mandarin, and that everyone on the team was female and spoke the language. It is Mr. Winn's understanding that the Business Operations team in San Jose had a history of interviewing and hiring only East Asian females who spoke Mandarin for their team.

150.    Mr. Winn left TSMC on January 26, 2024, as he knew the company's discriminatory culture would not change, and that there would be no future growth for him with the company, given that TSMC had rejected his candidacy on two occasions. Mr. Winn was constructively discharged due to TSMC's discriminatory conduct.

*Mr. McKinley's Experience*

151.    Edward McKinley is a Process Engineer who is skilled in process engineering, manufacturing operations, sales leadership, and building client

relationships across diverse industries. He holds a Bachelor's Degree in Communication and Media Studies from California Baptist University. Over the past decade, Mr. McKinley has served as a Process Engineer, Manufacturing Technician, and Sales Representative, and has worked in Customer Support. Prior to joining TSMC, Mr. McKinley worked as a Manufacturing Technician for Entegris for almost four years.

152.    Mr. McKinley joined TSMC Arizona on December 7, 2021, moving from Los Angeles, California to Arizona for work. While he was hired as a Manufacturing Operator, he was also tasked with campus recruiting and sat on a board that was responsible for selecting cafeteria food for TSMC Arizona. Mr. McKinley reported to Dieuanh Phan, who is Taiwanese.

153.    TSMC hired Mr. McKinley because he is African American, and the company needed an employee to showcase its purported commitment to "diversity." TSMC forced Mr. McKinley to be profiled on social media and in internal newsletters, and had him participate in campus recruiting efforts, even though he did not have a background in talent acquisition. When Mr. McKinley assisted in campus recruiting, he would receive resumes ranked in order of priority, and Taiwanese and Chinese students were almost always given the number one ranking. TSMC overwhelming hired students of Taiwanese and Chinese descent.

154.    While TSMC used Mr. McKinley as an example of its "diversity," Mr. McKinley was consistently treated poorly and subjected to a hostile work environment

63

by his Taiwanese colleagues. Mr. McKinley was constantly yelled at, criticized, and excluded by his team. (Mr. McKinley was the only Black employee on his team of seven and was the only one who was treated with hostility). On one occasion, when Mr. McKinley returned from lunch, he noticed that one of his colleagues had left her computer open with a message from a group chat clearly visible, stating: "Ed McKinley is a spy for HR. Don't trust him." While Mr. McKinley reported the hostile work environment to his manager on multiple occasions between December 2021 and the end of March 2022 (when he left for training in Taiwan), no changes were made to improve Mr. McKinley's treatment and working conditions.

155. In April 2022, Mr. McKinley traveled to Taiwan for engineering training, and was part of the initial TSMC Arizona group sent to Taiwan. While he was there, the Taiwanese trainers picked on him and bullied him, and his work was criticized without justification. Mr. McKinley again reported the harassment, this time to Scott Holman, CHRO, who was located in the United States. Mr. McKinley explained to Mr. Holman that TSMC was targeting Black employees, including Mr. McKinley, and treating non-Taiwanese employees unfairly.

156. After Mr. McKinley complained of the discrimination and hostile work environment at TSMC, his treatment worsened. Mr. McKinley's Taiwanese colleagues constantly yelled at him, trying to get a rise out of him and start physical fights. But Mr. McKinley remained calm and refused to engage. On one occasion, Mr. McKinley's Taiwanese colleague cornered him in the bathroom at a karaoke night, got in his face,

64

and yelled "You want to hit me, don't you?" Mr. McKinley responded "No," and simply walked away. In November 2022, Mr. McKinley was specifically told by one of his Taiwanese colleagues "nobody likes you."

157. Mr. McKinley again raised his concerns with Mr. Holman in October 2022. During that meeting, Mr. Holman, who is Caucasian, became very upset, as other non-Taiwanese employees had reported the same discriminatory conduct. Mr. Holman shared with Mr. McKinley that the Taiwanese employees at TSMC were targeting those of other nationalities and trying to get them to quit, and that Mr. McKinley was not alone in his experience.

158. The hostile work environment and resulting stress became so unbearable that Mr. McKinley began having panic attacks and was unable to sleep or focus at work. Mr. McKinley ultimately sought medical treatment, and was referred by TSMC to one of the company's therapists, who is Taiwanese and was paid directly by TSMC. The therapist spoke mostly in Mandarin, and prescribed Mr. McKinley a medication he had never taken before that made Mr. McKinley feel out-of-body, without inhibitions, and made impulse control difficult. While Mr. McKinley still has the prescription, it is in Chinese, and he was never warned of the side effects from his TSMC doctor.

159. TSMC terminated Mr. McKinley in November 2022 while he was still in Taiwan for training.

*Ms. Prieto's Experience*

65

160.     Wendy Prieto is an engineer who holds a Bachelor of Science Degree in Robotics (Engineering) from Arizona State University. She is currently pursuing a Master of Science Degree in Manufacturing Engineering, and will complete her coursework in August 2025. Ms. Prieto joined TSMC shortly after graduating college in May 2022 and currently works as a Mechanical Engineer for Intel.

161.     Ms. Prieto joined TSMC Arizona as an IT Engineer in August 2022. At the time of her hire, TSMC Arizona's IT Department—the department in which Ms. Prieto worked—was diverse, and employed engineers from a number of different backgrounds. Ms. Prieto first reported to Seven Hsieh, who is Taiwanese.

162.     Ms. Prieto's initial experience at TSMC was positive. Her manager, Ms. Hsieh, treated her well and worked to create a career path for Ms. Prieto which would allow her to be successful at the company. The IT Department was divided into three sections—2999, which was responsible for customer support, and comprised of mostly technicians, 3999, the fab support system, which was comprised mostly of engineers, and 5999, which was the business application of IT. Ms. Prieto began her career with TSMC training in 2999, but then transitioned to 3999, which matched her skillset and engineering background. Ms. Hsieh informed Ms. Prieto that she wanted her to be the tool owner of that group in two years, and encouraged her to learn as much as she could to advance within the company.

163.     However, about six months into Ms. Prieto's employment with TSMC Arizona, there was a change in leadership, which was accompanied by a dramatic shift

66

SECOND AMENDED COMPLAINT

in her treatment, and the treatment of other non-Taiwanese applicants and employees. Ms. Hsieh was sent back to Taiwan and was replaced by Lauren Deng (who is Taiwanese). TSMC also transferred Jasper Chien, a Taiwanese manager, to TSMC Arizona.

164. Following the change in leadership, new hires to TSMC were all Taiwanese, or East Asians who spoke Mandarin, and trainings began being conducted in Mandarin. The non-Taiwanese members of the IT Department in which Ms. Prieto worked either quit due to the company's harsh treatment, or were moved to other areas within the company.

165. While Ms. Prieto wanted to continue to grow within the company, her efforts were stymied. Ms. Deng was not supportive of Ms. Prieto's efforts to advance within TSMC and to take on more responsibility. Ms. Deng made it clear that because Ms. Prieto did not speak Mandarin, she would not succeed. When Ms. Prieto asked to be sent to Taiwan for training like the Taiwanese workers who were recently hired in the U.S., so that she could learn the language and continue to develop professionally, Ms. Prieto was denied this training, and was told that the Taiwanese workers would train her when they returned from Taiwan. But that approach made little sense, given that Ms. Prieto had been with the company for over a year, and was well versed in TSMC's systems, whereas the new TSMC hires sent to Taiwan had little to no knowledge of TSMC's systems. While Ms. Deng ultimately suggested that Ms. Prieto try to learn Mandarin using the Duolingo app, she was specifically instructed that any

67

such study of Mandarin was to be conducted during Ms. Prieto's personal time, and outside of work hours. When Mr. Prieto asked if she could dedicate just one hour of her twelve-hour shifts to learning Mandarin, her request was denied.

166. Ms. Prieto was given some training manuals while at TSMC, but all were written in Chinese. She was instructed by her manager to use Google to translate the materials into English, but TSMC had security restrictions in place which prohibited her from doing this. Ms. Prieto was thus at a training disadvantage as compared to her Taiwanese colleagues (particularly those that were sent to Taiwan for training).

167. Following the change in management, Ms. Prieto's work transitioned from IT engineering tasks (for which she was originally hired), to lower-level technician work, despite Ms. Prieto having asked to take on greater responsibility and despite her degree in engineering. At the same time that Ms. Prieto was being forced to perform lower-level technician work, TSMC continued to hire Taiwanese engineers who spoke Mandarin, and assigned them the technical work that Ms. Prieto had repeatedly asked for (and was well qualified to perform, as she had before for TSMC). Slowly, Ms. Prieto's work and job responsibilities were stripped away, and she was ignored by her colleagues and management because she did not speak Mandarin.

168. Ms. Deng ultimately transferred to another role within TSMC, and Ms. Prieto began reporting to Mr. Chien. Mr. Chien treated Mr. Prieto with hostility as she was not Taiwanese, and ignored her, choosing to speak only with team members who knew Mandarin (despite the fact that Mr. Chien was fluent in English). At her

68

SECOND AMENDED COMPLAINT

performance review, Mr. Chien rated Ms. Prieto poorly (despite Ms. Prieto being a strong performer), claiming that she didn't have enough practice. But all of the cases and procedures at TSMC that would have allowed Ms. Prieto to have more practice were in Chinese/Mandarin, foreclosing Ms. Prieto from access. Ms. Prieto's Taiwanese colleagues also treated her with disdain, and wouldn't even respond when she would say "good morning."

169.    When it was clear to Ms. Prieto that Mr. Chien's treatment of her would not improve, she attempted to transfer to the Automated Material Handling System ("AMHS") department at TSMC. Ms. Prieto interviewed for an engineering role in that department, performed well, and was told that she would be a great fit for the team. Mr. Chien informed Ms. Prieto, however, that if she was ultimately offered the role, she would be put on probation for one month (as he did not think she could perform the role). While Mr. Chien agreed to release Ms. Prieto, he did so only on the condition that another non-Taiwanese member of the group transfer with her to AMHS, whom Ms. Prieto would be forced to compete against for the engineering role (Ms. Prieto's colleague had not expressed any interest in the role or in a transfer). It was clear that Mr. Chien was eliminating non-Taiwanese employees from his team. Ms. Prieto waited for a month to learn whether she would receive the engineering role with AMHS, but when TSMC still had not made its decision after a month, she resigned from TSMC on or around February 12, 2024. Ms. Prieto was constructively discharged by the company.

SECOND AMENDED COMPLAINT

*Mr. Zepeda's Experience*

170.    Luis Zepeda is an experienced IT professional. Prior to joining TSMC, Mr. Zepeda worked as a repair agent in the IT department at Best Buy, as an IT technician at Glendale Community College, and as a data center operations lead at Banner Health. He has also completed coursework at Arizona State University, with a focus in Computer Technology.

171.    Mr. Zepeda joined TSMC Arizona's IT department in July 2022 in an IT Tech role. (At the time of his departure, his role was titled "IT User Success," but Mr. Zepeda was never given a formal promotion or elevated to a "lead" role.) He was the third hire in the IT department and tasked with building the department from the ground up, which included creating standard operating procedures ("SOPs") and training materials for the department. After about a year, Taiwan HQ became more involved and separated the IT department into three tiers, the highest of which was the Fab Applications team, which provided IT support for fabs, and was comprised of approximately eight people, including Mr. Zepeda. At that time, only two of the eight team members spoke Mandarin, and the majority of the team members were not Taiwanese or Chinese. A few weeks after the division of the IT department, Mr. Zepeda's team was pulled into a meeting at which they were told by Lauren Dang (Deputy Director of IT) that "things are changing soon," that new managers would be coming over from Taiwan to provide training, and that anyone not fluent in Mandarin did not "have a future on the team or the department." It was stated thereafter in job

70

postings for the IT department that Mandarin was a requirement for roles, and from there on out, the only new hires were Mandarin speakers of Taiwanese or Chinese national origin, most of whom were on visas. By the end of Mr. Zepeda's time at TSMC only two members of his eight-person team were not fluent in Mandarin and not of Taiwanese or Chinese national origin (including Mr. Zepeda), and the other left TSMC on the same day as Mr. Zepeda.

172.    After the meeting with Ms. Dang, Mr. Zepeda complained to Brian Mullin (HR Business Partner), and Mr. Mullin held a meeting with the non-Mandarin speakers in the IT department. In that meeting, the employees voiced concerns about Ms. Dang's comments, about the new assignees having been given an opportunity to meet one-on-one with the Director of IT (Peter Cheng)—an opportunity non-assignees had not been given, and about a new policy whereby IT workers would be required to rotate their work scheduled (i.e., work 2-3 months of day shifts, followed by 2-3 months of night shifts, and so on).[22] Following the meeting, the non-assignee IT workers were granted the opportunity to speak with Mr. Cheng, but Mr. Zepeda's meeting with Mr. Cheng only reinforced Mr. Zepeda's suspicion that Mr. Cheng (and TSMC) did not care about U.S. workers. The meeting lasted at most ten minutes—while the Taiwanese and Chinese assignees were able to meet with him for an hour—and Mr. Cheng arrived twenty minutes late, did not bother to learn Mr. Zepeda's position in advance of the

---

[22] This policy was ultimately only enacted as to the Fab Applications team—Mr. Zepeda's team.

71

SECOND AMENDED COMPLAINT

meeting, then proceeded to explain Mr. Zepeda's job to him before answering a phone call and walking out. Mr. Zepeda felt that the meetings were given as a check-the-box activity, so that TSMC could say that the non-assignees were given the opportunity to meet with management in response to their complaints.

173.    Mr. Zepeda also noticed that many of the new TSMC hires did not have a college degree or experience related to the requirements stated in the job postings for their positions. Where they did have IT work experience (and many had none), it was frequently in an unrelated industry. Even though Mr. Zepeda and those on his original team had more relevant experience (having been at TSMC for over a year) and understood the systems, the new hires were soon given lead roles, managing Mr. Zepeda and others. In practice, Mr. Zepeda still ran things, as the new hires were still learning the ropes and many had never worked an IT job, but his communications with management were filtered through the new hires, which took place largely in Mandarin. For instance, Mr. Cheng, who is from Taiwan, avoided speaking to anyone who was not Taiwanese or Chinese, and many operations were conducted in Mandarin. In at least one instance, there was a meeting that Mr. Zepeda was told not to worry about attending because it would be conducted in Mandarin.

174.    In addition, the Chinese and Taiwanese hires were given accommodations that Mr. Zepeda and other non-Chinese and non-Taiwanese employees were denied. For instance, those subject to the shift rotation policy found it difficult to switch back and forth between day and night shifts, and a Taiwanese worker who complained was

72

allowed to change his schedule so that his work schedule was consistent. In contrast, when Mr. Zepeda and another coworker (who was also of non-Taiwanese/ Chinese national origin) requested an arrangement whereby Mr. Zepeda would always take days and the co-worker (a natural night owl) would take nights, the request was denied. As a result of the shift change requirement, Mr. Zepeda was forced to drop out of Arizona State University, where he was pursuing a degree. In addition, the general rule in the IT department was that remote work was not allowed, and this rule was enforced for non-Taiwanese and non-Chinese workers. In contrast, a Taiwanese co-worker was allowed to work from home for three months to care for a sick family member, and a Chinese co-worker whose visa expired was allowed to work remotely from China.

175. After the management change at TSMC, the responsibilities of the non-Taiwanese and non-Chinese workers on Mr. Zepeda's team were also substantially curtailed, as most operations were conducted in Mandarin. Mr. Zepeda and those on his team who did not speak Mandarin then focused heavily on translating SOPs from Chinese to English using Google Translate. Often the translation did not make sense, so Mr. Zepeda spent time fixing the translated SOPs to make them usable. Mr. Zepeda was called into Ms. Dang's office and told that he was spending too much time on the translations. Mr. Zepeda explained the issues with using Google Translate and explained that he was trying to make the SOPs usable for non-Mandarin speakers. Mr. Zepeda was reprimanded for doing this, which he understood to mean that TSMC did not care about devoting resources to tasks that would enable non-Mandarin speakers

73

(who were by and large not Taiwanese or Chinese) to be successful and feel welcome at TSMC. The message was received—by the end of his time at TSMC, all five of Mr. Zepeda's original team who were not fluent in Mandarin and not of Taiwanese or Chinese national origin left the company. Prior to the management change, Mr. Zepeda had been told by his manager, Seven Hsieh, that he was being considered for a promotion to Engineer. After the management change, however, it was clear that the prospect of promotion had disappeared.

176.    Mr. Zepeda resigned from TSMC in March 2024 due to the hostile work environment described above. He knew the company's discriminatory culture would not change, and that there would be no future growth for him with the company, given Ms. Dang's statement that there was no possibility for upward movement for non-Mandarin speakers. Mr. Zepeda was constructively discharged due to TSMC's discriminatory conduct.

*Mr. Sterbinsky's Experience*

177.    Phillip Sterbinsky is a U.S. Navy veteran. He was an Electronic Technician and then an Instructional Supervisor in the Navy with substantial responsibilities for leading teams and coordinating training and instruction materials. He has a degree in from Grand Canyon University.

178.    Mr. Sterbinsky joined TSMC Arizona in June 2022 as a Wet Tech Advanced Technician with responsibilities that included cleaning fab machines. He was later promoted to Senior Technician. Once he was hired, Mr. Sterbinsky started

74

his training online, and was then sent to Taiwan for 300 days to complete his training. Mr. Sterbinsky's experience training in Taiwan was terrible. He was frequently yelled at by his managers and called stupid and lazy, and he heard Taiwanese employees say that "black people are lazy and smell." His experience was not unique—when he arrived in Taiwan, there were four U.S. workers in his section, but all quit soon after as a result of TSMC's hostile and discriminatory treatment.

179.    In the U.S., Mr. Sterbinsky continued to experience hostility that made it difficult for him to perform his job effectively. For instance, when components of Mr. Sterbinsky's job required coordinating with other TSMC departments, his requests to coordinate were met with silence, while his Taiwanese and Chinese counterparts received immediate responses. In one instance, he asked the company to send a technician to help with a leak, and was told that there was nobody to send. Mr. Sterbinsky then asked a Taiwanese counterpart to make the exact same request, and someone was immediately sent to help. In another instance, Mr. Sterbinsky was refused a broom that he needed to clean up debris, and was told to buy one on his own and submit for reimbursement. Often, when Mr. Sterbinsky asked his Chinese or Taiwanese colleagues how to do something, he was told "I don't know," but then he would later see those colleagues performing the activities for which they had disclaimed knowledge. Additionally, TSMC frequently sent Teams messages that employees were required to respond to in a certain amount of time, but they were often in Chinese such that Mr. Sterbinsky had to scramble to contact another department for

75

a translation within the deadline. It was clear to Mr. Sterbinsky that this culture of hostility and exclusion came from the top down—the head of his department spoke only in Mandarin, despite being fluent in English.

180.    Mr. Sterbinsky also observed a complete disregard for safety at TSMC. Non-Mandarin speakers (who were largely not Chinese or Taiwanese) were most at risk, because instructions were communicated in Mandarin and were frequently not relayed to non-Mandarin speakers. As a result of the lax safety standards, accidents (including fatal accidents) were frequent. Mr. Sterbinsky submitted two Occupational and Safety Health Administration ("OSHA") complaints and an internal complaint to TSMC's Legal Department, but his complaints were ignored.

181.    Mr. Sterbinsky understood that East Asian directors and managers had bonus-related KPIs based on maintaining a certain number of U.S. employees in their departments (a requirement that Mr. Sterbinsky understood to be related to the CHIPS Act). It was clear to Mr. Sterbinsky that those KPIs were just for show, given the openly hostile treatment of non-East Asians and culture, and in any event, were entirely ineffective. When Mr. Sterbinsky left TSMC, he was the only non-Chinese and non-Taiwanese hire left on his team.

182.    Mr. Sterbinsky left TSMC in September 2024 due to the hostile and discriminatory work environment described above. He knew the company's discriminatory culture would not change, and that there would be no future growth for him with the company. He was constructively discharged due to TSMC's

76

discriminatory conduct.

*Mr. Langley's Experience*

183.    Samuel Langley is a Certified Industrial Hygienist and Certified Safety Professional. He is a Professional member of the American Conference of Governmental Industrial Hygienists and the American Industrial Hygiene Association. He has a Bachelor of Science degree in Environment Health Science ("EHS") with an emphasis in Industrial Hygiene from Eastern Kentucky University and a Master of Science in Occupational Safety and Health from Southeastern Oklahoma State University.  Mr. Langley has over fifteen years of work experience, including as an EHS Manager for Georgia Pacific LLC (a pulp, paper, and container manufacturer), an EHS Engineer for 3M Corporation (a producer of epoxy resins and equipment), and a Senior Health and Safety Engineer for Samsung Austin Semiconductor (a manufacturer of semiconductor wafers).

184.    Mr. Langley joined TSMC Arizona in June 2022 as a Senior EHS Engineer, relocating from Austin, Texas to Phoenix, Arizona for the position. Mr. Langley was the only process safety engineer supporting the operations and the only industrial hygienist onsite, and his responsibilities included safety inspections, overseeing audits, electrical safety, and overseeing fall protection. When he joined TSMC, the EHS group was largely U.S. hires, including Mr. Langley, an EHS Manager, two EHS engineers, and some first responders. Mr. Langley and one other EHS engineer were initially the only two employees working in the U.S., and

coordinated with the other members of the group who were training in Taiwan. (Mr. Langley was originally supposed to train in Taiwan as well but his visa issuance was delayed.) Things initially ran smoothly as Mr. Langley and his team put together training materials.

185.    In or around September 2022, leaders from Taiwan began arriving in Phoenix and in the months thereafter, hundreds of Chinese and Taiwanese workers began arriving to staff all departments at TSMC Arizona. In or around October 2022, assignees from Taiwan and China began showing up to staff EHS positions. Mr. Langley would become aware of these new hires when they appeared in meetings, unannounced. Thereafter, a cultural divide became apparent—there would be a team meeting in the morning conducted in English, and a separate meeting afterward, conducted entirely in Mandarin, and it was not clear whether the same information was being passed along to both groups. By the time Mr. Langley left, TSMC those in charge of his department were all assignees from China or Taiwan and there were around 18 people on his team (in addition to about a dozen first responders), at least 30% of whom were assignees from China or Taiwan.

186.    The employees brought into Mr. Langley's group were junior, and many had little to no work experience. Those who had work prior experience had never worked in the United States, and a substantial component of EHS work required an understanding of United States regulations. Even EHS experience at a fab in another country was of limited use—while the fab-specific component of the position was

78

fairly learnable, U.S. regulations were more complex.

187. The change in staffing at TSMC Arizona was accompanied by a complete disregard for OSHA standards. Mr. Langley was asked to sign waivers to allow workers to work at heights of 20-30 feet without fall protection—a request he refused. There were numerous injuries and safety violations. Despite being the most experienced person in the department, with the highest education and credentials, Mr. Langley's responsibilities were curtailed and handed to assignees with no experience with U.S. regulations and no business having those responsibilities. Mr. Langley heard assignees say that "Americans were useless," were considered "dumb Americans" and "don't know what they're talking about." Many of Mr. Langley's responsibilities were handed over to an inexperienced Taiwanese assignee on a short-term visa who had planned to return to Taiwan. To convince him to stay, TSMC brought this employee's girlfriend to the U.S. on a visa and gave her the position of EHS Construction Safety Engineer even though she too had minimal experience.

188. Mr. Langley also observed that Chinese and Taiwanese employees were preferred and given special treatment in promotion and appraisal decisions. For example, Mr. Langley got a 2.38% raise despite his level of experience and expertise, and is aware of inexperienced assignees receiving 8 and 9% raises. He also observed assignees being promoted at higher rates than local, U.S. workers despite their inexperience, and learned of a U.S. (non-Taiwanese/Chinese) engineer who inquired about a promotion and was told that he would have to wait until the following year

79

because promotions had already been given to assignees from China and Taiwan.

189. Mr. Langley left TSMC in February 2024 due to the hostile and discriminatory work environment described above. He knew the company's discriminatory culture would not change, and it was becoming increasingly clear that the discriminatory culture was inhibiting from doing his job effectively. He was constructively discharged due to TSMC's discriminatory conduct.

*Mr. Driggs' Experience*

190. Kevin Driggs is an HR professional who specializes in recruiting, employee relations, and workforce planning. He has over 20 years of relevant experience in HR and Talent Acquisition and has held a number of senior management roles, working closely with leadership. Prior to joining TSMC Arizona, Mr. Driggs worked as a Senior HR Manager for Micron Technology for almost 13 years, managing a team of up to 15 members, developing recruiting strategies and processes, and creating and fostering strategic partnerships with target universities.

191. Mr. Driggs joined TSMC Arizona in March 2021 and worked there for just over a year as a Senior Manager, Talent Acquisition. Mr. Driggs was one of TSMC's first 10 hires in Arizona. He reported to Ben Miller (a former Director and Head of HR who was constructively discharged by TSMC after just 6 months with the company), and later to Scott Holman, TSMC's CHRO (who has also left the company). At TSMC, Mr. Driggs managed a team of six employees and was responsible for recruiting and onboarding. During his time with the company, Mr. Driggs hired over

80

600 Engineers and Technicians and worked—to the best of his ability—to establish U.S. recruiting policies and practices for the company, including training hiring managers on U.S. labor laws.

192.    Soon after joining TSMC Arizona, it became apparent to Mr. Driggs that the company was not interested in assimilating with U.S. culture, nor obeying U.S. labor laws governing the recruitment and hiring of employees. During one of the first recruitment calls in which Mr. Driggs participated, candidates for technician roles were presented, and TSMC instructed HR that "no females" were to be considered for those positions. Older non-Taiwanese and non-Chinese employees were also openly disfavored by TSMC. On one occasion in June 2021, Allan Lan (who is Taiwanese) sent Mr. Driggs an email instructing him not to hire a candidate over 40 and to instead focus on hiring the "young bucks." When Mr. Driggs told Mr. Lan that it was not acceptable to discriminate against older workers or to use such language in emails, as it would subject him to legal trouble, Mr. Lan responded simply that he would "scrub" the email next time, not that his conduct would change.

193.    Over time, Mr. Driggs learned that TSMC had a discriminatory preference for Taiwanese and Chinese candidates in hiring, preferring to hire those who spoke Mandarin or read Chinese over all others. On one occasion, TSMC hired a candidate whose only prior work experience was at Baskin Robbins, simply because the applicant spoke Mandarin. Mr. Driggs had presented a non-Taiwanese candidate for the same role who had five years of relevant experience with Micron, but TSMC rejected Mr.

81

Driggs' referral. TSMC also refused to hire any U.S.-based managers, preferring instead to bring Taiwanese managers onsite for these roles. During Mr. Driggs' tenure, only one non-Taiwanese local manager was hired, at Mr. Driggs' insistence (despite Mr. Driggs having submitted hundreds of qualified profiles to TSMC for manager-level roles).

194.    As part of their recruiting efforts, Mr. Driggs and the recruiting team would send large volumes of candidates to TSMC's hiring managers located in Taiwan. But despite sending the hiring managers thousands of qualified candidates, very few were hired in the U.S. who were not of Taiwanese or Chinese descent. Further, employees in leadership roles would disqualify or reject candidates without having met or spoken with them. For example, Mr. Driggs learned that the Vice President of Manufacturing and Fab Director for Arizona, Y.H. Wu (who is Taiwanese), reviewed every potential manufacturing hire, regardless of job level, and rejected profiles (who had passed 2 levels of interviews) without even speaking to candidates, preferring to hire those of Taiwanese descent who spoke Mandarin. Mr. Wu was hiring Mandarin speakers even though they had no relevant experience in the semiconductor industry, in line with the company's discriminatory practices. Despite trying to increase TSMC's diversity hiring, Mr. Driggs was ultimately told "just bring on as many Taiwanese as you can."

195.    Because TSMC could not staff the entire fab with Taiwanese and Chinese employees, it was forced to hire some candidates of its non-favored races and national

82

origins. When hiring locally, however, TSMC preferred to hire inexperienced workers, as those employees were less likely to challenge TSMC's practices or to speak out against the discriminatory and hostile work environment at TSMC. Candidates with more than 2 years of experience were seen as "not coachable," and oftentimes excluded from consideration despite having relevant experience. When Mr. Driggs spoke to TSMC leadership about the company's practice of hiring inexperienced workers, he was told that TSMC managers did not like the American culture, and knew that Americans would be vocal and question their authority. TSMC's preference for younger, inexperienced hires who would follow instructions without question led to the rejection of many qualified U.S. workers.

196.    While Mr. Driggs sought to correct TSMC's discriminatory practices by holding multiple trainings on U.S. discrimination laws, the Taiwanese employees in attendance refused to turn on their cameras and did not participate by making comments or asking questions. Mr. Driggs had no way of knowing whether they were paying attention to his trainings and no authority to require participants to turn on their cameras. TSMC's leadership had no interest in making sure that its Taiwanese workers understood and were complying with U.S. laws.

197.    During Mr. Driggs' tenure with TSMC, he also witnessed the company's hostile work environment towards non-Taiwanese and non-Chinese employees. Comments to the effect that "Taiwanese are better than those in the U.S." was common, and female recruiters would leave meetings in tears, having been berated and

83

humiliated by Taiwanese management.

198.     Mr. Driggs repeatedly raised concerns regarding TSMC's discriminatory hiring practices, including to his Human Resources Director, Ben Miller, Pierre Loisel, who is Taiwanese and works in Taiwan, Mr. Miller's replacement, Scott Holman, CHRO, Brian Harrison, a Vice President, and Ted Chiang, Senior Director of HR. To Mr. Driggs' knowledge, no action was taken to address or remedy these practices, including after his departure from the company.

199.     Mr. Driggs was constructively discharged from TSMC Arizona in April 2022, having been forced to resign due to TSMC's blatant disregard for U.S. labor laws and constant rejection of qualified non-Taiwanese and non-Chinese candidates, which made it impossible for Mr. Driggs to perform his job and frustrated his job's purpose. Just prior to his constructive discharge, and after becoming more vocal and frustrated with TSMC's discriminatory hiring practices, Mr. Driggs received negative performance feedback from TSMC—the only time in his career he has received such feedback. Mr. Driggs was told that TSMC Headquarters was not pleased with his progress, an unfounded claim in light of Mr. Driggs' hard work and efforts to change TSMC's discriminatory practices. Mr. Driggs was replaced by Emmy Chen, an HR employee from Taiwan, despite the fact that a local, non-Taiwanese employee who Mr. Driggs hired with 15 years of experience should have been given Mr. Driggs' role.

*Ms. Bernardo's Experience*

200.     Michelle Bernardo is a Human Resources professional with nine years of

84

relevant experience. She holds an Associate of Science Degree in Paralegal, a Bachelor of Science degree in Business Administration (International Business), an MBA in Management, and is a Ph.D. candidate (I/O Psychology) set to graduate this year. Ms. Bernardo has experience across all HR functions on a global scale and has helped launch two start-up businesses in Arizona—Chewy (4,000 employees) and TSMC Arizona (2,500 employees).

201.    Ms. Bernardo joined TSMC Arizona in December 2021, after having been recruited by a former manager from Chewy, and she now helps support approximately 2,500 employees (a figure that continues to grow) as a Senior Human Resources Business Partner ("HRBP").

202.    At TSMC, Mr. Bernardo reported to Sheng Cho Lai, a HRBP Manager who had no prior HR experience. Mr. Lai treated Ms. Bernardo poorly, bullied her, and would shame her on emails that included Ms. Bernardo's colleagues. Mr. Lai also spoke negatively about Ms. Bernardo's skill sets to Elaine Wei, a TSMC colleague. Mr. Lai himself was a poor performer, and received an S- ("poor") performance review score in 2023, but was never disciplined, and was instead favored as he spoke Mandarin. Mr. Lai's constant harassment affected Ms. Bernardo and her schoolwork, forcing Ms. Bernardo to escalate her concerns of discrimination and hostile work environment to Kenny Huang, Senior HRBP Manager who oversaw the department, Ted Chiang, Senior HR Director (who had no prior HR experience), and at times, Richard Liu, an HR Director (all of whom are Taiwanese). While Ms. Bernardo asked

85

Mr. Huang to meet with her in-person to discuss Mr. Lai's treatment, that meeting never took place, and Mr. Lai's hostile conduct continued unabated for months. As a result, Ms. Bernardo's mental and emotional health began to decline as she was constantly bullied and harassed, and ridiculed for any and all mistakes, despite not having received training nor been presented with any standard operating procedures for recruiting. After again escalating her concerns to Mr. Huang, Mr. Chiang, and Mr. Liu, Ms. Bernardo was finally able to change managers. She began reporting to Mr. Huang in early 2024 and presently reports to Rene Perez-Cabrera.

203.    Mr. Lai treated two of Ms. Bernardo's non-Taiwanese colleagues, Ashlee Ramage and Elene Huizar, in a similarly hostile manner, placing both of them on Corrective Action Plans for purported performance issues without warning and without any type of progressive discipline. These employees were then transferred to Nai-Yu Hsu's section, another HR manager who had no prior Human Resources experience. Ms. Hsu would constantly berate Ms. Bernardo's non-Taiwanese colleagues in public and also made inappropriate comments to her direct reports on Teams and in-person. However, Ms. Hsu was not disciplined for her conduct, and instead received only light coaching, and was promoted to a higher job grade shortly thereafter.

204.    When Ms. Bernardo began reporting to Mr. Huang in early 2024, he would sometimes speak to Ms. Bernardo (though only in Mandarin with Katherine Yeh, who is Taiwanese, translating). But Mr. Huang's friendliness quickly wore off, and he began to ignore Ms. Bernardo, refusing to greet her and directing her to Ms.

86

Yeh when she asked for assistance. Mr. Huang would provide direction to Ms. Yeh, in Mandarin, and Ms. Yeh was tasked with then providing that direction to Ms. Bernardo. Mr. Huang never had any one-on-one meetings with Ms. Bernardo to discuss her performance, and would not provide her with any coaching or training, but was quick to email her when he noticed that she had made even the smallest of mistakes.

205.    Ms. Yeh too treated Ms. Bernardo poorly and would publicly shame her on emails and broadcast her mistakes to her team members. This, in turn, caused Ms. Bernardo to become isolated from her team, and many team members stopped talking to Ms. Bernardo altogether, refused to help her, and also publicly shamed her when she asked for help or had questions.

206.    Ms. Yeh is married to Eugene Tsai, an HR employee who had no prior HR experience before being hired by TSMC. Ms. Yeh convinced Mr. Chiang to hire her husband into the same HR department where she worked, thereby foreclosing a local, experienced hire from assuming that role.

207.    It is apparent from Ms. Bernardo's experience at TSMC that the company

87

is averse to hiring qualified non-Taiwanese and non-Chinese workers, preferring instead to staff Taiwanese workers with no prior relevant experience in HR roles. For instance, during Ms. Bernardo's tenure with TSMC, members of TSMC's engineering department have been transferred to HR roles, and a manager from process integration, Nai-Yu Hsu, was given a managerial role in HR despite still being under process integration's headcount (TSMC simply wanted a Taiwanese worker staffed in this role). In addition, when Ms. Bernardo was reporting to Mr. Huang, two of the departments she supported were taken from her and given to Esther Lu, a Taiwanese worker with no U.S. experience and no knowledge of U.S. labor laws. Ms. Lu was also more recently given another department Ms. Bernardo supported, Industrial Safety and Environmental Protection ("ISEP"). Similarly, Helen Chung, a secretary for TSMC, had her role changed to HR by Mr. Chiang, despite her not having any prior HR experience, in order to increase her chances of localization (i.e. being considered a local employee rather than an assignee by TSMC, thereby making her eligible for the green card process). Ms. Chung was ultimately given a recruiting role in HR, despite her lack of experience. When Ms. Bernardo sent Ms. Hsu the resume of a former non-Taiwanese coworker with HR experience, Ms. Hsu told Ms. Bernardo that the candidate would not be hired, claiming, falsely, that she did not have relevant experience.

208.    Ms. Bernardo has also been targeted by TSMC for not being a member of the company's favored group. On one occasion, the Director of Manufacturing and

88

AMHS, Wexler Lee, asked Scott Holman, TSMC's former CHRO, to have a Taiwanese worker who speaks Mandarin support her organization, rather than Ms. Bernardo. Mr. Holman (who is not Taiwanese or Chinese) denied Mr. Lee's request, but Mr. Holman has since left TSMC, and Ms. Bernardo has been stripped of the departments she supported, which were given to Ms. Lu and Mr. Perez-Cabrera.

209.     Older American workers and women[23] are particularly disfavored by TSMC, and H.T. Yang, Fab Director, specifically instructed recruiters not to hire employees who are 40 or older. Recruiters are instead expected to seek out "young talents," which is how managers at TSMC often refer to younger employees. Ms. Bernardo herself has recently been forced out of the company in line with its preference for younger workers, and her responsibilities have been given to a summer intern from 2024 who was hired as a Human Resources Business Partner ("BPHR"). In addition, some TSMC managers ask job candidates if they plan to become pregnant, which TSMC seeks to avoid, preferring to hire employees without families upon whom it can imposed punitive work requirements. TSMC also tracks the citizenship of its applicants and favors Taiwanese and Chinese candidates over employees of other nationalities. During a meeting in which localization was discussed, a Taiwanese manager commented that the Taiwanese are afraid of hiring more local workers as it will

---

[23] On one occasion, Lars Lee, a section manager at TSCM, told employees to turn off their phones and laptops during a meeting then displayed pictures of women in bikinis.

SECOND AMENDED COMPLAINT

"change the environment" at TSMC.

210. Taiwanese workers are also treated more favorably than non-Taiwanese workers, both in Taiwan and in the U.S. ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

211. It is clear that TSMC protects its Taiwanese workers at all costs, allowing them to make mistakes without reprimand, while scrutinizing the work of non-Taiwanese workers and using small mistakes as pretext to force U.S. workers out of the company for purported performance issues. In fact, H.T. Yang changed the progressive discipline process so that TSMC could fire local hires more quickly. When TSMC wants to get rid of a non-Taiwanese, non-Chinese, local hire, it will target that employee and blame all mistakes on him or her so as to "justify" an S- or I performance

90

appraisal rating (the two lowest performance review scores), thereby forcing the employee out of the company. Ms. Bernardo has been a victim of this practice, pursuant to which TSMC has overloaded her with work and been overly critical of her performance, despite not having set any performance goals for Ms. Bernardo since 2023, nor scheduling any one-on-one meetings with her to discuss TSMC's expectations. Ms. Bernardo has been screamed at for small errors, and even blamed for errors made by Headquarters in Taiwan, which are out of her control. Ms. Bernardo is worried that TSMC will use purported "performance" issues to manage her out of the company. Conversely, Taiwanese workers who make mistakes are simply counseled—or in the case of Nai-Yu Hsu, are promoted and given a new job within the HR department.

212. Taiwanese hires are also treated more favorably than local hires, and are given extremely generous localization packages, which include housing, cars, paid tax preparations, etc. if they localize within one year. U.S. hires, on the other hand, receive just a one-time $5,200 bonus for joining TSMC and relocating to Arizona for work. Taiwanese workers are also given more generous vacation packages. When Ms. Bernardo sought to take a 3 to 4 week vacation in July 2024 to complete her schooling, Mr. Huang and Mr. Chiang denied Ms. Bernardo's PTO request, while allowing Taiwanese workers to take equivalent time off.

213. At TSMC, Mandarin is constantly spoken when discussing business, to the exclusion of most U.S. workers who are unfamiliar with the language, and it is

91

common for management at TSMC to yell and belittle employees, including in front of others so as to humiliate the worker.

214.     In November 2024, Ms. Bernardo had a meeting with Brian Mullin and Mr. Perez-Cabrera (the new BPHR to whom Ms. Bernardo now reports) to discuss her performance. During that meeting, Ms. Bernardo was told that Mr. Chiang and Mr. Huang wanted to place her on a Corrective Action Plan, despite them never having had a one-on-one conversation with Ms. Bernardo regarding her performance, and informed Ms. Bernardo that if her performance did not improve, she would be terminated.

215.     On November 8, 2024, Ms. Bernardo had a second meeting with Mr. Perez-Cabrera and Mr. Mullin (who has since resigned from TSMC in December 2024). During that meeting, Ms. Bernardo's performance was critiqued, and while Mr. Perez-Cabrera cited an Excel document of Ms. Bernardo's purported mistakes that was compiled by Ms. Yeh, Ms. Bernardo was not permitted to review the documentation. Ms. Bernardo was informed that she would either be put on a Corrective Action Plan, or that she could accept severance money and leave the company (Mr. Perez-Cabrera urged Ms. Bernardo to resign multiple times during the meeting). Ms. Bernardo, however, wished to remain with TSMC and informed Mr. Perez-Cabrera of the same.

216.     On November 15, 2024, Ms. Bernardo and Mr. Perez-Cabrera had a meeting with a TSMC employee to discuss the employee's time off request. However, once the employee left the meeting, Mr. Perez-Cabrera began discussing Ms.

SECOND AMENDED COMPLAINT

Bernardo's path forward at TSMC, and immediately began belittling Ms. Bernardo, telling her that moving forward, "Just don't fuck up! Get your shit done! Get it done!" Mr. Perez-Cabrera claimed that Ms. Bernardo does not have the skills to work for TSMC and that she does not know how to talk to Taiwanese people. He informed Ms. Bernardo that TSMC was moving her away from her people-facing role (which is her strength). He also stated that she would receive an S- ("poor") performance rating (despite the fact that Ms. Bernardo had not yet had a formal performance review meeting). At the end of the meeting, Mr. Perez-Cabrera commented: "I don't know how the Fuck you got hired in the first place," and then left for another meeting. Ms. Bernardo was shocked by his abrasive conduct (although she has heard Mr. Perez-Cabrera curse regularly in the workplace). The conversation was extremely unprofessional, and left Ms. Bernardo feeling disappointed, upset, and belittled.

217.     Ms. Bernardo reported the incident to the President of HR, Rose Castanares, on December 5, 2024, stating that she felt like she was being subjected to a hostile work environment, that members of HR's leadership team should encourage, rather than berate employees, and that swearing at and insulting employees is inappropriate. Ms. Bernardo cc'd Ted Chiang, Samantha Jarvinen, Employee Relations (who investigates serious claims), and Richard Liu on her email. Ms. Castanares responded to Ms. Bernardo, stating that what she described "is not acceptable" and asked Samantha Jarvinen to investigate.

218.     Shortly after Ms. Bernardo reported Mr. Perez-Cabrera's conduct, Mr.

Chiang approached Ms. Bernardo at her cubicle, and chastised her for not raising the concern to him first, as her complaint reflected on both him and Ms. Bernardo and how they work as a team. But Ms. Bernardo had previously approached Mr. Chiang to report Mr. Lai's harassment, and Mr. Chiang had taken no action.

219.    While Ms. Jarvinen interviewed both Ms. Bernardo and Mr. Perez-Cabrera regarding the incident, because they were the only two individuals in the room, Ms. Jarvinen concluded that it was a "he said/she said" incident that could not be substantiated. Ms. Bernardo was extremely upset that her complaints were not taken seriously by TSMC.

220.    While Ms. Bernardo remains employed by TSMC Arizona, she was recently informed that she would be demoted to an entry level HR role (and tasked with only administrative work) and was formally awarded an S- ("poor") appraisal score. As such, Ms. Bernardo continues to be victimized by TSMC's discrimination and hostile work environment.

*Ms. Teixeria's Experience*

221.    Victoria Teixeria is a recruiting specialist who has worked in the semiconductor industry for almost four years. She holds a degree in Psychology from Arizona State University and excels in people-facing roles. Prior to joining TSMC, Ms. Teixeria worked as a Technical Recruiting Associate for SBT Industries.

222.    Ms. Teixeira joined TSMC Arizona in February 2022 as a member of the company's recruiting team. She is a Senior Recruiter responsible for locating and

94

screening candidates for technical roles with TSMC. When Ms. Teixeira first joined the company, she reported to Kevin Driggs, Senior Manager, Talent Acquisition, until he departed the company in or around April 2022. She then reported to Emmy Chen, a Taiwanese employee who had been with the company for over 20 years. After Ms. Chen accepted an overseas assignment, Ms. Teixeira reported to an interim manager named Richard Liu (who is Taiwanese) and was part of TSMC's Global HR Operations Team. Ms. Teixeira currently reports to Mary Jane Brosowske ("M.J.") who is half Taiwanese.

223.    Ms. Teixeira has performed well in her recruiting role. She has been recognized for her work ethic, professionalism, and performance capabilities, and is a trusted employee who has generally worked with little supervision or oversight.

224.    As a recruiter, Ms. Teixeira has witnessed TSMC's discriminatory recruiting and hiring practices pursuant to which Taiwanese and Chinese candidates are favored over all others races and national origins. Older, non-Taiwanese employees and females are particularly disfavored by TSMC, oftentimes passed over for roles for which they are well qualified. Ms. Teixeira has heard a number of discriminatory (and illegal) comments made about such candidates along the lines of: "This person graduated high school too long ago. We're going to decline to hire them." TSMC prefers to hire younger, inexperienced employees, even when they do not meet the qualifications for technician roles, as it expects such employees to follow TSMC's directives without question and not to speak out against the company's discriminatory

95

employment practices. Veterans are also disfavored by TSMC, as the company views them as lacking motivation given that they receive a pension and other benefits for their prior service.

225. When Ms. Teixeira receives emails from hiring managers recommending or rejecting candidates for hire, the justification for the hiring decision is often written in Chinese. When Ms. Teixeira complained to the hiring managers that information concerning their hiring decisions was not shared with her in English, TSMC's hiring managers either stopped providing the feedback to Ms. Teixeira altogether, or continued to provide the feedback only in Chinese.

226. At TSMC Arizona, management is predominantly Taiwanese, and it is difficult for experienced, non-Taiwanese workers to assume management-level positions. While TSMC will hire local, non-Taiwanese employees who are subject matter experts in their fields, many of these employees are ultimately forced to resign from the company (a constructive discharge), as TSMC provides them with minimal resources and training, impeding their ability to succeed. These local hires are then replaced by assignees from Headquarters in Taiwan.

227. Prior to going out on maternity leave in mid-April 2024, Ms. Teixeira worked onsite at TSMC's Phoenix office. However, when Ms. Teixeira returned to TSMC from maternity leave on October 1, 2024, she sought to work remotely, an accommodation that was requested by her doctor. While TSMC initially refused Ms. Teixeira's request for an accommodation, it has since approved her doctor's request

that she be permitted to work remotely from home with work hours of 8:00 a.m. to 4:00 p.m.

228. In advance of her return from maternity leave, Ms. Teixeira tried to reach her manager, Ms. Brosowske, to learn about any changes within the organization since she went out on leave and what the expectations were for her return to work. Ms. Brosowske did not proactively reach out to Ms. Teixeira prior to her return, and Ms. Brosowske did not return Ms. Teixeira's telephone call. Ms. Teixeira therefore had very limited onboarding when she returned to work, and was given less than a day to review thousands of emails, catch up on overdue trainings, and familiarize herself with benefits updates and new company policies (among other work). Conversely, a Taiwanese worker who returned from maternity leave within a couple weeks of Ms. Teixeira was spoken to by Ms. Brosowske before she returned to work and therefore had clearly defined expectations and job responsibilities when she returned to TSMC. It is Ms. Teixeira's understanding that Ms. Brosowske made a comment after Ms. Teixeira returned to work indicating that Ms. Brosowske planned to fire Ms. Teixeira or give her "just enough rope to hang herself on."

229. Ms. Brosowske has recently begun phasing Ms. Teixeira out of her role and raising unfounded "concerns" regarding Ms. Texeira's performance. For example, Ms. Brosowske transferred Ms. Teixeira from a project focused on hiring equipment technicians to a new project on which she is responsible for recruiting manufacturing specialists. This new role was previously held by a non-Taiwanese worker, who Ms.

97

Brosowske fired, and was then held by several interim recruiters. While Ms. Brosowske gave Ms. Teixeira a tracker in order to track her recruiting progress for candidates, which requires her to input a date for each step of the recruitment process, Ms. Teixeira recently learned that the tracker was used previously by another non-Taiwanese employee who was fired and cited as being "inefficient." Ms. Teixeira is concerned that she has been slotted into this role and required to use an inefficient tracker that over-documents each step of the recruitment process for candidates so that Ms. Brosowske can later fire Ms. Teixeira for the same alleged shortcomings.

230.    Ms. Brosowske also uses Ms. Teixeira as a scapegoat, blaming her for Ms. Brosowske's own oversights. When stakeholders or the businesses that recruiting supports ask about tasks that remain incomplete, Ms. Brosowske will include Ms. Teixeira's on the email or chat messages, asking her whether she has completed the assignments (that were never assigned to her), or claiming that Ms. Teixeira was responsible for the unperformed work. Ms. Brosowske also treats Ms. Teixeira as if she is stupid and Ms. Brosowske has made comments in the work environment indicating that she cannot conceive how a female professional can also function as a mother (or vice versa). Ms. Brosowske's inappropriate comments and conduct have caused Ms. Teixeira a great deal of stress.

231.    In a recent meeting, Ms. Brosowske announced that TSMC had entered into its annual performance review cycle. She noted that while only a few employees on the team would receive performance appraisals (those who had been with the

98

company for over a year, like Ms. Teixeira), based on what she was seeing, "we're all looking at a S- or worse." Thereafter, apparently realizing that she had disclosed to the entire team that Ms. Teixeira was going to receive one of the two lowest performance review scores, Ms. Brosowske backtracked and stated that some might earn S ratings, which did little to improve the situation. Ms. Teixeira is concerned that Ms. Brosowske will give her an unjustifiably low performance rescore, an S- ("poor") or lower, despite her consistently strong performance.

232.    While Ms. Teixeira has reported her concerns and the fact that she felt targeted by her manager to Brian Mullin (who resigned from TSMC) and Rene Perez-Cabrera of Human Resources, HR took no action. Mr. Perez-Cabrera was instead complimentary of Ms. Brosowske, saying that she has "accomplished things [Ms. Teixeira's] team hasn't been able to ever accomplish."

233.    Ms. Teixeira remains employed by TSMC. However, the company's discriminatory and conduct continues, and even when working remotely, Ms. Teixeira is subjected to a hostile work environment.

*Mr. Fisher's Experience*

234.    Antonio Fisher is an Assistant Engineer who has worked for TSMC Arizona since July 2021. He is a United States Air Force veteran (honorably discharged) with a background in applied science, aircraft armament systems, and missile technology. Prior to joining TSMC, Mr. Fisher worked as a Semiconductor Engineer Technician at Applied Materials, a leading semiconductor and display

99

equipment company. In that role, Mr. Fisher was responsible for performing assessments and troubleshooting semiconductor fabrication chambers, determining methods to remedy power electronic malfunctions and enhance wafer yield, and creating technical reports to assist manufacturing technicians.

235.    At TSMC Arizona, Mr. Fisher works as an Engineering Technician, assisting Engineers and the Etch Department (the department responsible for removing unwanted material from wafers, a critical step in the semiconductor manufacturing process).

236.    After Mr. Fisher joined TSMC Arizona, he moved to Taiwan for 1.5 years of training where he was just one of just two African American employees in his department. When Mr. Fisher would show up for work each day, he would greet his colleagues and wave, but his Taiwanese coworkers ignored his presence and looked away. When Mr. Fisher would ask for assistance and training on how to perform his role, he would receive no response from his colleagues who refused to train him or speak to him because he was not Taiwanese. The trainings that were provided to Mr. Fisher were in Chinese or Mandarin, which made it impossible for him to learn his role, and meetings too were often conducted in Mandarin, which precluded Mr. Fisher from participating and fully understanding his job. Mr. Fisher also received emails and Microsoft Teams messages in Chinese, which he had to translate into English to understand—a lengthy process.

237.    During Mr. Fisher's training in Taiwan, traveling between his

100

accommodations and TSMC's work facilities required an hour-long bus ride. The bus ride was painful for Mr. Fisher, as he is over 6 feet tall and his knees hit the seat in front of him, which exacerbated knee problems from his prior military service. When Mr. Fisher asked TSMC to provide a shuttle or a taxi to work as an accommodation, TSMC denied his request, so Mr. Fisher purchased a scooter to ride to work. One morning, Mr. Fisher was hit by a car (that ran a red light) while on his scooter, and Mr. Fisher had to go to the hospital. TSMC sent no one to the hospital to help translate for Mr. Fisher, resulting in him receiving delayed treatment for his knee injury (which remained untreated for six weeks).

238.    When Mr. Fisher spoke to Human Resources regarding the discriminatory treatment he was subjected to while training in Taiwan, HR simply blamed it on the Taiwanese culture.

239.    When Mr. Fisher returned to the United States in May 2023, his work conditions did not improve. Approximately 90-95% of management in the U.S. is Taiwanese, and meetings are still conducted in Mandarin and emails sent in Chinese, to the exclusion of Mr. Fisher. Management and Section Leadership at TSMC (which is exclusively Taiwanese) intentionally withhold information from Mr. Fisher and ignore his questions, preventing him from understanding how to do his work (and TSMC's expectations of him). Mr. Fisher is talked down to as if he is inferior to the Taiwanese or stupid, despite being more educated and experienced than a number of the Taiwanese workers. Mr. Fisher is also excluded from social events outside of work,

101

such as lunches, dinners, and housewarmings, as TSMC's Taiwanese employees invite only other Taiwanese workers to those events. Mr. Fisher has been repeatedly patted on the buttocks by older Taiwanese male engineers (an unwelcomed physical contact), and inappropriate sexual jokes at TSMC are common among Taiwanese male employees.

240. ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████.

241.    Mr. Fisher has also witnessed a number of safety violations at TSMC Arizona, including Taiwanese employees failing to use "lockout tagout," a safety procedure required for tools with high voltage which ensures hazardous energy sources are isolated before maintenance or servicing is performed. When Mr. Fisher raised safety issues to TSMC, he was met with contempt. For instance, when Mr. Fisher told management that his team needed to send at least two people into the fab to perform preventative maintenance and that "lockout tagout" was mandatory to prevent injury or death, management stopped including Mr. Fisher and his team on daily work assignment emails, an act of retaliation against him for raising concerns.

242.    While Mr. Fisher remains employed by TSMC, he fears for his safety, and TSMC's discriminatory and hostile conduct continues unabated.

*Ms. Wyse's Experience*

243.    Jyni Wyse holds a Bachelor of Science degree in both Sustainability and Conservation & Ecology from Arizona State University, as well as three Associates Degrees in Liberal Arts & Humanities, Social & Behavioral Sciences, and Mathematics & Natural Sciences. She is currently pursuing a Bachelor's Degree in Biology, which she anticipates completing in August 2025. Ms. Wyse worked for TSMC Arizona from March 20, 2024 through September 9, 2024 (just under six months), after learning about a job opening with TSMC through Indeed and applying to the role through TSMC's third-party contractor TruPath, which provides staffing resources to TSMC Arizona.

244.    While Ms. Wyse was contracted by TruPath for the position, she was, in fact, a contractual employee of TSMC Arizona. TSMC maintained complete control over Ms. Wyse's employment and daily work, and Ms. Wyse reported to Alyson Poole (who is Chinese), a TSMC employee. She was also given a TSMC laptop and email address to perform her job. Ms. Wyse had little to no contact with TruPath during her time working for TSMC, other than submitting her work hours to TruPath. When Ms. Wyse's role with TSMC ended with her constructive discharge, Ms. Wyse's position with TruPath also ended.

245.    Ms. Wyse first worked for TSMC as a Mechanical Technician in the clean

SECOND AMENDED COMPLAINT

room as part of the Airborne Contaminants Department. However, after a month at TSMC, the job recruiter who helped Ms. Wyse secure her role with TSMC told Ms. Wyse about a Laboratory Technician role for the Slurry Department at TSMC. Ms. Wyse expressed interest in that role and was moved to the Slurry Department on April 8, 2024.

246.    In the Slurry Department, Ms. Wyse primarily worked with chemicals in diluted forms, which still posed a risk to lab technicians if exposed or improperly handled. Ms. Wyse was instructed by her manager, Ms. Poole (Lead of the Slurry and Water Departments), to collect her own samples, and Ms. Wyse followed that instruction. It was only later in her tenure that Ms. Wyse learned that she should have been prohibited from collecting her own samples as she lacked the proper certifications and training. It was apparent that Ms. Poole had little concern for Ms. Wyse and her safety and was willing to put Ms. Wyse at risk of exposure to hazardous materials.

247.    Ms. Wyse began having concerns regarding the chemicals she came into contact with during her day-to-day work. ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ Ms. Wyse raised these concerns

104

to Ms. Poole repeatedly over a number of months, but TSMC did nothing to address Ms. Wyse's safety concerns.

248.    Ms. Wyse also witnessed a number of other safety incidents while at TSMC. The fire alarm was constantly going off, but employees just ignored it, not knowing whether the alarm was a test or indicative of a real emergency.



249.    During her six-month tenure with TSMC, Ms. Wyse was discriminated against and subject to a hostile work environment simply because she was not Taiwanese or Chinese. For example, Ms. Wyse was often ignored or talked down to by her Taiwanese colleagues as if she were dumb or unskilled. These colleagues made it apparent to Ms. Wyse that they viewed her as inferior simply because of her race and national origin. Ms. Wyse also overheard her Taiwanese colleagues refer to American workers as "lazy," and they routinely complained that Americans took too long to complete tasks or were not working hard enough.

250.

105



251.

252.     On August 29, 2024, Ms. Wyse filed a complaint with the Occupational Safety and Health Administration ("OSHA"), reporting that TSMC employees, including herself, were being exposed to health hazards due lack of respiratory PPE when working with chemicals. Ms. Wyse also complained about the lack of training at TSMC, including on (1) donning on and off protective gowns, (2) Hazardous Communications or HazCom (a program aimed at protecting workers from injury/illness caused by hazardous chemicals in the workplace), (3) job hazard assessment, and (4) Emergency Action Plans (which outline how employees should

106

respond to emergencies). Ms. Wyse further complained that employees lacked access to Safety Data Sheets, which provide information about the safety of various chemicals, and that fume hoods used while cleaning the labs were not functioning. Ms. Wyse is still waiting on the result of OSHA's investigation of her complaint.

253.    After Ms. Wyse returned to TSMC Arizona on September 2, 2024, she was retaliated against for filing her OSHA complaint. While Ms. Wyse reported her concerns to OSHA anonymously, it was clear that her identity had become known to TSMC (likely because specific individuals were named in the complaint). Ms. Wyse was stripped of her position, laptop, and email address (her desk, laptop, and role were given to Michelle Jolly), and was told that she could not resume work until she completed a mandatory training. Completing the "mandatory" training, however, was impossible, as it required Ms. Wyse to work with an experienced technician in the laboratory in order to gain hands-on experience, and TSMC had barred Ms. Wyse from leaving the main office upon her return from leave. Ms. Wyse was forced to sit alone in the "staff aug room" for hours at a time where there were no computers or work materials. To make matters worse, Ms. Wyse's Taiwanese colleagues ignored her, and she was isolated from others who worked in the laboratory.

254.    TSMC then transferred Ms. Wyse to the Gas and Chemical Department, a more dangerous department in which Ms. Wyse would be working directly with industrial chemicals, including concentrated acids and bases, which required specialized training and more intensive use of PPE to protect against potential chemical

107

burns, inhalation risks, or contamination. Ms. Wyse was not consulted about this transfer, and she received no training on the correct procedure for handling concentrated acids and bases. And while Ms. Wyse was familiar with using basic PPE, she was expected to wear more extensive PPE following her transfer, yet TSMC did not ensure that all necessary PPE was made available to Ms. Wyse, nor did TSMC provide training on how to properly use the PPE. For instance, Ms. Wyse was not taught how to safely put on or remove her safety gear to avoid exposing herself to hazardous materials, placing her in an extremely dangerous situation. █████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████

255.    On September 9, 2024, Ms. Wyse was constructively discharged by TSMC Arizona. She was forced to resign due to the discrimination, hostile work environment, and retaliation by TSMC. Ms. Wyse worked at a coffee shop following her constructive discharge, where she was forced to take an $8 per hour pay cut, and had to break her lease on her apartment, as she could no longer afford it.

### Mr. Hernandez's Experience

256.    Prior to joining TSMC Arizona, Marcus Hernandez worked as a Field Service Engineer for Tokyo Electron, a company that sells and installs fab machines for companies in the semiconductor field like TSMC. In or around 2023, TSMC contracted

with Tokyo Electron to provide and install tools for TSMC's new Arizona facilities. To prepare for the installation, Tokyo Electron sent Mr. Hernandez (and other contractors from Tokyo Electron) to Taiwan for three months, at the request of TSMC. Mr. Hernandez found the work that TSMC was doing interesting and wanted to be a part of the company's growth in Phoenix, so he joined TSMC as an employee in January 2024.

257.    Mr. Hernandez joined TSMC as Equipment Technician in its WET department, and was tasked with leading a team through the complete installation of fab machines for the new facilities from start to finish. Working directly for TSMC was a completely different experience from working with TSMC through Tokyo Electron. All of Mr. Hernandez's managers were on visas (originally from Taiwan), and they were overtly hostile toward non-Taiwanese/Chinese employees. On one occasion, one of Mr. Hernandez's Taiwanese managers probed Mr. Hernandez as to his ethnic background by listing each Asian nationality one by one, asking Mr. Hernandez whether he identified by that ethnicity, and muttering "shame" each time Mr. Hernandez said no. While Mr. Hernandez had more experience with the machines being installed at TSMC than any of the managers—given that he had worked with those exact machines at Tokyo Electron—every time he offered an opinion on the installation, management said "no need." Any task Mr. Hernandez attempted to undertake was swiftly removed from him and assigned to a Taiwanese or Chinese counterpart, and when Mr. Hernandez tried to shadow his counterparts to observe what they were doing and stay relevant, he was pushed away and his questions were ignored. Then, at day-end meetings, management

109

berated Mr. Hernandez for not having solved issues, often talking about him in Mandarin while he was in the room.

258.     Mr. Hernandez was also pressured to violate safety regulations and take actions that would have put himself and others in danger. For example, turning on the chemical supply to the fab machines incorrectly or without proper protective gear is very dangerous, so the safety team was required to sign off before it was turned on and designated personnel were required to physically turn it on. However, Mr. Hernandez's managers constantly pressured him to turn on the chemical supply himself. When Mr. Hernandez refused, explaining that he was not qualified and was not wearing appropriate protective gloves, his managers threatened to fire him. Mr. Hernandez's managers also instructed him to pressure third-party contractors to coerce safety personnel to prematurely provide the all-clear to turn on the chemical supply, so that work could be resumed without additional delay. When Mr. Hernandez said no, his managers continued to pester him and questioned his commitment to the job. ████

████████████████████████████

██████████████████████████████

██████████████████████

---

[24] *See, e.g.*, U.S. Consumer Product Safety Commission, *Gasaciods Children's Helmets Recalled Due to Risk of Head Injury; Violation of Federal Safety Regulation for Bicycle Helmets; Imported by Fengwang Sports; Sold Exclusively on Temu.com*, (Apr. 18, 2024); U.S. Consumer Product Safety Commission, *Magnets; U.S. Consumer Product Safety Commission, CPSC Warns Consumers to Immediately Stop Using Allvre High-Powered Magnetic Ball Sets Due to Ingestion Hazard; Failure to Meet Federal Safety Regulation for Toy Magnet Sets; Sold Exclusively at Temu.com*, (Dec. 7, 2023); Kate Nishimura, Federal Consumer Watchdog to Investigate Shein and Temu Over Safety

SECOND AMENDED COMPLAINT

259.    Mr. Hernandez was also pushed by Taiwanese management to cut corners with machine qualifications. In one instance, Mr. Hernandez was tasked with inspecting load ports on fab machines where the wafers dropped in. When Mr. Hernandez explained to his managers that the task would take 1-2 hours per machine to complete, they told him to work on one machine and to shift the wafers around on others to make it appear as though he had done the same with the other machines. When Mr. Hernandez said no, his commitment to the company was again questioned.

260.    From the moment he joined TSMC, Mr. Hernandez had the distinct impression that TSMC was trying to force him out of the company, including by refusing to assign him tasks and by pushing him to do tasks that were unsafe and outside of his job duties. Mr. Hernandez's managers also scheduled daily meetings at 6:00 p.m.—outside of Mr. Hernandez's normal work hours—but told Mr. Hernandez, who was an hourly employee, that he was not allowed to accrue overtime. (Mr. Hernandez refused to clock out prior to starting the meeting, as he was instructed to do by his manager, so he was ultimately paid for meetings outside of work hours.) Mr. Hernandez complained about safety violations and discrimination to upper management and HR, but nothing came of those complaints.

261.    In May 2024, Mr. Hernandez was constructively discharged from TSMC, having been forced to resign due to TSMC's discriminatory conduct and the hostile

Concerns, SOURCING JOURNAL (Sept. 6, 2024), https://sourcingjournal.com/topics/business-news/federal-consumer-watchdog-cpsc-investigate-shein-temu-safety-concerns-525401/

111

SECOND AMENDED COMPLAINT

work environment described above.

*Mr. Haley's Experience*

262.    Hunter Haley is an Engineering Technician with almost fifteen years of relevant experience. He holds a Master's Degree in Entertainment Business and served in the Air Force as an F-16 Aircraft Armament Instructor / Technician for just over six years. Prior to joining TSMC, Mr. Haley worked as an Engineering Technician for Applied Materials, one of the leading semiconductor and display equipment companies in the world, and he has also worked for Samsung Electronics America as an Equipment Technician.

263.    Mr. Haley joined TSMC Arizona in May 2021 as an Engineering Technician, and he remained in that role for approximately two years. Mr. Haley was one of the first equipment technicians hired by TSMC Arizona, and he was hired along with a number of other experienced U.S. veterans in an apparent effort by TSMC to demonstrate its commitment to diversity. In reality, however, Mr. Haley and his non-Taiwanese colleagues (including veterans) were treated with hostility.

264.    Following his hire, Mr. Haley traveled to Taiwan for training in October 2021. In Taiwan, each U.S. employee was to be assigned a buddy to provide training on TSMC's equipment and systems. However, Mr. Haley's buddy spoke very little English, which made learning difficult, and Mr. Haley spent much of his time in Taiwan teaching his buddy English. Mr. Haley was never assigned a fluent English-speaking trainer, and while Japanese hires were assigned buddies who spoke Japanese,

112

similar efforts were not made for Americans who spoke English. Mr. Haley's training was therefore limited to shadowing a fully ramped-up production line, and it was clear to him that the Taiwanese workers just saw him as "an American in the way." Mr. Haley wanted to learn and tried to ask questions, but he was made to feel like a distraction. While Mr. Haley has prior semiconductor experience, and was uniquely positioned to succeed at TSMC, nobody in Taiwan told him what his full job responsibilities were or what was expected of him, which made it incredibly difficult to perform his role.

265.    At the beginning and end of each day in Taiwan, there was a "pass down," during which daily tasks were reviewed, but these meetings were conducted only in Mandarin, precluding Mr. Haley from participating and understanding what was required of him. The end-of-day "pass down" was also conducted very late in the day, causing Mr. Haley to consistently miss the bus back to his living quarters and requiring him to take a later bus. Taking the later bus foreclosed him from getting home in time to catch another bus to the grocery store to buy food for his home (as that bus left shortly after the earlier bus arrived at the housing compound). This scheduling appeared intentional to Mr. Haley. After a year in Taiwan, Mr. Haley asked his Lead, Ken Peng (who is Asian) if the "pass down" could be conducted in English as well so that he and the other U.S. hires could follow along. He made this request multiple times, and made the same request of Mr. Peng's supervisor, S.Y. (who is Taiwanese), explaining that it would be beneficial for the "pass down" to be conducted in English

113

so that he and others could participate. However, rather than addressing Mr. Haley's concerns and making accommodations to allow him to understand "pass down," Mr. Peng berated and belittled Mr. Haley in front of his colleagues, and made no effort to provide any training accommodations. Mr. Peng instead raised his voice at Mr. Haley and responded with hostility to Mr. Haley for not understanding his role (which had still not been explained to Mr. Haley, despite him having joined TSMC over a year earlier).

266.    Mr. Haley's department in Taiwan, CVD, was divided into two sections: Mr. Haley's section, which was comprised of just three people, and another section comprised of 6-8 people, most of whom were Taiwanese. Despite the size disparity, the two sections were expected to perform equal amounts of work. As a result, Mr. Haley was tasked with performing the job of multiple employees, shouldering more of the workload than the Taiwanese team members, and was spread very thin, particularly when the other American on his team quit due to the unbearable workload.

267.    While in Taiwan, Mr. Haley noticed a number of safety issues that, having had prior experience in the industry, he knew were concerning. For instance, the Taiwanese employees failed to use "lockout tagout," which required employees to turn off the circuit breaker and lock it when they were using tools with high voltage electricity. "Lockout tagout" is a fundamental rule that must be followed when working on an electrical hazard, and failing to follow it increases the likelihood of electrocution and death. Mr. Haley complained to S.Y., the Head of the department (who is

114

Taiwanese), and the ISEP safety team, but despite scheduling several meetings as well as follow-up meetings, his concerns went unredressed by management. Mr. Haley also repeatedly requested that he be provided with training, and that the training occur in a safe environment where "lockout tagout" and other fundamental safety protocols were recognized and implemented, but his requests were ignored.

268.    Despite his hard work, Mr. Haley was targeted and retaliated against for having raised concerns regarding TSMC's failure to follow safety protocols and refusal to provide sufficient training (an act he viewed as discriminatory). TSMC retaliated against Mr. Haley by assigning him an S- ("poor") performance rating shortly after he raised concerns—singling him out for not silently abiding by TSMC's practices. TSMC claimed that Mr. Haley had received a low rating because he had fallen behind on his training KPIs, which made little sense, given that Mr. Haley's workload and responsibilities had continued to increase at TSMC. TSMC also began slotting Taiwanese workers into the various roles Mr. Haley was filling, thereby displacing him and stripping him of responsibility.

269.    TSMC's discriminatory conduct caused Mr. Haley to suffer neck and back pain due to stress, for which he had to see a doctor and chiropractor on multiple occasions while in Taiwan. Mr. Haley also began seeking treatment from a mental health professional while in Taiwan to deal with the stress, depression, and anxiety he was experiencing and was prescribed Klonopin and Xanax. When Mr. Haley informed management that he was suffering from the aforementioned issues, management

115

doubled his workload, causing him to break out in hives from the stress.

270.    Mr. Haley was constructively discharged from TSMC Arizona after he returned to the United States in March 2023. Mr. Haley informed Human Resources that he was forced to resign due to the stress, discrimination, and hostile work environment at TSMC. TSMC's conduct caused Mr. Haley to be unemployable due to severe depression and anxiety, and Mr. Haley was unemployed for over 1.5 years after he was constructively discharged and forced to live out of his car for numerous months.

*Mr. Lindley's Experience*

271.    Mark Lindley worked at TSMC Arizona as a Senior EHS Engineer from September 2021 to March 2024. When he joined TSMC, approximately 80% of his team was non-Taiwanese and non-Chinese, but by the time of Mr. Lindley's departure, he was one of just two non-Taiwanese and non-Chinese team members. Mr. Lindley speaks Mandarin, and he overheard numerous conversations among his Taiwanese and Chinese coworkers and managers. In those conversations, his colleagues and managers expressed an explicit preference for hiring employees from Asia, who they believed would be compliant and would not speak out against TSMC's discriminatory and hostile practices, over Americans, who they perceived as lazy. Mr. Lindley also observed secondary parallel meetings held among the ESH Taiwanese teams led by the ESH Deputy Director. In these meetings, work tasks and strategies were discussed in Mandarin, and these additional meetings created segregation among the ESH team.

272.    Despite working hard and performing well in his engineering role, Mr.

116

Lindley was told that he would be placed on a PIP by his manager, who is Taiwanese. Mr. Lindley's manager did not specifically identify any performance issues that he felt needed improvement and in fact told Mr. Lindley to go into the PIP tool and create a PIP for himself and to "decide for what reasons." It is Mr. Lindley's understanding that he was placed on a PIP because his manager did not want to oversee a non-Taiwanese and non-Chinese employee. Mr. Lindley found the request to design his own PIP inappropriate and complained to the HR Business Partner at TSMC, but his concerns went unaddressed. By this point, only Mr. Lindley and one other non-Taiwanese and non-Chinese team member remained.

273.    After this experience, Mr. Lindley sought to switch to an open role in a different department after being approached by that department's manager, which required approval from higher-ups. Mr. Lindley had a competing offer from an external business at that point, but would have preferred to stay at TSMC (due to the interesting nature of the work) and told the managers that he would decline the offer if he was allowed to switch to the new role. Ultimately, the ESH Deputy Director and Senior Director (who are Taiwanese) vetoed the internal move, even though the other department management was willing to receive Mr. Lindley. Mr. Lindley then resigned from TSMC.

274.    Mr. Lindley was constructively discharged by TSMC due to TSMC's discriminatory conduct and the hostile work environment described above. He knew that the company's discriminatory culture would not change and that it was only a

117

matter of time before he was pushed out of the company.

### *Mr. Holmes' Experience*

275.    Terrence Holmes is an electronics technician, engineering technician, and field service technician with eight years of experience in the semiconductor industry. Mr. Holmes specializes in mechanical and electronic installation, maintenance, and repair. Prior to joining TSMC, Mr. Holmes worked for Intel for almost four years and also served in the United States Navy.

276.    Mr. Holmes joined TSMC Arizona on January 20, 2024. He currently works as an Equipment Technician in the Etch Department, which is responsible for using plasma and gasses to erase or carve out unwanted material from wafers.

277.    Since joining TSMC, Mr. Holmes has been repeatedly subjected to discrimination and a hostile work environment by both his manager, Hsin Hsiang ("H.H.") Wang (who is Chinese) and his Taiwanese colleagues. Training has been intentionally withheld from Mr. Holmes, and when he asks his Taiwanese colleagues questions, they often provide inaccurate information, which precludes Mr. Holmes from learning the tool and performing his work. For instance, Mr. Holmes will be told by his Taiwanese colleagues to prepare parts for installation, without any further specification, only to later be berated and called stupid for not preparing Taiwan clean parts (parts cleaned in Taiwan and sent back to the U.S. after being cleaned). On other occasions, when Mr. Holmes prepares Taiwan clean parts in response to the same

SECOND AMENDED COMPLAINT

request (assuming from past experience that his colleagues intended to request Taiwan clean parts), he is told that Arizona clean parts (parts cleaned through a "local" loop in Arizona) are instead needed, information that was not previously shared with him. Mr. Holmes is forced to redo his work because information is intentionally withheld from him, while being subjected to ridicule by his Taiwanese colleagues. While Mr. Holmes is a grade level 24, which is a mid-range technician at TSMC, he is called "too stupid" to work on the machines, and is instead assigned menial work, such as moving pallets and picking up trash. TSMC's Taiwanese management has also accused Mr. Holmes of not knowing the lam tool (used for etching), while at the same time, refusing to train him on it.

278.     On one occasion, Mr. Holmes was physically assaulted by a Taiwanese trainer. When Mr. Holmes made a joke about forgetting to put a part in the tool, the trainer picked Mr. Holmes up by the collar of his protective coveralls and screamed at him. The trainer was so angry that he was shaking while he was yelling at Mr. Holmes, who feared for his safety. Mr. Holmes reported the assault to Human Resources, but the trainer was not punished. Mr. Holmes still sits near the trainer, who will call his friends over to his desk and point at Mr. Holmes, making him feel unsafe and uncomfortable.

279.     In addition to being assaulted, Mr. Holmes is constantly bullied, humiliated, and harassed. A Taiwanese assignee called Mr. Holmes a "dog" in Mandarin (which he learned about by using a voice translator). When Mr. Holmes

119

reported this mistreatment to his manager, Mr. Wang was dismissive of his complaints. Mr. Wang also treats Mr. Holmes with hostility, constantly bullying, mocking, and insulting him. Mr. Holmes remains calm during this verbal abuse, which only causes Mr. Wang to become even more irate, to the point where he is shaking and balling his fists while screaming at Mr. Holmes. This conduct is humiliating for Mr. Holmes, as he is often berated in front of his colleagues.

280.    Mr. Holmes has also witnessed a number of potential OSHA violations at TSMC.

120

██████████████████████████████████████████████████████

███████████ When Mr. Holmes raised concerns about safety with TSMC, and the need for masks, filters, and respirators, he was told there was no issue and that employees could simply share the PPE TSMC had.

281.    After seven months of abuse, Mr. Holmes complained to Human Resources regarding TSMC's discriminatory treatment and the hostile work environment he was subjected to. When Mr. Holmes' complaint became known to his colleagues, a Taiwanese coworker commented: "Fuck Terrance, I hope he gets raped by a dog." Another coworker, Shuo Huang, an assignee from Taiwan, commented: "H.H. will fire him anyways." Mr. Holmes' manager also retaliated against him by changing his schedule from a compressed work week (working 3 days per week with 4 days off) to a 5-day work week (working 8-5 those days). Mr. Holmes commutes 50 miles to work each way, and a 5-day work week means that Mr. Holmes will spend more time on travel and lose out on time with his wife and 6-month-old son. Since complaining, Mr. Holmes' schedule has been changed four times in the last three months, oftentimes without warning, resulting in Mr. Holmes arriving to work only to be told he has the day off, or being accused of missing work when he was not informed that his schedule had changed. Mr. Holmes has also lost money, primarily vacation pay, when his schedule has changed such that he is no longer working on a federal holiday on which he was previously scheduled to work. Mr. Holmes' manager also berated him for going to breakfast with his colleagues and accused him, falsely, of

121

wasting company time, while his colleagues were not similarly reprimanded, and Mr. Holmes rarely breaks for meals. Recently, the department had a company-sponsored dinner—a team building event—but Mr. Holmes was not invited, and was excluded from the event. Human Resources claims to have found "no evidence" to support Mr. Holmes' claims, and has refused to transfer him out of his department, forcing him to continue to work with the Taiwanese trainer who assaulted him. As such, Mr. Holmes continues to fear for his safety.

282. While TSMC hires employees locally, it has shifted to primarily hiring Taiwanese workers in the U.S. Mr. Holmes is familiar with the hiring manager for the Etch Department, who has expressed frustration concerning her inability to hire qualified American candidates and the pressure from TSMC to instead hire Taiwanese or Mandarin-speaking candidates who are less qualified.

283. In January 2025, Mr. Holmes informed Human Resources that he planned to resign as a result of TSMC's discriminatory and hostile conduct, but Human Resources asked him to reconsider and to remain with the company. Mr. Holmes is still employed by TSMC, but is unsure how much longer he can endure this treatment given the impact it is having on his physical and emotional well-being. The stress of working at TSMC has caused Mr. Holmes to suffer significant emotional distress, resulting in him breaking out in hives, and he is considering seeking treatment from a counselor or psychologist.

*Mr. Amiri's Experience*

122

284.    David Amiri has had a long career in fire safety. Immediately prior to joining TSMC Arizona, he served as a Fire Protection Engineer Technical Lead with the City of Phoenix, working in the city's Planning and Development Department. In that role, he was responsible for ensuring compliance with fire and life safety codes/standards for a variety of major and minor commercial development projects, buildings, and facilities. He holds a Bachelor degree in Fire Science Administration, along with a wide variety of certifications (he is a certified fire marshal through the International Code Council ("ICC") and a certified public manager through Arizona State University).

285.    Mr. Amiri joined TSMC Arizona in June 2022 as a Fire Protection Engineer in TSMC's facilities department and was promoted to Principal Fire Protection Engineer approximately six months later. In August 2023, Mr. Amiri began acting as the Fire Protection Section Manager, but was never given an actual promotion (or associated raise) to that position. Mr. Amiri held this role until the time of his constructive discharge in June 2024. At TSMC, Mr. Amiri was responsible for a variety of Fire Life Safety systems, programs, and operational staff.

286.    Mr. Amiri believed that his experience would make him an asset to TSMC, as he was uniquely situated to guide the implementation of protocols to keep workers safe and to ensure compliance with city codes and standards—some of which Mr. Amiri helped develop. However, TSMC's leadership were entirely uninterested in Mr. Amiri's expertise and skill set, which was characteristic of TSMC's management's general

123

attitude towards U.S. workers (particularly those charged with implementing safety protocols). Mr. Amiri found that there were two distinct hierarchies at TSMC—the "local" employees (hired in the U.S. and of non-Taiwanese and non-Chinese national origin) and the Taiwanese/Chinese employees, many of whom were assignees. While there were many areas in which TSMC's U.S. hires had significantly more experience and proficiency—including Mr. Amiri, who had in-depth knowledge of federal, state, and local regulations—TSMC's Taiwanese and Chinese leadership favored assignees, frequently referring to Americans as "slow," "lazy," and as asking too many questions. When Mr. Amiri and other U.S. workers attempted to offer their expertise or flag concerns to their Taiwanese and Chinese leadership, they were accused of "not solving problems but creating problems" and excluded from meetings. Mr. Amiri's Taiwanese and Chinese counterparts were similarly dismissive, disregarding Mr. Amiri's advice by saying "that's not how it's done in Taiwan," and refusing to heed direction from anyone but Taiwanese leadership.

287.    In line with this, safety advice from U.S. workers (including Mr. Amiri) was either ignored from the outset, or if accepted, was later overridden by Taiwan leadership without notice or explanation. For example, there was a hazardous exhaust duct suspended 30-40 feet in the air that was crooked due to structurally unsound bracing. U.S. workers recommended rescheduling a city inspection (scheduled for the next day) in order to erect scaffolding and fix the issue without putting employees' lives at risk. However, Mr. Amiri returned the next day to find that the exhaust duct had been

SECOND AMENDED COMPLAINT

corrected, but without the use of scaffolding or fall protection measures. The City of Phoenix gave TSMC several "non-compliance citations" related to safety issues—particular fire prevention concerns—but TSMC did not change its practices, and U.S. workers were chastised by Taiwanese leadership for raising safety or regulatory compliance concerns.

288. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

289.    Among the Taiwanese assignees with whom Mr. Amiri worked was Shane Hsu—Mr. Amiri's counterpart responsible for Fire Life Safety with the Construction team. Mr. Hsu consistently ignored Mr. Amiri's recommendations that he made based

125

on his knowledge of U.S. fire life safety compliance, told lies about Mr. Amiri, and was overtly hostile towards Mr. Amiri at every opportunity. For instance, Mr. Amiri learned from a former colleague of his that worked for the City of Phoenix that Mr. Hsu had told that colleague to ignore Mr. Amiri because Mr. Amiri did not have authority to be involved in conversations about fire protection. This behavior went on for over a year, and while Mr. Amiri repeatedly reported these incidents to TSMC management, his complaints were ignored and no actions were taken.

290.    The conflict between Mr. Hsu and Mr. Amiri came to a head in April 2024. Mr. Amiri was in the TSMC office building talking to a construction manager (who was in a construction trailer) by phone regarding wheeled $CO_2$ fire extinguisher units. Mr. Hsu, also in the construction trailer, heard Mr. Amiri's voice on the line and grabbed the phone, yelling "dumbass" and "stupid American" at Mr. Amiri, along with other profanity. Mr. Amiri drove to the trailer for a face-to-face conversation with Mr. Hsu, during which, he told Mr. Hsu in no uncertain terms that his behavior was unacceptable. Mr. Amiri was stern but professional, and did not yell at or make physical contact with Mr. Hsu. There were two contractors in the construction trailer that observed the conversation, after which Mr. Amiri left.

291.    The next day, Mr. Amiri learned that he was being placed on paid suspension, pending an HR investigation. When he returned from suspension a couple days later, Mr. Amiri was called into a meeting with an HR representative and a director (both of whom are Asian) and was told that he was being put on a three-month

126

Corrective Action Plan stemming from an allegation that he hit Mr. Hsu. Mr. Amiri quickly corrected the false allegation, as he had not hit Mr. Hsu, and the contractors who were present during the interaction between Mr. Amiri and Mr. Hsu also confirmed this by written statement during the HR investigation. Mr. Amiri asked whether HR had spoken to Mr. Hsu and whether Mr. Hsu had made the false allegation, but did not receive an answer. The only goal of the Corrective Action Plan was to "demonstrate professional behavior at all times." There were no measurable goals, and when Mr. Amiri asked how his progress on the plan would be measured or tracked, he was given no answer.

292. Following the meeting, an American manager pulled Mr. Amiri aside and said that the investigation was a ruse, that there had been no evidence that Mr. Amiri acted inappropriately, and that TSMC was looking for any excuse to terminate Mr. Amiri, including by raising false complaints to HR.

293. Mr. Amiri was constructively discharged by TSMC in June 2024, having been forced to resign due to the company's discriminatory, hostile, and dangerous work environment.

*Mr. Vonica's Experience*

294. Alex Vonica is a United States Air Force veteran who served in the Air Force for four years as an Emergency Manager, supporting the installation of emergency planning, response, and mitigation efforts at both the operational and tactical levels. After leaving the Air Force, Mr. Vonica worked for Tokyo Electron

127

USA as a Field Service Engineer for approximately nine months before joining TSMC. In that role, he was responsible for performing on-site installation, service, modification, and repair of semiconductor manufacturing equipment (among other job duties).

295.    Mr. Vonica was hired by TSMC Arizona in July 2022 as an Emergency Response Coordinator, and he remained in that role for approximately fourteen months. The Emergency Response Team was initially comprised primarily of U.S. workers, but shortly after Mr. Vonica's hire, TSMC brought a number of workers over from Taiwan to "support" the team.

296.    Mr. Vonica reported to Joy Jones, who managed a team of approximately 30 employees that were responsible for safety and environmental health at the job site. Mr. Jones, who is Asian, routinely spoke in Mandarin in front of Mr. Vonica and his team, despite the fact that Mr. Vonica and his U.S. team members did not understand the language. The use of Mandarin language was routine at TSMC, particularly in meetings where status updates were provided, which prevented Mr. Vonica from fully participating. During those meetings, employes were routinely screamed at for inconsequential errors, such as formatting errors in a PowerPoint presentation.

297.    Mr. Vonica was provided with no training when he joined TSMC, making it difficult for him and his team to understand their job responsibilities and TSMC's expectations of them. While Mr. Vonica's job description resembled that of a security guard, and he spent some time patrolling and investigating safety incidents, he was also

128

tasked with developing policy. With respect to the latter task, Mr. Vonica was not provided any guidance as to the purpose or intent of the policies he was tasked with developing, but would be chastised by Mr. Jones for not writing the policies correctly. Mr. Vonica and other U.S. hires were constantly berated for not knowing their job or for making simple errors, despite not having been provided with any guidance or training. While Mr. Vonica was required to spend a month in Taiwan for training (October 2022), he received no formal training there, and was forced spend many hours wandering the facilities to "learn." Mr. Vonica was given busy-work translating job materials into English using Google Translate, the results of which were not easily understandable, given the prevalence of internal TSMC terminology in the job materials.

298.    At TSMC, employees were expected to obey directions and to not question authority. Rong Tai ("R.T."), a Director at TSMC senior to Mr. Jones, taught Mr. Vonica the term "washing your face." If an employee at TSMC were to challenge a directive, they would get their face "washed" by the spit flying out of the mouth of the person berating them. Mr. Vonica saw this practice occur regularly at TSMC.

299.    Back in Arizona, Mr. Vonica began performing safety audits for TSMC at the fab. In that role, Mr. Vonica noticed a number of issues that raised safety concerns. For instance, the entirety of the second floor of the fab lacked OSHA-rated fall protection anchors, which meant that employees working high up did not have proper anchors to secure to, and either worked unsecured, or improperly anchored to

129

SECOND AMENDED COMPLAINT

whatever materials they could find. TSMC also lacked a proper emergency response team. TSMC's emergency response team was limited to just two individuals who were responsible for both the primary fab construction and operations side at the facility. One employee was required to stay inside the emergency response center and there was far too much square footage for any single employee to cover, resulting in delays in responding to emergencies. TSMC employees were specifically instructed to contact TSMC's emergency number, and not 911, again leading to delays, confusion, and ineffective responses. Mr. Vonica also discovered that a Taiwanese contractor was flipping circuit breakers (i.e., fire alarm systems) without receiving proper authorization or providing any safety notification. (Mr. Vonica and his teammates followed the official procedure of providing notice prior to any alarm testing and were scolded for providing such notice during "nap time" and important meetings.) ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ While Mr. Vonica voiced a number of safety concerns to TSMC, they fell on deaf ears, and Mr. Vonica had no power to enact change within the company despite having been tasked with keeping the site and employees safe.

300.    In November 2023, Mr. Vonica was constructively discharged by TSMC Arizona, having been forced to resign as a result of the company's discriminatory, hostile, and unsafe work environment. During his exit interview, he again voiced his

130

SECOND AMENDED COMPLAINT

concerns to Human Resources, but to his knowledge, Human Resources has taken no action.

*Mr. Brookins' Experience*

301.     Kerrick Brookins is an engineer who, prior to joining TSMC Arizona, spent over six years working for Intel as a Manufacturing Technician where he operated, maintained, and repaired specialized processing equipment both inside and outside a clean room environment. He holds an Associate's degree in Mathematics from Langston University.

302.     Mr. Brookins joined TSMC Arizona in February 2022 as a Lithography Equipment Technician and remained in that position for eight months. In that role, Mr. Brookins was responsible for performing preventative maintenance activities on Lithography semiconductor equipment in a cleanroom environment, responding to error messages of factory systems and/or equipment, and conducting defect troubleshooting.

303.     In April 2022, Mr. Brookins traveled to Taiwan for training. Upon arriving in Taiwan, Mr. Brookins met Danny Liao, a Taiwanese employee, who Mr. Brookins was led to believe was his manager, along with the rest of his American team members. (It was not until many months later that Mr. Brookins learned that that Mr. Liao was not actually his manager.) There were two other African Americans on Mr. Brookins' team: Katia Gounou and Edward McKinley.

304.     After a month in Taiwan, Mr. Brookins noticed some irregularities with

131

his timecard, and raised the issue with Mr. Liao. Mr. Liao admitted that he had been adjusting Mr. Brookins' timecard without his knowledge or consent, deducting approximately fifteen minutes from his timecard each day. Mr. Liao claimed that this deduction was warranted because Mr. Brookins was required to wait to clock in until after he entered the fab (and had proceeded through security), not when he first arrived at the fab (as Mr. Brookins had done in Arizona, and as he had observed his colleagues doing in Taiwan). In July 2022, Mr. Brookins complained to Human Resources that Mr. Liao was improperly adjusting his timecard, and HR agreed to look into Mr. Brookins' complaint.

305.    After Mr. Brookins met with HR, Mr. Liao stopped adjusting Mr. Brookins' timecard, but began retaliating against Mr. Brookins for complaining. Mr. Liao began to track Mr. Brookins around the office, repeatedly passing by Mr. Brookins' desk to ensure that he was working and following him to meetings. Even when Mr. Brookins moved desks to be farther away from Mr. Liao and closer to Meng-Tsung Lin ("Mason")—who Mr. Brookins learned was his true manager—Mr. Liao continued his harassment. For instance, TSMC employees in Taiwan observe National Nap Time, during which employees are encouraged to sleep at their desks for an hour during the day, typically after lunch. On one occasion, Mr. Brookins closed his eyes for a few minutes during National Nap Time when Mr. Liao too was sleeping, only to be woken up two minutes later by Mr. Liao, who demanded that Mr. Brookins work while his Taiwanese colleagues slept.

132

SECOND AMENDED COMPLAINT

306.    During the daily "pass down" meetings, during which team members would present on the work they had completed, Mr. Liao would constantly interrupt Mr. Brookins and the other African Americans on his team (Ms. Gounou and Mr. McKinley), while Taiwanese team members were allowed to speak freely without interruption. When Mr. Brookins suggested to Mr. Liao that he wait until the end of their presentations to ask questions so that the meeting would move along efficiently, Mr. Liao became even more critical and hostile towards Mr. Brookins and the other African American employees, cutting them off more aggressively during the "pass down" and seeking to humiliate them in front of their peers. In addition, Mr. Liao began holding an additional, mandatory "pass down" meeting at the end of the day, which made Mr. Brookins miss the 5:45 p.m. bus to his living quarters. Mr. Brookins was forced to take a later bus home, which meant that he was unable to go to the grocery store and restaurants after work, as the bus to that area left shortly after the 5:45 p.m. bus arrived at the housing complex (which was in an isolated area).

307.    In August 2022, Mr. Brookins was called into a meeting by HR to discuss his complaint about his timecard. During that meeting, Michelle Henderson (who is Taiwanese) stated that Mr. Brookins had been found to have been leaving work early and falsifying his timecard, thereby stealing time from the company from May through August. Ms. Henderson warned Mr. Brookins that he could be terminated for having committed time fraud. Mr. Brookins' manager, Mr. Lin (who is Taiwanese), also attended the meeting, but pretended not to know what was going on, despite having

133

been briefed on the timecard incident. During the meeting, Ms. Henderson was irate and screamed at Mr. Brookins, which was unwarranted, particularly given that Mr. Brookins had not been stealing time. After the meeting, Mr. Lin confirmed that he had not observed any irregularities with Mr. Brookins' timecard and that he had repeatedly approved Mr. Brookins' submitted time.

308.    Following that meeting, Mr. Liao's tracking of Mr. Brookins became even more persistent, and Mr. Brookins sought to avoid Mr. Liao in the fab.

309.    On September 6, 2022, Mr. Brookins left work early for an emergency root canal. His early leave request was approved by Mr. Lin, who provided Mr. Brookins with taxi vouchers to travel to his dentist appointment.

310.    The next day, Mr. Brookins approached his desk to find Mr. Liao there. Mr. Liao quickly shooed Mr. Brookins away, saying "go, go, go," which Mr. Brookins found strange, but he complied and went to lunch. When Mr. Brookins returned from lunch, Ms. Henderson and Mr. Lin called Mr. Brookins into a meeting. In that meeting, Ms. Henderson stated that Mr. Brookins had been found to have left work early on a number of occasions and was being terminated for time fraud. Ms. Henderson was not swayed when Mr. Brookins pointed out that he was unable to leave work early—even if he had wanted to—as he and his team members had to attend "pass downs" at the end of the day. (Had HR interviewed Mr. Brookins' colleagues, they would have confirmed his consistent presence at the end-of-day "pass down" meetings.) Ms. Henderson instead chose to credit Mr. Liao over Mr. Brookins even though it was Mr.

134

SECOND AMENDED COMPLAINT

Brookins who first reported Mr. Liao for altering Mr. Brookins' timecard. Mr. Brookins was shocked to learn of his termination, as he had left work early only once (with his manager's permission) and he was in fact the only employee on his team who never called out of work. Mr. Brookins asked why Mr. Liao was not in the meeting, as he was the individual who had made false accusations against Mr. Brookins, but no reason was provided. As it turns out, Mr. Liao was packing up Mr. Brookins' desk during the meeting. Mr. Brookins' colleagues were shocked and disappointed to hear of his termination, and created a petition for TSMC to re-hire Mr. Brookins while he was still in Taiwan (which was unsuccessful).

311. Mr. Brookins immediately reached out to Scott Holman, TSMC's Chief Human Resources Officer. Mr. Brookins and Mr. Holman set up a meeting to discuss Mr. Brookins' termination via Teams, but Mr. Holman never joined the meeting, nor informed Mr. Brookins that he would be late or needed to reschedule.

312. TSMC afforded Mr. Brookins just two days to pack up his belongings and return to the U.S. While TSMC paid for Mr. Brookins' flight home, Mr. Brookins paid for his checked luggage out-of-pocket, for which TSMC told Mr. Brookins he would be reimbursed. TSMC did not reimburse Mr. Brookins, and blocked him from accessing the portal for requesting reimbursements.

313. Once back in the U.S., Mr. Brookins emailed Mr. Holman and asked whether he could rejoin TSMC Arizona in the U.S. Mr. Holman told Mr. Brookins that he could reapply to the company, but that he would have to wait six months before

135

reapplying. Mr. Brookins reapplied to a number of positions with TSMC Arizona in January 2023 after having been informed by Mr. Holman that TSMC Arizona was hiring for new positions. However, Mr. Brookins was not interviewed nor hired for any of these roles. When Mr. Brookins followed up with Mr. Holman, Mr. Holman told Mr. Brookins he was ineligible for rehire due to the nature of his termination.

314.    TSMC's discrimination, hostile work environment, and wrongful termination of Mr. Brookins has taken a significant toll on him both financially and emotionally. TSMC's wrongful termination caused Mr. Brookins and his family to suffer financial strain, as they struggled to cover daily expenses without savings, and lost important benefits, such as health care coverage (along with other fringe benefits). The financial instability Mr. Brookins suffered while unemployed and searching for new job caused him significant stress and anxiety. Mr. Brookins' wrongful termination also impacted his confidence and self-esteem, and led him to question his abilities. Mr. Brookins also faced embarrassment and social stigma, having been fired from a prominent technology company. Mr. Brookins has suffered harm to his professional reputation as potential employers may perceive Mr. Brookins differently knowing that he has been terminated by TSMC, which could harm his future job prospects in the industry. The combination of financial instability, damaged self-esteem, and emotional distress Mr. Brookins suffered as a result of TSMC's wrongful actions led him to suffer depression, and Mr. Brookins still struggles with the emotional harm caused by TSMC to date.

136

*Mr. Bruner's Experience*

315.    Ronald Bruner is an experienced Quality Assurance Inspector who specializes in aerospace, electronics, and semiconductors. He holds a Bachelor of Business Administration – Logistics, Materials, and Supply Chain Management from Colorado Technical University, has taken 44 credits from Arizona State University in Earth and Space Exploration, and holds a number of relevant certificates. Prior to joining TSMC Arizona, Mr. Bruner worked as a Quality Inspector for ATF Aerospace LLC where he was responsible for aerospace hardware inspection.

316.    Mr. Bruner worked for TSMC Arizona from October 2022 to November 2023 as an Outgoing Quality Assurance Technician. In that role, he was responsible for inspecting wafers and packaging them prior to shipment. However, because the fab was behind schedule for production, Mr. Bruner was tasked with collecting data from within the fab by testing air quality and cleanliness and would also login remotely to Taiwanese servers to visually inspect wafers. He reported to Yi-Min Tang ("Y.M.") who is Taiwanese.

317.    While Mr. Bruner's contract with TSMC did not require him to train in Taiwan, about three weeks after he joined the company, Ms. Tang informed Mr. Bruner that he would nonetheless be required to travel to Taiwan for training. Mr. Bruner agreed to the travel, provided that it was a short-term trip, given his family commitments. Once Mr. Bruner renewed his passport, Ms. Tang informed him that she had booked his travel to Taiwan for slightly less than 90 days, the maximum amount

137

of time he could be abroad without a visa. When Mr. Bruner responded that he could not be in Taiwan for that long, reiterating that he had family commitments, she told him "You don't have a choice. If you cannot go, maybe you don't belong here." Ms. Tang stated that the trip was important as Mr. Bruner needed to "learn the Taiwanese culture."

318.    Mr. Bruner spent approximately 80 days in Taiwan (from March 2023 through May 2023). █████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ In Taiwan, Mr. Bruner was required to attend regular meetings that were conducted only in Mandarin, precluding him from participating and understanding the information being shared. The Taiwanese employees in the fab were hostile to Americans, including Mr. Bruner, and did not want to provide them with training. In fact, the Taiwanese employee who was selected to train Mr. Bruner and his colleagues refused to train them, stating "I don't train Americans, they don't like to listen." Mr. Bruner was forced to rely on Google translate for many of his trainings. Mr. Bruner was also told in Taiwan that he was not as valued by the company given his race, and that he was not as good as the Taiwanese simply because he was American. And when Mr. Bruner and his American colleagues would enter their workspace, they were ignored by their Taiwanese colleagues. The hostile work environment in Taiwan was so severe that Mr. Bruner used vacation time to fly home from Taiwan early.

SECOND AMENDED COMPLAINT

319.     While in the U.S., Mr. Bruner's Taiwanese manager and colleagues made it clear that they viewed him as inferior simply because he was an American, and treated him with hostility. Ms. Tang ignored Mr. Bruner, and would acknowledge and communicate with only the Taiwanese workers (despite walking by Mr. Bruner's desk multiple times per day). Mr. Bruner and his American colleagues were referred to as "lazy" and "not as efficient" as the Taiwanese, and were repeatedly told that "Americans aren't capable of building the fab" and that TSMC needed the Taiwanese in order to be successful in the U.S. These discriminatory comments were made on a daily basis by employees across all job levels, including in meetings, isolating Mr. Bruner and his American team members from the Taiwanese staff.

320.     Mr. Bruner also witnessed TSMC's discriminatory promotion and staffing practices favoring Taiwanese workers. While a number of Mr. Bruner's American coworkers applied for promotions and lateral transfers to other positions, they were denied these opportunities. As a result, Mr. Bruner never applied for a new role within TSMC, as he knew any such efforts would be fruitless in light of TSMC's discriminatory preference for Taiwanese in staffing.

321.     TSMC also subjected non-Taiwanese workers to an unsafe work environment. ████████████████████████████████████████ ████████ TSMC required one of Mr. Bruner's engineers, a physicist in his 60s, to perform inspections on the roof in 115 degree heat—a task that was dangerous and outside of the physicist's normal work duties. TSMC also required Mr. Bruner to

139

perform tasks outside of his job role, including inspecting machines and equipment 40 miles offsite.

322.    Mr. Bruner's employment with TSMC and the company's hostile and discriminatory treatment began impacting his health, and he felt mentally drained even before leaving home for work.

323.    In or around October 2023, Mr. Bruner complained to Human Resources about the discriminatory and hostile work environment. At his meeting with HR, the first question Mr. Bruner was asked was "What nationality is your manager?" When Mr. Bruner responded that his manager was Taiwanese, the HR representative, Brian Hartline, stated that it would be harder to get results, and seemed reluctant to help Mr. Bruner.

324.    In mid-November 2023, Mr. Bruner was constructively discharged by TSMC, having been forced to resign from TSMC Arizona because of the stress and anxiety he suffered as a result of TSMC discriminatory conduct and hostile work environment, in which he was targeted, disrespected, harassed, and made to feel worthless because he was not Taiwanese or Chinese.

*Ms. Kitagawa's Experience*

325.    Rosalie Kitagawa has worked in the semiconductor industry since 2016. Prior to working at TSMC Arizona, she was an Equipment Technician at Micron Technology, where she did preventative maintenance, troubleshooting, and repairs on multiple types of wet etch processing equipment. Prior to that, Ms. Kitagawa was a Wet

140

Cleans Equipment Engineer at NSTAR Global Services where she conducted extensive training of technicians and engineers in the troubleshooting and maintenance of wet etch equipment. Before joining NSTR Global Services, Ms. Kitagawa worked as a Manufacturing Technician at Intel where she operated, maintained, and repaired processing equipment in a cleanroom environment. She has multiple certifications related to installing, maintaining, operating, and monitoring fabs.

326.    Ms. Kitagawa joined TSMC Arizona in July 2023 as an Advanced Technician. Her job, as described by TSMC, was supposed to entail working with vendors and engineers to install, clean, and perform maintenance on fabs—the same type of work with the same type of equipment that she had been performing for multiple years. Ms. Kitagawa was the only person on her team with experience related to the fabs in question, but despite this, she was not allowed to touch the equipment at TSMC. For her first four months at TSMC, Ms. Kitagawa was instead instructed to perform only hard labor or to complete online training, and when she asked to take on other, job-related tasks, she was told by her managers (who were Chinese or Taiwanese) that they would let her know when that would be possible. While Ms. Kitagawa was told that she needed to receive training before working on the machines, she already had the necessary skills, and there was nobody qualified to provide the training. Ms. Kitagawa made multiple complaints to TSMC about not being allowed to handle the equipment but her complaints were summarily dismissed. Ms. Kitagawa escalated her concerns to the area manager, stating that she was trained and capable of working on the equipment,

and that the tasks she had been given were different from those in the job description, but her concerns were dismissed, as were similar concerns raised by other locally hired technicians. At one point, Jamie Hsu, a Lead Engineer, asked one of the technicians why local hires were so sensitive.

327.    Ms. Kitagawa also spoke out frequently about safety concerns, but those complaints were also ignored. For instance, on one occasion, Ms. Kitagawa tripped when she stepped on a loose tile and her foot went through the floor. When she tried to steady herself by grabbing onto a barricade, the barricade itself fell down because it was not properly installed. Luckily, Ms. Kitagawa was not injured, but when she raised awareness of the hazard, she was told to just put cones up around the area (which were constantly being moved). Ms. Kitagawa also tried placing hazardous tape on the floor with labels alerting people to the loose tile, but the company did not like having tape on the floor because it was not "aesthetically pleasing" and she was told to remove the tape. A couple months after Ms. Kitagawa tripped, a vendor suffered the same fate, but he was seriously injured. In addition, due to the fabs using extremely dangerous acids and gases, Ms. Kitagawa strongly suggested that TSMC create training sessions educating employees as to what hazards to look out for and how to properly respond to such hazards, but she was told that such training was not necessary.

142

328.    Ms. Kitagawa's team was comprised mostly of assignees from Taiwan and China, but even the local hires to her team were mostly Taiwanese and Chinese employees who spoke Mandarin. An HR representative told Ms. Kitagawa that TSMC listed Mandarin as a requirement in job advertisements (the HR representative explained that TSMC used to list Mandarin as a requirement and had discontinued the practice, but later resumed it). All the new hires that Ms. Kitagawa came across at TSMC were Taiwanese or Chinese, including interns.

329.    Eventually, after a few months, and after additional tools had been installed, Ms. Kitagawa was allowed to perform some limited tasks beyond hard labor. However, she was still precluded from performing a number of fab-related tasks that assignees were allowed to perform, such as troubleshooting and repairing the equipment. Instead, she was relegated to performing only minimal preventative maintenance and only when supervised. However, if there was an immediate issue with the equipment that needed emergency response, Ms. Kitagawa (and others who too had been given limited tasks) were expected to respond immediately, despite TSMC not having trained them on the proper protocol for responding to emergencies. When Ms. Kitagawa and the other non-Taiwanese/Chinese local hires asked about taking on additional responsibility, the constant refrain was that training was required, but the training was not offered to U.S. hires, and when they asked for training, management deflected their requests (while at the same time blaming them for not having the proper training).

143

330.     The turning point for Ms. Kitagawa was when she was chastised and called unqualified simply because TSMC refused to allow her to perform certain tasks. This occurred after an equipment alarm went off and Mr. Kitagawa did not have the privileges to sign off on necessary documents for operations to continue processing. An assignee had to come into work to sign the documents, and the assignee was angry about having to come in and spoke to Ms. Kitagawa rudely. Ms. Kitagawa's team lead, Jerry Lin, said that it was ridiculous that Ms. Kitagawa did not have privileges and that she did not know how to perform her job and was in no position to be working at TSMC. Ms. Kitagawa also witnessed other non-Taiwanese/Chinese employees being subjected to similar discriminatory treatment. For instance, a local hire process engineer from wet etch would frequently come to Ms. Kitagawa's desk, crying and stressed because her Taiwanese manager overloaded her with work, prohibiting her from leaving until that work was done (sometimes forcing her to stay until 3:00 a.m. while allowing assignees to leave early), and yelled at her. The vendors that supported the equipment also vented to Ms. Kitagawa about being mistreated by assignees at TSMC, including being yelled and cursed at for making mistakes on the equipment. Ms. Kitagawa also heard from senior vendors that she had previously worked with at other fabs that they had assisted at TSMC a few times but refused to go back due to TSMC's mistreatment.

331.     Ms. Kitagawa was constructively discharged by TSMC Arizona, having been forced to resign due to the company's discriminatory conduct and the hostile work environment described above.

144

SECOND AMENDED COMPLAINT

*Mr. Block's Experience*

332.    Cody Block is a Maintenance Technician who has taken classes in Electronics and is certified in forklifts and other heavy equipment and machinery. Prior to joining TSMC Arizona, Mr. Block worked for Intel for four years as an Equipment Technician where he completed preventative maintenance, calibrations, and repair on various tool sets.

333.    Mr. Block worked for TSMC Arizona from May 2023 to October 6, 2023. While Mr. Block was hired as a Maintenance Technician and anticipated overseeing tool installations, his day-to-day job responsibilities stood in stark contrast to the TSMC job description. While TSMC maintained Taiwanese engineers onsite in Arizona, Mr. Block was required to perform the engineers' job duties while they stood by idly. For instance, Mr. Block was tasked with writing detailed reports at the start, middle, and end of his shifts, and creating PowerPoint presentations detailing the tool installation progress for each day. Mr. Block was also required to oversee TSMC vendors and to ensure that they remained on track for the fab's construction. When Mr. Block asked his manager, Raven (full name unknown) who is Taiwanese, why Mr. Block was being asked to complete the writeups instead of the engineers, Raven screamed at Mr. Block in front of his colleagues, stating: "You're an American, you need to do as I say, and not give any backlash." Raven also called Mr. Block a "piece of shit" and said, "you don't know what you're doing." Raven's treatment of Mr. Block was in line with TSMC's practice of publicly humiliating and denigrating those who

speak out against TSMC's practices.

334.    Mr. Block's team at TSMC was predominantly Taiwanese, and just four of his team members were non-Taiwanese local hires. Mr. Block's Taiwanese colleagues would ignore him and speak Mandarin in the office, thereby excluding Mr. Block from the conversations. They would also stare nastily at Mr. Block and make gestures of disgust towards him. At morning meetings, it was common for TSMC management to scream at non-Taiwanese, local workers and to tell them that they were useless. When non-Taiwanese workers were constructively discharged by TSMC as a result of this conduct, TSMC replaced them with assignees from Taiwan.

335.    Mr. Block filed a complaint with Human Resources, reporting his manager's conduct to Katherine Ye (who is Taiwanese) and another HR employee (who is American). But HR did not take Mr. Block's complaint seriously, and Mr. Block's manager was not reprimanded or punished for his conduct.

336.    Working conditions at TSMC were also poor. Mr. Block was expected to work 12-hour shifts in the fab where there was no air conditioning. TSMC also had electric, gas, and chemicals running in the same general area, and electric panels below water supplies, both of which create unsafe working conditions.

337.    On October 6, 2023, Mr. Block was constructively discharged by TSMC, having been forced to resign due to the hostile work environment and discriminatory treatment from his manager and Taiwanese colleagues.

## CLASS ACTION ALLEGATIONS

146

338.    Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TSMC's systematic pattern and practice of discrimination against individuals not of East Asian race and not of Taiwanese or Chinese national origin/citizenship in the United States and TSMC's hostile work environment impacting these same groups. This action is brought on behalf of the following classes:

> All non-East Asian, non-Taiwanese, and non-Chinese individuals who: (1) applied for positions with or within TSMC North America, TSMC Technology, TSMC Arizona and/or TSMC Washington in the United States and were not hired, (2) were employed by one or more of these entities (including contractors), but were not promoted, and/or (3) were employed by one or more of these entities (including contractors) and were involuntarily terminated or constructively discharged.

> All individuals who are not Taiwanese or Chinese citizens who : (1) applied for positions with or within TSMC North America, TSMC Technology, TSMC Arizona and/or TSMC Washington in the United States and were not hired, (2) were employed by one or more of these entities (including contractors), but were not promoted, and/or (3) were employed by one or more of these entities (including contractors) and were involuntarily terminated or constructively discharged.

339.    Members of the classes are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to number in the thousands. Furthermore, class members are readily identifiable from information and records in TSMC possession.

147

SECOND AMENDED COMPLAINT

340.     There are numerous questions of law and fact common to members of the classes. Among the common questions of law or fact are:  (a) whether TSMC has engaged in a pattern or practice of intentional discrimination against non-East Asians, non-Taiwanese nationals, and non-Chinese nationals in its hiring, staffing, appraisal, promotion, and termination decisions; (b) whether TSMC has intentionally favored East Asians, Taiwanese nationals, and Chinese nationals (including those on visas) in hiring, staffing, appraisal, promotion, and retention decisions and/or whether TSMC has intentionally disfavored non-East Asians, non-Taiwanese nationals, and non-Chinese nationals in hiring, staffing, appraisal, promotion, and termination decisions; (c) whether TSMC's employment practices have resulted in a disparate impact on those who are not of East Asian race and not of Taiwanese or Chinese national origin; (d) whether TSMC has created a hostile work environment for non-East Asians and non-Taiwanese and non-Chinese nationals; (e) whether TSMC has violated § 1981; (f) whether TSMC has violated Title VII; (g) whether equitable and injunctive relief is warranted for the classes; and (h) whether compensatory and/or punitive damages are warranted for the classes.

341.     Plaintiffs' claims are typical of the classes. Members of the classes were damaged by the same discriminatory policies and practices employed by TSMC in favor of East Asians and Taiwanese and Chinese citizens.

342.     Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with

148

those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent Plaintiffs and the classes.

343.     Plaintiffs and the classes they seek to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of TSMC's actions.

344.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TSMC has acted and/or refused to act on grounds generally applicable to the classes, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the classes as a whole. Members of the classes are entitled to declaratory and injunctive relief to end TSMC's systematic, common, uniform, unfair, and discriminatory policies and practices, and resulting hostile work environment.

345.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary questions common to the class are whether TSMC has discriminated on the basis of race, national origin, and citizenship in its employment practices and whether TSMC has created a hostile work environment. These questions are central to the case and predominate over individual issues among the members of the proposed classes. TSMC has engaged in a common course of discriminatory and

hostile conduct in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

346.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TSMC's discrimination and hostile work environment. Certification under this rule is also appropriate to decide whether TSMC has adopted a systemic pattern and practice of racial, national origin, and citizenship discrimination in hiring, staffing, appraisal, promotion, and retention/termination decisions and whether TSMC's conduct creates a hostile work environment. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

**COUNT I**
**(Disparate Treatment on the Basis of Race)**
**(Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of all Plaintiffs and the Class)**

347.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

348.    This claim is brought by Plaintiffs on behalf of themselves and the class.

349.    Throughout the class liability period, TSMC has engaged in a pattern and

150

practice of discriminating against individuals who are not of East Asian race by: (a) knowingly and intentionally favoring individuals of East Asian race in employment decisions (i.e., hiring/staffing, appraisal, promotion, and termination decisions), (b) knowingly and intentionally disfavoring individuals who are not of East Asian race (including Plaintiffs) in employment decisions (i.e., hiring/staffing, appraisal, promotion, and termination decisions), and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 90% or more East Asian employees.

350.    As a direct and proximate result of TSMC's intentional discrimination, Plaintiffs and class members have been denied employment and continued employment with TSMC.

351.    TSMC's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

**COUNT II**
**(Disparate Treatment on the Basis of Citizenship)**
**(Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of all Plaintiffs and the Class)**

352.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

353.    This claim is brought by Plaintiffs on behalf of themselves and the class.

354.    Throughout the class liability period, TSMC has engaged in a pattern and practice of discriminating against individuals who are not Taiwanese citizens or Chinese citizens by: (a) knowingly and intentionally favoring Taiwanese and Chinese

151

citizens in employment decisions (i.e., hiring/staffing, appraisal, promotion, and termination decisions), and (b) knowingly and intentionally disfavoring individuals who are not Taiwanese and not Chinese citizens (including Plaintiffs) in employment decisions (i.e., hiring/staffing, appraisal, promotion, and termination decisions).

355.    As a direct and proximate result of TSMC's intentional discrimination, Plaintiffs and class members have been denied employment and continued employment with TSMC.

356.    TSMC's actions constitute unlawful discrimination on the basis of citizenship in violation of 42 U.S.C. § 1981.

**COUNT III**
**(Hostile Work Environment on the Basis of Race)**
**(Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of Plaintiffs and the Class)**

357.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

358.    This claim is brought by Plaintiffs on behalf of themselves and the class.

359.    Throughout the class liability period, TSMC has created a hostile work environment for individuals who are not East Asian by: (a) constantly yelling at non-East Asian workers and referring to them as "stupid" or "lazy;" (b) excluding them from meetings or business-related conversations (which are often conducted in Mandarin); (c) denying them trainings, as training materials are in written in Chinese; (d) withholding from them critical information needed to perform their jobs, thereby thwarting non-East Asian employees' ability to advance within TSMC; (e)

152

downplaying or discrediting their strong performances; (f) reviewing them more harshly, resulting in lower appraisal scores, and fewer promotions or opportunities for advancement; (g) talking to them in a condescending manner; (h) discrediting their opinions; (i) publicly humiliating them in front of coworkers; and (j) micromanaging them and stripping them of job responsibilities. As a result of TSMC's hostile work environment, many non-East Asian employees are forced to take protected FMLA leave due to the incredible stress and anxiety caused by TSMC's conduct, and are oftentimes constructively discharged by the company.

360.    An objectively reasonable person would find that, as a whole, the environment within TSMC was hostile. And TSMC leadership was on notice of this hostile work environment, having received multiple employee complaints, but took no remedial action.

361.    TSMC's hostile work environment constitutes a violation of 42 U.S.C. § 1981.

**<u>COUNT IV</u>**
**(Disparate Treatment on the Basis of Race and National Origin)**
**(Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley and the Class)**

362.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

363.    This claim is brought by Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley on behalf of themselves and the class.

153

364.    Throughout the class liability period, TSMC has engaged in a pattern and practice of discriminating against individuals who are not of East Asian race or Taiwanese/Chinese national origin by: (a) knowingly and intentionally favoring East Asian and Taiwanese and Chinese individuals in employment decisions (i.e., hiring/staffing, appraisal, promotion, and termination decisions), and (b) knowingly and intentionally disfavoring individuals who are not East Asian or Taiwanese or Chinese (including Plaintiffs) in employment decisions (i.e., hiring/staffing, appraisal, promotion, and termination decisions), and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 90% or more East Asian employees (of Taiwanese or Chinese descent).

365.    As a direct and proximate result of TSMC's intentional discrimination, Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley and class members have been denied employment and continued employment with TSMC.

366.    TSMC's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq*.

**COUNT V**
**(Disparate Impact on the Basis of Race and National Origin)**
**(Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley and the Class)**

367.    Plaintiffs re-allege each preceding paragraph as though fully set forth

154

SECOND AMENDED COMPLAINT

herein.

368.    This claim is brought by Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley on behalf of themselves and the class.

369.    Throughout the class liability period, TSMC has engaged in policies and practices relating to hiring, staffing, appraisals, and termination/retention decisions described herein that have resulted in a disparate impact on non-East Asians and non-Taiwanese/Chinese individuals who, as a result, are disproportionately not hired, not selected for positions, appraised poorly (and therefore not promoted), and/or terminated or constructively discharged. These practices are neither job-related for the positions at issue nor consistent with business necessity.

370.    TSMC's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq*.

## COUNT VI
**(Hostile Work Environment on the Basis of Race and National Origin)**
**(Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2))**
**(On behalf of Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley and the Class)**

371.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

372.    This claim is brought by Plaintiffs Howington, Huizar, Carrier, Winn, Prieto, Zepeda, Sterbinsky, Langley, and Lindley on behalf of themselves and the class.

373.    Throughout the class liability period, TSMC has created a hostile work environment for individuals not of East Asian race or Taiwanese/Chinese national

155

origin by: (a) constantly yelling at non-East Asian and non-Taiwanese/Chinese workers and referring to them as "stupid" or "lazy;" (b) excluding them from meetings or business-related conversations (which are often conducted in Mandarin); (c) denying them trainings, as training materials are in written in Chinese; (d) withholding from them critical information needed to perform their jobs, thereby thwarting non-East Asian and non-Taiwanese/Chinese employees' ability to advance within TSMC; (e) downplaying or discrediting their strong performances; (f) reviewing them more harshly, resulting in lower appraisal scores, and fewer promotions or opportunities for advancement; (g) talking to them in a condescending manner; (h) discrediting their opinions; (i) publicly humiliating them in front of coworkers; and (j) micromanaging them and stripping them of job responsibilities. As a result of TSMC's hostile work environment, many non-East Asian and non-Taiwanese/Chinese employees are forced to take protected FMLA leave due to the incredible stress and anxiety caused by TSMC's conduct, and are oftentimes constructively discharged by the company.

374.    An objectively reasonable person would find that, as a whole, the environment within TSMC was hostile. And TSMC leadership was on notice of this hostile work environment, having received multiple employee complaints, but took no remedial action.

375.    TSMC's hostile work environment constitutes a violation of 42 U.S.C. § 2000e, *et seq*.

156

**COUNT VII**
**(Retaliation in Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of Plaintiffs Howington, Perry, McKinley, Wyse, Haley, Holmes, and Brookins)**

376.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

377.    This claim is brought by Plaintiffs Howington, Perry, McKinley, Wyse, Haley, Holmes, and Brookins on behalf of themselves.

378.    Plaintiffs Howington, Perry, McKinley, Haley, Holmes, and Brookins engaged in a protected activity under Section 1981 by reporting to TSMC concerns about the corporation's discriminatory practices and hostile work environment, including its preference for East Asians and Taiwanese/Chinese citizens in hiring and other employment decisions. Ms. Wyse engaged in protected activity under Section 1981 by reporting safety concerns at TSMC to OSHA.

379.    Plaintiffs Howington, Perry, McKinley, Wyse, Haley, Holmes, and Brookins suffered harm as a result of engaging in this protected activity. Ms. Howington, for example, was given a negative performance review, threatened to be placed on a PIP, subjected to a hostile work environment, and had her responsibilities curtailed, requiring her to take a leave of absence. Mr. Perry was the victim of an anonymous, unsubstantiated complaint by TSMC to his subsequent employer, Oracle, which put his employment at risk, and when Mr. McKinley complained of discriminatory and unfair treatment, TSMC's conduct only worsened and Mr.

157

McKinley was ultimately fired by TSMC. Similarly, after Ms. Wyse filed her OSHA complaint, she was stripped of her position, laptop, and email address, forced to sit alone in a "staff aug room" for hours at a time, and transferred, without consultation, to a more dangerous department and denied proper PPE and training. Shortly after Mr. Haley raised complaints with TSMC, he was given an unjustifiably low performance rating, his workload was doubled, and he was constructively discharged. After Mr. Holmes complained, his work schedule was repeatedly changed without his knowledge, he was berated by his manager, and excluded from a team building dinner. And Mr. Brookins was harassed and humiliated by his Taiwanese colleague after raising concerns and then wrongfully terminated by TSMC.

380.    A causal link exists between the harm Plaintiffs Howington, Perry, McKinley, Wyse, Haley, Holmes and Brookins suffered and the protected activity. TSMC retaliated against Ms. Howington, Mr. Perry, Mr. McKinley, Ms. Wyse, Mr. Haley, Mr. Holmes, and Mr. Brookins because they engaged in protected activity under Section 1981. Ms. Howington, for example, was given a negative performance review, threatened to be placed on a PIP, and subjected to hostile treatment shortly after complaining about TSMC's discriminatory employment practices, including the company's discriminatory preference for East Asian and Taiwanese citizens and its practice of conducting meetings in Mandarin. Mr. Perry was retaliated against by having a complaint lodged against him by TSMC with his subsequent employer, which put his employment at risk, and Mr. McKinley experienced increasingly hostile

158

treatment shortly after he complained, resulting in his termination. Similarly, after Ms. Wyse filed her OSHA complaint, she was stripped of her position, laptop, and email address, forced to sit alone in a "staff aug room" for hours at a time, and transferred, without consultation, to a more dangerous department and denied proper PPE and training. Shortly after Mr. Haley raised complaints with TSMC, he was retaliated against by being given an unjustifiably low performance rating, his workload was doubled, and he was constructively discharged. After Mr. Holmes complained, his work schedule was repeatedly changed without his knowledge, he was berated by his manager, and excluded from a team building dinner. And Mr. Brookins was harassed and humiliated by his Taiwanese colleague after raising concerns and then wrongfully terminated by TSMC. But for TSMC's retaliation, Plaintiffs Howington, Perry, McKinley, Wyse, Haley, Holmes, and Brookins would not have been treated in such a hostile manner and subjected to changes in the terms and conditions of their employment.

381.    TSMC's actions constitute unlawful retaliation in violation of 42 U.S.C. § 1981.

**COUNT VIII**
**(Retaliation in Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiff Howington)**

382.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

383.    This claim is brought by Plaintiff on behalf of herself.

159

384.    Ms. Howington engaged in a protected activity under Title VII by reporting to TSMC concerns about the corporation's discriminatory practices and hostile work environment, including its preference for East Asians and Taiwanese/Chinese citizens in hiring and other employment decisions.

385.    Ms. Howington suffered harm as a result of engaging in this protected activity. She was given a negative performance review, threatened to be placed on a PIP, subjected to a hostile work environment, and had her responsibilities curtailed, requiring her to take a leave of absence.

386.    A causal link exists between the harm Ms. Howington suffered and the protected activity. TSMC retaliated against Ms. Howington because she engaged in protected activity under Title VII. Ms. Howington was given a negative performance review, threatened to be placed on a PIP, and subjected to hostile treatment shortly after complaining about TSMC's discriminatory employment practices, including the company's discriminatory preference for East Asian and Taiwanese citizens and its practice of conducting meetings in Mandarin. But for TSMC's retaliation, Ms. Howington would not have been treated in such a hostile manner and subjected to changes in the terms and conditions of her employment.

387.    TSMC's actions constitute unlawful retaliation in violation of 42 U.S.C. § 2000e, *et seq.*

160

SECOND AMENDED COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the classes pray for relief as follows:

a. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Designation of Plaintiffs as representatives of the classes;

c. Designation of Plaintiffs' counsel as counsel for the classes;

d. A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981 and the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2;

e. A permanent injunction against Defendants and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f. Order Defendants to adopt a valid, non-discriminatory method for hiring, staffing, performance appraisals, termination, and other employment decisions;

g. Order Defendants to post notices concerning its duty to refrain from discriminating against employees on the basis of race, national origin, and citizenship;

h. Award Plaintiffs and the Classes compensatory damages for the harm they suffered as a result of Defendants' violations § 1981 and Title VII;

i. Award Plaintiffs and the Classes pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendants' discriminating against them in violation of § 1981 and Title VII;

j. Award Plaintiffs and the Classes front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

k. Award Plaintiffs and the Classes exemplary and punitive damages;

l. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m. Award Plaintiffs and the Classes such other relief as this Court deems just and appropriate.

SECOND AMENDED COMPLAINT

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the Classes respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED:  February __, 2025                    Respectfully submitted,

By: /s/Daniel Low
Daniel Low, SBN 218387
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com

*Attorney for Plaintiffs and the Classes*

162

SECOND AMENDED COMPLAINT